**ORIGINAL**

1   STEPHANIE STEVENS (STATE BAR NO. 236034)
    KERSTIN ARUSHA (STATE BAR NO. 182624)
2   **LAW FOUNDATION OF SILICON VALLEY**
    111 West Saint John Street, #315
3   San Jose, CA 95113
    Telephone: (408) 280-2448
4   Facsimile: (408) 293-0106
    Email: stephanies@lawfoundation.org
5          kerstina@lawfoundation.org

6   WILLIAMS J. GOINES (STATE BAR NO. 61290)
    KAREN ROSENTHAL (STATE BAR NO. 209419)
7   CINDY HAMILTON (STATE BAR NO. 217951)
    ALISHA M. LOUIE (STATE BAR NO. 240863)
8   **GREENBERG TRAURIG LLP**
    1900 University Avenue, Fifth Floor
9   East Palo Alto, CA 94303
    Telephone: (650) 328-8500
10  Facsimile: (650) 328-8508
    Email: goinesw@gtlaw.com
11         rosenthalk@gtlaw.com
           hamiltonc@gtlaw.com
12         louiea@gtlaw.com

13  Attorneys for Plaintiffs

14

ADR
E-FILING
FILED
MAR 1 9 2007
RICHARD W. WIEKING
CLERK, U.S DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

#5
Fees Pd
SJ

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17  MARIA A. GARVIN, JESUS ARREOLA,        **C07   01571**   **RS**
18  ANTONIA ARREOLA, RAFAEL M.          Case No.
    BRAVO, TOMAS HERNANDEZ,
19  MARTHA HERNANDEZ, JUAN              **COMPLAINT FOR DAMAGES,**
    RAMIREZ, MARIA C. RAMIREZ,          **INJUNCTIVE RELIEF, AND**
20  EUGENIO RAMOS, COLUMBA RAMOS,       **DECLARATORY RELIEF**
    PROSPERO TORRALBA AND CIRILA
21  TORRALBA,

22              Plaintiff(s);           **DEMAND FOR JURY TRIAL**
    v.
23
    LINDA TRAN; ABSOLUTE INVESTMENT
24  GROUP, INC., a California corporation doing
    business as PALACIO MORTGAGE;
25  NORMA VALDOVINOS; RAYA GHAJAR;
    PABLO CURIEL; PABLO CURIEL doing
26  business as DOWNPAYMENT
    ASSISTANCE; PAUL CURIEL; PAUL
27  CURIEL INSURANCE AGENCY;
    PALACIO REAL FUNDINGS, INC., a
28  California corporation, doing business as

                                              COMPLAINT I

1  PALACIO FUNDINGS; GOLDEN HILLS
   ASSOCIATES, INC., a California
2  corporation doing business as CENTURY 21
   GOLDEN HILLS; and TARA HOME
3  FINANCIAL SERVICES, INC., a California
   corporation,
4
                    Defendants.
5

## INTRODUCTION

1. This is an action for declaratory judgment, permanent injunctive relief, and damages for a conspiracy targeting Hispanic households for predatory loans. Predatory and abusive lending practices inflict wide-ranging damage on society; borrowers and their families can be devastated by these practices, which often result in non-judicial foreclosure of the borrowers' homes. Defendants in this action preyed upon plaintiffs through predatory and abusive lending practices, including making misrepresentations about essential terms of the loans, using bait and switch tactics and duress, charging unreasonable and unearned fees, falsifying information on loan applications, failing to translate important loan documents from English to Spanish, and including unexpected and problematic loan terms such as balloon payments, pre-payment penalties, and negative amortization. Plaintiffs seek rescission of the predatory loans in which they are trapped, equitable relief, and monetary damages.

2. The experience of the seven Plaintiff households was remarkably similar. The real estate agents, Defendants Norma Valdovinos, Jesus Chavez, and their company, Century 21 Golden Hills (collectively, the "real estate agent Defendants"), recruited Spanish-speaking individuals to purchase homes, stating that the homes being shown, which cost more than $500,000, would have loan payments of only a couple of thousand dollars per month. After convincing the Plaintiffs to make high purchase offers, the real estate agent Defendants referred the Plaintiffs to the mortgage broker Defendants – Linda Tran, Raya Ghajar, and their company, Tara Home Financial or Absolute Investments (collectively, the "mortgage broker Defendants").

3. Defendants falsified each Plaintiff's loan application, unbeknownst to Plaintiffs. The mortgage broker Defendants typically obtained two loans through large lenders for each Plaintiff household and lied to Plaintiffs about the onerous terms of the loans, failing to disclose their negative

SV 346132979v4

amortization, balloon payments, variable interest rates, and prepayment penalties. These loans were not only worse for the Plaintiffs than loans they should have received based upon Plaintiffs' objective circumstances, but were more profitable to the lenders, leading the lenders to pay the mortgage broker Defendants additional fees. The mortgage broker Defendants routinely told Plaintiffs not to worry about their loans because their properties would appreciate and they would assist then to refinance, and in fact some Plaintiffs did refinance with the mortgage broker Defendants seeking to lower their monthly payments. While the loans were negotiated in Spanish, all of the loan documents were exclusively in English, contrary to law.

4. The mortgage broker Defendants put all Plaintiffs into an additional loan with Defendant Pablo Curiel, an individual lender who specializes in "down payment" loans to Hispanic borrowers. Plaintiffs either were never told by Defendants about the loan, and/or were not told the terms of the loan. Defendant Pablo Curiel's loans involved an undisclosed upfront fee of approximately 15% of the loan amount, 10% interest-only payments for two years, and a balloon payment of the entire original loan amount due in two years.

5. Defendants arranged for many Plaintiffs to unknowingly pay for homeowners' insurance, from Plaintiffs' loan proceeds, through Defendant Paul Curiel and/or his company, Paul Curiel Insurance Agency or his employer, Farmer's Insurance. Plaintiffs knew nothing about the policies and had no opportunity to negotiate their terms.

6. Plaintiffs, who are unsophisticated and have limited English skills, relied heavily upon the expertise of Defendants in the real estate field. Whenever a Plaintiff questioned any part of the transaction, Defendants, who owed Plaintiffs a fiduciary duty of loyalty, made false statements or threats to ensure that the transactions occurred.

7. The real estate agent Defendants received hefty, inordinate commissions and sometimes additional kickbacks from each transaction. The mortgage broker Defendants received high fees financed through the transactions, often in conjunction with extra payments from the lenders for putting Plaintiffs in worse loans than they would otherwise qualify for. Defendant Pablo Curiel received a very large fee and over-market interest on his two-year loans. Defendant Paul Curiel and his insurance agency received unearned business, commissions, and kickbacks. Defendants failed to

1   disclose to Plaintiffs exactly how and in what amount they were to be compensated through the

2   purchase and refinance transactions.

3       8. Plaintiffs, who trusted Defendants, received only untenable loans with looming,

4   undisclosed balloon payments and skyrocketing interest rates.

5       9. Plaintiffs now struggle to meet their monthly mortgage obligations and face the loss of their

6   homes through foreclosure.

7   **JURISDICTION AND VENUE**

8       10.   Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. section 1331 in that the

9   claims alleged herein arise under the laws of the United States.   This Court has supplemental

10   jurisdiction pursuant to 28 U.S.C. section 1367 to hear and determine plaintiffs' state law claims

11   because those claims are related to plaintiffs' federal claims and arise out of a common nucleus of

12   related facts and form part of the same case or controversy under Article III of the United States

13   Constitution.

14       11.   The Court has jurisdiction over plaintiffs' action for declaratory relief pursuant to 28

15   U.S.C. section 2201 and Rule 57 of the Federal Rules of Civil Procedure.   Injunctive relief is

16   authorized by 28 U.S.C. section 2203 and Rule 65 of the Federal Rules of Civil Procedure.

17       12.   Venue is proper in the Northern District of California Pursuant to 28 U.S.C. section

18   1391(b)(2) in that the unlawful conduct that gave rise to these claims occurred within the Northern

19   District of California.

20   **INTRADISTRICT ASSIGNMENT**

21       13.   Intradistrict assignment in San Jose, California is proper because the unlawful conduct

22   that gives rise to the alleged claims occurred in Santa Clara County.

23   **PARTIES**

24       14.   Plaintiff Maria Argentina Garvin is a Hispanic woman who traces her national origin to

25   Mexico.  At all relevant times alleged herein, Maria Argentina Garvin was over the age of 18 and a

26   resident of Santa Clara County.  At all relevant times alleged herein, Maria Argentina Garvin had

27   only limited understanding of the English language.   Accordingly, all communications by and to

28

1   Maria Argentina Garvin alleged herein occurred in the Spanish language, unless specifically alleged

2   otherwise.

3       15.   Plaintiff Raul Gonzalez is a Hispanic man who traces his national origin to Mexico.  At

4   all relevant times alleged herein, Raul Gonzalez was over the age of 18 and a resident of Santa Clara

5   County.  At all relevant times alleged herein, Raul Gonzalez had only limited understanding of the

6   English language.  Accordingly, all communications by and to Raul Gonzalez alleged herein occurred

7   in the Spanish language, unless specifically alleged otherwise.

8       16.   Plaintiff Antonia Arreola is a married Hispanic woman who traces her national origin to

9   Mexico.  At all relevant times alleged herein, Antonia Arreola was over the age of 18 and a resident

10   of Santa Clara County and spoke only Spanish.

11       17.   Plaintiff Jesus Arreola is the husband of Antonia Arreola.  He is a Hispanic man over the

12   age of 18 who traces his national origin to Mexico.

13       18.   Plaintiff Tomas Hernandez is a married Hispanic man who traces his national origin to

14   Mexico.  At all relevant times alleged herein, Tomas Hernandez was over the age of 18 and a resident

15   of Santa Clara County.  At all relevant times alleged herein, Tomas Hernandez spoke limited English,

16   and was not proficient in reading or writing in the English language.  Accordingly, all

17   communications involving Tomas Hernandez alleged herein occurred in the Spanish language, unless

18   specifically alleged otherwise.

19       19.   Plaintiff Martha Hernandez is a Hispanic woman who is married to Tomas Hernandez

20   and  who traces her national origin to Mexico.  At all relevant times alleged herein, Martha

21   Hernandez was over the age of 18 and a resident of Santa Clara County.  At all relevant times alleged

22   herein, Plaintiff Martha Hernandez spoke minimal, if any, English, and did not read or write in the

23   English language.  Accordingly, all communications involving Martha Hernandez alleged herein

24   occurred in the Spanish language, unless specifically alleged otherwise.

25       20.   Plaintiff Eugenio Ramos is a married Hispanic man who traces his national origin to

26   Mexico.  At all relevant times alleged herein, Eugenio Ramos was over the age of 18 and a resident

27   of Santa Clara County.  At all relevant times alleged herein, Eugenio Ramos spoke minimal English,

28   and was not proficient in reading or writing in the English language.  Accordingly, all

1   communications involving Eugenio Ramos alleged herein occurred in the Spanish language, unless

2   specifically alleged otherwise.

3      21. Plaintiff Columba Ramos is a Hispanic woman who is married to Eugenio Ramos and

4   who traces her national origin to Mexico. At all relevant times alleged herein, Columba Ramos was

5   over the age of 18 and a resident of Santa Clara County. At all relevant times alleged herein, Plaintiff

6   Columba Ramos spoke minimal, if any, English, and did not read or write in the English language.

7   Accordingly, all communications involving Columba Ramos alleged herein occurred in the Spanish

8   language, unless specifically alleged otherwise.

9      22. Plaintiff Juan Ramirez is a Hispanic man who traces his national origin to Mexico. At all

10   relevant times alleged herein, Juan Ramirez was over the age of 18 and a resident of Santa Clara

11   County. At all relevant times alleged herein, Plaintiff Juan Ramirez spoke minimal, if any, English,

12   and did not read or write in the English language. Accordingly, all communications involving Juan

13   Ramirez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

14      23. Plaintiff Maria Conception Ramirez is the wife of Juan Ramirez.. At all relevant times

15   alleged herein, Maria Ramirez was over the age of 18 and a resident of Santa Clara County. At all

16   relevant times alleged herein, Plaintiff Maria Ramirez spoke minimal, if any, English, and did not

17   read or write in the English language. Accordingly, all communications involving Maria Ramirez

18   alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

19      24. Plaintiff Prospero Torralba is a married Hispanic man who traces his national origin to

20   Mexico. At all relevant times alleged herein, Prospero Torralba was over the age of 18 and a resident

21   of Santa Clara County. At all relevant times alleged herein, Plaintiff Prospero Torralba spoke limited

22   English, and did not competently read or write in the English language. Accordingly, all

23   communications with Prospero Torralba alleged herein occurred in the Spanish language, unless

24   specifically alleged otherwise.

25      25. Plaintiff Rafael Maldonado Bravo is a Hispanic man who traces his national origin to

26   Mexico. At all relevant times alleged herein, Rafael Maldonado Bravo was over the age of 18 and a

27   resident of Santa Clara County. At all relevant times alleged herein, Plaintiff Rafael Maldonado

28   Bravo spoke minimal English, and was not proficient in reading or writing in the English language.

1   Accordingly, all communications with Rafael Maldonado Bravo alleged herein occurred in the

2   Spanish language, unless specifically alleged otherwise.

3   26. Plaintiff Tomas Hernandez is a Hispanic man who traces his national origin to Mexico.

4   At all relevant times alleged herein, Tomas Hernandez was over the age of 18 and a resident of Santa

5   Clara County. At all relevant times alleged herein, Plaintiff Tomas Hernandez spoke no English and

6   did not read or write in the English language. Accordingly, all communications involving Tomas

7   Hernandez alleged herein occurred in the Spanish language, unless specifically alleged otherwise.

8   27. Plaintiff Juan Ramirez is a Hispanic man who traces his national origin to Mexico. At all

9   relevant times alleged herein, Juan Ramirez was over the age of 18 and a resident of Santa Clara

10   County. At all relevant times alleged herein, Plaintiff Juan Ramirez spoke limited English, and did

11   not read or write in the English language. Accordingly, all communications involving Juan Ramirez

12   alleged in this Complaint occurred in the Spanish language, unless specifically alleged otherwise.

13   28. At all relevant times alleged herein, Defendant Norma Valdovinos was a natural person

14   over the age of 18 whom Plaintiffs are informed and believe was licensed as a real estate agent by the

15   California Department of Real Estate and who was an employee and agent of Defendant Century 21

16   Golden Hills.

17   29. At all relevant times alleged herein, Defendant Linda Tran was a natural person over the

18   age of 18, a loan agent, and an employee and agent of Defendant Absolute Investment Group, Inc.,

19   doing business as Palacio Mortgage and/or Tara Home Financial. Plaintiffs are informed and believe

20   that at all relevant time Linda Tran was a licensed salesperson by the California Department of Real

21   Estate.

22   30. Plaintiffs are informed and believe that, at all relevant times, Defendant Pablo Curiel was

23   a natural person over the age of 18. Plaintiffs are informed and believe that, at all relevant times,

24   Defendant Pablo Curiel does business as Downpayment Assistance or Down payment Assistance.

25   31. Defendant Pablo Curiel is a creditor who regularly extended credit and extended far

26   more than five residential real estate loans in each of 2004, 2005, and 2006.

27   32. Defendant Pablo Curiel does not hold a valid license to issue real estate loans in

28   California.

33.   Defendant Pablo Curiel made two or more high cost loans, as defined by 15 U.S.C. § 1602(aa), in the 12 months preceding issuing loans to Plaintiffs.

34.   Defendant Pablo Curiel extended credit of more than $1 million in each of the following years: 2004, 2005, and 2006.

35.   Defendant Pablo Curiel issued a vastly disproportionate number of subprime loans, likely to be predatory, to Hispanic borrowers in Santa Clara County, between 2004 and 2006.

36.   Plaintiffs are informed and believe that, at all relevant times, Defendant Paul Curiel was a natural person over the age of 18.

37.   Plaintiffs are informed and believe that, at all relevant times, Defendant Paul Curiel was an agent of Paul Curiel Insurance Agency.   Paul Curiel was also an agent  and/or employee of Farmer's Insurance Agency.

38.   Plainitffs are informed and believe that Paul Curiel is the son or other relative of Defendant Pablo Curiel.

39.   Defendant Paul Curiel Insurance Agency was, at all relevant times, a California corporation.   Plaintiffs believe that Paul Curiel Insurance Angecy is in fact the alter ego of Paul Curiel.

40.   Plaintiffs are informed and believe that, at all relevant times, Defendant Jesus Chavez was a natural person over the age of 18 whom Plaintiffs are informed and believe was licensed as a real estate agent by the California Department of Real Estate and who was an employee and agent of Defendant Century 21 Golden Hills.

41.   Plaintiffs are informed and believe that, at all relevant times, Defendant Raya Ghajar was a natural person over the age of 18.   Plaintiffs are informed and believe that at all relevant times alleged herein, Raya Ghajar held a broker's license issued by the California Department of Real Estate. Plaintiffs are further informed and believe that at all relevant time alleged herein, Raya Ghajar was the designated broker and for both Tara Home Financial and Absolute Investment Group, Inc.

42.   Plaintiffs are informed and believe that, at all relevant times mentioned in this Complaint, Defendant Golden Hills Associates, Inc., a California corporation doing business as Century 21 Golden Hills was and is a California corporation, which regularly conducted business

1 | activity with Santa Clara County residents.  Plaintiffs are informed and believe that Century 21
2 | Golden Hills' business activity included the representation of parties in residential real estate
3 | transactions, as well as soliciting and negotiating loans secured by liens on real property.

4 |   43.  Plaintiffs are informed and believe that, at all relevant times mentioned in this
5 | Complaint, Defendant Palacio Real Funding, Inc. is a now dissolved California corporation which
6 | regularly conducted business activity with Santa Clara County residents.  Plaintiffs are informed and
7 | believe that Palacio Real Funding's business activity included the brokerage or residential real estate
8 | mortgage loans and representation of parties in residential real estate transactions.  Palacio Real
9 | Funding, Inc.'s designated place of business pursuant to the California Secretary of State's records
10 | was 705 Capitol Expressway, San Jose, California, the same address as Defendant Absolute
11 | Investment Group, Inc., doing business as Palacio Mortgage.

12 |   44.  Plaintiffs are informed and believe that, at all relevant times mentioned in this
13 | Complaint, Defendant Tara Home Financial Services, Inc., was and is a currently suspended
14 | California corporation which regularly conducted business activity with Santa Clara County
15 | residents.  Plaintiffs are informed and believe that Tara Home Financials business activity included
16 | the brokerage or residential real estate mortgage loans and representation of parties in residential real
17 | estate transactions.

18 |   45.  Plaintiffs are informed and believe that, at all relevant times mentioned in this
19 | Complaint, Defendant Absolute Investment Group, Inc., a California corporation doing business as
20 | Palacio Mortgage was and is a California corporation which regularly conducted business activity
21 | with Santa Clara County residents. Plaintiffs are informed and believe that Absolute Investment
22 | Group's business activity included the brokerage or residential real estate mortgage loans and
23 | representation of parties in residential real estate transactions.  Pursuant to the California Secretary of
24 | State's Office, Defendant Linda Tran is the designated Agent for Service of Process for Defendant
25 | Absolute Investment Group, Inc., and pursuant to the California Department of Real Estate's records,
26 | Defendant Raya Ghajar is an affiliated licensed broker for Defendant Absolute Investment Group,
27 | Inc.

28 |

46.   At all relevant times alleged herein, all of the defendants were agents, servants and/or employees of each other and were acting within the scope of such agency or employment while engaged in the acts, omissions and other conduct alleged in this complaint, or the alleged acts, omissions and other conduct of each defendant were subsequently ratified or adopted by the other defendants.

## FACTUAL ALLEGATIONS

### Plaintiff Maria Argentina Garvin

47.   Ms. Garvin was and is a single woman and a financially unsophisticated borrower, who traces her national origin to Mexico. Ms. Garvin's first language is Spanish, but she speaks and understands limited English.

48.   Ms Garvin currently resides at 817 Pentz Way in San Jose CA (hereinafter "Pentz Way Property") with her daughter Roxanna Navarez, and son-in-law, Luis Navarez.

49.   Before purchasing the Pentz Way Property, Ms. Garvin and her family rented an apartment in San Jose with her daughter and son-in-law for $1,250 per month.

50.   Sometime in 2005 Ms. Garvin and her family decided that instead of renting, they wanted to purchase a home.

51.·  At this time, Ms. Garvin earned approximately $1,000 per month as a home health aide and her son-in law earned $3,000 per month, while her daughter earned approximately $1,200 per month.

52.   A friend of Ms. Garvin's daughter referred them to Norma Valdovinos of Century 21 Golden Hills. Shortly thereafter Roxanna called Valdovinos and set up an appointment with her.

53.   In early April 2005, Roxanna and Luis Navarez along with Ms. Garvin met with Valdovinos at her office. Norma checked the Navarez's credit but they did not have good credit or sufficient credit history.  Therefore Valdovinos suggested that they check Ms. Garvin's credit. Ms. Garvin's credit score was much better, so they all decided that the loans and the house would be in her name so they could get a better deal.

54.   Ms. Garvin told Norma exactly how much money she made every month and Norma told her that would be no problem. Ms. Garvin also told Valdovinos that she and her family were

SV 346132979v4

1   looking for a two-bedroom home and could afford to pay no more than $2200 per month on a

2   mortgage.   Valdovinos again responded that would be "no problem" and agreed to help them

3   purchase a home. Valdovinos also said that there were many houses on the market that Ms. Garvin

4   and her family could afford.

5        55.   Valdovinos made these statements, knowing they were false, to induce Ms. Garvin to

6   purchase a home.

7        56.   Ms. Garvin reasonably relied on Valdovinos' statements in continuing with the

8   transaction.

9        57.   Valdovinos then referred Ms. Garvin to defendant Linda Tran for assistance with

10  financing. At the time Tran was employed by Tara Home Realty Inc.  Valdovinos explained that she

11  and Tran often worked together as a team and had been working together "for years"

12       58.   One week later, Ms. Garvin, Mr. and Mrs. Navarez, and Norma Valdovinos, met with

13  Linda Tran at her Tara Home Financial office with the assistance of a translator from Tran's office.

14       59.   At this meeting, Tran did some calculations and quoted Ms. Garvin a very high

15  monthly mortgage payment.

16       60.   Ms. Garvin promptly responded that her family could not afford such a high payment.

17  Tran responded that was fine because she had other loan programs that she could offer them, and

18  promised she would find them "a low rate."

19       61.   A few days later Ms. Garvin got a phone call from Tran informing her that they had a

20  "new plan" with monthly mortgage payments of $2700 per month. Although this amount was higher

21  than what Garvin and her family had originally planned, they agreed that they could make this

22  payment between them. No other information was provided to Garvin about the loans

23       62.   Tran's statement about the monthly payment was knowingly false and misleading.

24  Ms. Garvin reasonably relied upon the statement in attempting to purchase the property.

25       63.   After viewing about three homes with Norma from late April to early May 2005, Ms.

26  Garvin and her family decided to make an offer on the Pentz Way property which was listed at

27  $638,000.  Valdovinos told Ms. Garvin to make an offer on the property for $10,000 more than the

28  listing price, and the seller's accepted the offer of $648,000.

64.     In several conversations with Valdovinos, Ms. Garvin stated that before signing anything, she wanted to go over the loan documents with Valdovinos first because she wanted someone to explain the paperwork as she felt that her understanding of English was not sufficient. Valdovinos agreed to do so.

65.     On, or about May 31, 2005, Valdovinos called Ms. Garvin and said that her assistant Claudia was going to pick her up to take you to Morgan Hill to sign the loan papers.  Ms. Garvin asked Valdovinos why Claudia was going to take her to sign documents when she hadn't seen any documents ahead of time as she had previously requested on several occasions.   Valdovinos responded that she would see the documents when Claudia came to pick her up, and reassured her that she (Valdovinos) would also be present. Based on Valdovinoss assurances, Ms. Garvin agreed to proceed.

66.     At all relevant times in this Complaint, Claudia was acting as an agent for Tara Home Financial, Absolute Investments, Tran, Ghajar, and Valdovinos.

67.     That same day, on or about May 31, 2005, Claudia came to Ms. Garvin's apartment to take her to the title company to sign the final loan documents.

68.     In the car on the way to the title company, Claudia told Ms. Garvin not to tell "them" that she did not have "this money." Ms. Garvin was confused and did not understand what Claudia was talking about. When she asked Claudia to explain it to her, Claudia said that she did not know the details.

69.     When Ms. Garvin and Claudia arrived, they met with a male employee who presented Ms. Garvin with a stack of transactional documents written in English. Contrary to Valdovinos' assurances, she did not come with Claudia and was not present when Ms. Garvin signed the loan documents.

70.     None of these documents had been presented to or explained to Ms. Garvin at any time beforehand and no one explained any of the documents to her at closing.  Ms. Garvin was merely instructed where to sign.

71.     As they were sitting at the table, Claudia again told Ms. Garvin, "if they ask you about the down payment you don't say nothing." Ms. Garvin asked "why?" and Claudia responded, "Just

COMPLAINT

SV 346132979v4

don't say nothing about this money." Ms. Garvin still did realize what Claudia was referring to and was only aware of the $5000 they put down on the house as a deposit

72.     Trusting that Tran and Valdovinos knew what they were doing because they were real estate professionals, Ms. Garvin proceeded to sign the loan documents and afterwards, Claudia took Ms. Garvin out to lunch.

73.     At the time that she signed the loan documents, Ms. Garvin understood that she was getting two loans: one from Washington Mutual Bank, and the other from National City Bank. She believed that the monthly payments would be $2,700 per month.

74.     The entire signing event took no more than 45 minutes, and Garvin was given only un-signed copies of the documents to take home with her.

75.     Approximately two days later, on or about June 2, 2005, Claudia called Ms. Garvin again and told her to come into Tran's office to sign the documents for "the other loan."

76.     Ms. Garvin was very surprised by Claudia's phone call because had never discussed getting a third loan with any of the Defendants. She asked Claudia why she had to sign more loan documents when had already signed them two days earlier. Claudia responded that was "the way it worked" and stated that if Ms. Garvin did not sign these new loan documents, she could incur a penalty. Thus, Ms. Garvin proceeded to Tran's office, but told Claudia that she was not going to sign any documents until she had talked to Tran.

77.     When Ms. Garvin arrived at Tran's office, she was every upset and asked Tran why she had to sign more loan documents? Using her assistant, Claudia, to translate, Tran told her that there was no other way for her to purchase the home, because they had needed an additional $96,000 to put towards the home. Tran told Ms. Garvin that they could try another bank and then started calculating numbers. However, the alternative plan involved would have increased her monthly payment to $4,000 per month- far more than what Garvin and her family could afford.

78.     Little did Ms. Garvin know that the HUD-1 for the first two loans fraudulently indicated that she was making a $96,000 down payment, which in fact were funds from a third loan that Tran and Valdovinos had arranged with defendant Pablo Curiel without Ms. Garvin's knowledge or consent.

COMPLAINT

79.     Ms. Garvin then reviewed the straight note, from Pablo Curiel, that Tran had given to her to sign, and noticed that the loan amount was for $121,500. Ms. Garvin asked Tran was the loan was for $121,500 and not $96,000. Tran responded that the additional amount represented 2 years of pre-paid interest, which is almost 27% of $96,000.

80.     Ms. Garvin then told Tran "do you know this is not legal?" Tran replied she did not know about that, but since she had already signed the other loan documents, she would incur a penalty if she did not sign for this third private loan. Ms. Garvin responded, "I may be Mexican but I am not stupid." Tran tried to placate Ms. Garvin and told her, "Oh no it's not what you think. This is going to be fine. Don't worry. I can refinance the loan for you in six months for free."

81.     Ms. Garvin was very upset by this turn of events because she had trusted Valdovinos and Tran to be honest with her and act in her best interests. Moreover, Ms. Garvin and her family had already given notice to their landlord, and were all packed and ready to move into their new home.

82.     In agreeing to sign the loan documents Ms. Garvin had reasonably relied upon the Tran's statements, which were knowingly false and misleading.

83.     Unlike the stack of transactional documents that she had signed days before, Tran presented Ms. Garvin with a single document- a "Straight Note" of $121,500 payable to Pablo Curiel.

84.     *Absolutely no disclosures were provided to Ms. Garvin in connection with the Pablo Curiel loan, including any disclosures mandated under TILA or RESPA or California law.*

85.     Upon leaving Tran's office, Ms. Garvin attempted to call Valdovinos three times but got no answer.

86.     Ms. Garvin then called Valdovinos from her friend's cell phone because she suspected that Valdovinos was avoiding her. Valdovinos answered her phone and stated to Ms. Garvin, "Don't worry" and "We can always refinance you."

87.     Since the time of the transaction, Ms. Garvin learned that defendant Linda Tran falsified or caused to be falsified her loan application which contained many false or misleading misrepresentations concerning, *inter alia*, Ms. Garvin's assets, income and employment history, including the following:

COMPLAINT

SV 346132979v4

1     •   That Ms. Garvin's monthly income was $10,990;

2     •   That Ms. Garvin had $31,000 in an account with Bank of America;

3     •   That Ms. Garvin had $55,000 in an another account with Bank of America

4     •   That Ms. Garvin's total liquid assets were $91,000;

5     •   That Ms. Garvin had a net worth of $90,434; and

6     •   That this information was taken from Ms. Garvin from a phone interview with "Jimmy

7        Vu," an individual whom Ms. Garvin had never met or spoken to.

8     88.    The final HUD-1 settlement statement indicates that defendants received the

9 following unearned, excessive, unreasonable and/or duplicative fees in conjunction with the loan

10 transaction:

11     •   Loan Origination Fee (1%) of $5,184 paid to Tara Home Financial;

12     •   Processing Fee of $595 paid to Tara Home Financial;

13     •   Broker Fee of $800 paid to Tara Home Financial;

14     •   Yield Spread Premium of $15,552 paid to Tara Home Financial;

15     •   Second Yield Spread Premium of $500 paid to Tara Home Financial; and

16     •   Administration fee to Century 21 Golden Hills.

17

18     89.    Defendants also caused the final HUD-1 to be falsified by fraudulently indicating

19 thereon that Ms. Garvin had put down a $96,000 down payment in addition to the $5,000 earnest

20 money deposit that her son-in-law paid to Tran.

21     90.    Ms. Garvin's current loans are as follows: a first loan from Washington Mutual Bank

22 in the amount of $518,400. This loan has an adjustable interest rate that is currently 7.9% and the

23 monthly payment amount is $1,612. This amount reflects the minimum payment, which does not

24 cover principal or the full interest, therefore causing the interest to compound (also known as

25 negative amortization).This loan also carries a three year pre-payment penalty.

26     91.    Ms. Garvin's second loan is an Equity Line of Credit from National City Bank in the

27 amount of $32,400. This loan carries a fixed interest rate of 8.75% and the monthly payments are $

28 235.

SV 346132979v4

92. Garvin's third loan was provided Pablo Curiel, at 10% interest, with interest only payments of $1,012.50 per month and a balloon payment for the full $121,000 due at the end of two years (June 2007).

93. Defendants failed to explain the terms of these loans to Ms. Garvin.

94. Ms. Garvin and her family struggle to meet their monthly mortgage obligations and are in danger of losing their home to foreclosure. Ms. Garvin will not be able to pay the balloon payment of $121,000 when it becomes due in June of this year.

**Plaintiffs Antonia Arreola and Jesus Arreola**

95. Antonia and Jesus Arreola are a married Hispanic couple, who are financially unsophisticated and trace their national origin to Mexico. Both Mr. and Mrs. Arreola are monolingual Spanish speaking.

96. In 2004, Mr. and Mrs. Arreola purchased the home at 18355 Del Monte Avenue in Morgan Hill, CA (hereinafter "Del Monte property") for $650,000 with the assistance of defendant Norma Valdovinos as their real estate agent, and defendant Linda Tran as their agent. At the time Mr. and Mrs Arreola owned a furniture store by the name of Muebleria Plaza Del Sol.

97. In conjunction with the purchase of the Del Monte property, Defendants placed Mr. and Mrs. Arreola in a homeowner's insurance policy through Paul Curiel at Farmer's Insurance Agency. No other insurance options were presented to them. They were not given an opportunity to review or negotiate the terms of the policy.

98. In 2005, the Arrrola's furniture store began to experience financial difficulties so they decided to refinance the home to get cash out so that Mr.Arreola could buy a truck and start working as a truck driver. The Arreola's refinanced with Countrywide Home Loans, and their principal loan amount increased to $688,000.

99. In or about August 2006, the Arreolas contacted Linda Tran to see if they could refinance and lower their monthly payments. The Arreolas trusted Tran because they had worked with her before

SV 346132979v4

100.   Through her Spanish-speaking assistant "Angelica," Tran told the Arreolas to meet with her at her office and stated that she had some options for them that would achieve their goal of lowering their payments.

101.   About three weeks later, Mrs. Arreola met with Tran at her office, and Tran (with the translating assistance of "Angelica") presented her with the following plan: A first loan from Countrywide for $688,000, with a 2% interest rate and a monthly mortgage payment of $2,083, a second loan with National City Bank in the amount of $85,910, a fixed 8.125% interest rate and monthly mortgage payment of $638, and a third "private' loan in the amount of $46,000, at 10% interest and monthly payments of $470.   Thus the Arreola's monthly mortgage payment would decrease from $4,800 to $3,191. Tran did not explain or disclose any other information about the three loans to Ms. Arreola.

102.   Despite the fact that on June 2, 2005 the Del Monte property appraised for $880,000, Tran told Mrs. Arreola  that there was not enough equity in their home to refinancing with only the first two lenders, so they needed the third private loan in order to achieve their goal of lowering their monthly mortgage obligation. Tran also stated that she could refinance the loans again in six months at no cost.  Ms. Arreola questioned Tran as to how that would be possible since the property had no equity in it, and Tran assured her that in six months the house would have sufficient equity to refinance.

103.   Mrs. Arreola then asked Tran to give her something in writing to assure her that Tran would not charge her to refinance in six months.   Tran's assistant Angelica responded that was not necessary because whatever Tran said she would do was "her word" and Ms. Arreola could trust that Tran would do what she'd promised.

104.   Tran and her agents made these knowingly false statements to Ms. Arreola to induce her to refinance with them.

105.   Reasonably relying on the statements of Tran and her agents, Ms. Arreola agreed to proceed with the transaction.

106.   Approximately three days later, Angelica called Mrs. Arreola to notify her that the final loan documents were ready for her to sign. Angelica asked Mrs. Arreola whether she wanted to

-17-

1  sign the documents at the title company or at Tran's office.  Mrs. Arreola responded that she wanted

2  to come in to Tran's office because she had some questions for Tran.

3       107.   On June 23, 2006, Mrs. Arreola went to Tran's Palacio Mortgage office to sign the

4  final loan documents.  Although Tran was in the office, she was occupied and unavailable to be

5  present during Mrs. Arreola's signing of the loan docs.

6       108.   Still felling anxious about going through with the transaction, Mrs. Arreola asked

7  Tran's Spanish-speaking assistant "Heidi" if there was any reason why she should not sign the loan

8  documents.  Heidi responded "Don't worry. I have the same type of loan."

9       109.   Mrs. Arreola was then shown to a room to sign the loan documents.  Mrs. Arreola

10  believes that a notary was present. While Mrs. Arreola waited in the room, "Angelica" would come in

11  and bring her a stack of all English transactional documents to sign and then leave the room.  Ms.

12  Arreola asked Angelica how high the payments on the loan could get, but Angelica could not answer

13  any questions about the loan and responded that she did not know.

14       110.   The entire signing event took no more than 45 minutes.

15       111.   *Absolutely no disclosures were provided to Mrs Arreola in connection with the third*

16  *loan from Pablo Curiel, including any disclosure required under TILA, RESPA, or applicable*

17  *California law.*

18       112.   *Even though this was a refinance transaction, Mrs. Arreola did not receive or sign any*

19  *Three-day Right to Cancel notice as mandated by TILA for the third loan from Pablo Curiel.*

20       113.   About one month after signing the loan documents, Mr. and Mrs Arreola received a

21  statement form Pablo Curiel in the mail and learned that contrary to Tran's representation that the

22  loan they had received from Pablo Curiel would be in the amount of $46,000, the loan amount was

23  actually for $56,250.

24       114.   About one month after signing the loan documents, Mr. and Mrs. Arreola learned that

25  Tran failed to disclose that the 2% rate on the Countrywide loan she had originally quoted Mrs.

26  Arreola was an introductory rate that ended after one month.

27       115.   Since the time of the transaction, Mr. and Mrs. Arreola learned that defendant Linda

28  Tran falsified or caused to be falsified Mrs. Arreola's loan application, which contained many false

SV 346132979v4

and misleading misrepresentations concerning, *inter alia,* Mrs. Arroela's assets, income and employment history, including the following:

- That Mrs. Arreola's monthly income was $17,500;

- That Mrs. Arreola owned liquid assets valued at $860,000;

- That Mrs. Arreola had a net worth of $172,000;

- That Mrs. Arreola had no credit card debt, and monthly debt obligation was limited to $2,709 for the mortgage payment.

116.   The final HUD-1 settlement statement from National City Bank and the Itemization of the Amount Finance from Countrywide indicates that defendants received the following excessive, unearned, duplicative and/or unreasonable fees in conjunction with the transaction:

- $859 paid to defendant Absolute Investment Group

- $859 yield spread premium paid outside of closing to Absolute Investment Group

- A broker discount fee in the amount of $6,880, presumably paid to Absolute Investment Group.

117.   The current loan obligations for the Mr. and Mrs. Arreola are as follows:

- A first loan and adjustable rate mortgage with Countrywide in the amount of $688,000, with an annual percentage rate of 7.9%, and monthly payment of $2,083.   This loan payment represents the minimum payment, which does not include payments on the principal or full interest, causing the interest to compound.   The cap on the principal is %115 of the original principal amount..;

- A second loan with National City Bank in the amount of $85,910 at a fixed rate of 8.125% and a balloon payment for $66,884 due in 15 years on June 22, 2021.

- A third loan with Pablo Curiel in the amount of $56,250, at 10% interest, interest only payments in the amount of $ 468 per month and a balloon payment in the amount of $56,250 due in June 2008.

SV 346132979v4

118.   Mr. Arreola is diabetic, but has taken on more work as a truck-driver in order to make the mortgage payments. However, the stress of making the mortgage payments often causes his blood glucose level to rive dangerously high so that he is not able to drive. Leave out?

119.   Mr. Arroela is unable to afford health insurance or medication for his diabetes due to the because of his available income is used to pay their mortgage debt.

120.   The Arreola's also incurred other debts, due to borrowing money from friends and family members in order to make ends meet

**Plaintiffs Eugenio and Columba Ramos**

121.   In early June 2006 the Ramoses were referred to real estate agent Norma Valdovinos through a classmate of Ms. Ramos' who is Valdovinos sister-in-law.  Mrs. Ramos called Valdovinos immediately after receiving the referral to discuss their desire to purchase a home.  The Ramoses had been house hunting, but had not yet selected a house that they wanted to buy.  Valdovinos told Mrs. Ramos to call her back when they had selected a home that they wanted to buy.

122.   Two weeks later, the Mrs. Ramos called back to say that they had selected a home they wanted to purchase. Valdovinos informed them that they would need to speak with Linda Tran who would determine if they were qualified to purchase the home they wanted.

123.   The first week in July, 2006, the Ramoses met with Linda Tran, an employee of Palacio Mortgage, as the agent for their first loan. Tran showed the Ramoses different payment options for loans in the range of $750,000 - $900,000. Ms. Tran represented that payments on loans for homes in this price range were approximately $3,000.00 - $4,000.00 a month. Tran does not speak Spanish. During the meeting between Tran and the Ramoses, a woman by the name of "Claudia" who is Vladovinos' daughter assisted with translating.

124.   At this meeting, Tran checked Mrs. Ramoses credit only and told her that her credit was good, and that they should put in an offer on the home.

125.   Two days later, Tran called the Ramoses back to her office and told them that Mrs. Ramos did not have sufficient credit to purchase the home, and that Tran needed to check Mr. Ramoses credit.  Tran told them that with Mr. and Mrs. Ramoses credit combined, they should be able to purchase the home. Mr. Ramos has a good credit score of 704-718.

126.   The Ramoses have a combined income of approximately $8,000.00 - $9,000.00 a month. At the time, they had a savings account with approximately $2,000.00 - $5,000.00.

127.   After meeting with Valdovinos and Tran, the Ramoses found another home to buy. Ms. Ramos found one home in an area that she liked that was listed for approximately $850,000.00 - $875,000.00. After deciding to put an offer in at the list price, the Ramoses were later contacted by Valdovinos who informed them that the list price was actually $950,000.00. On the basis of the representations made by Vladovinos and Tran, the Ramoses believed that the monthly payments to purchase this home would be between $3,000 - $4,000 a month.

128.   Ultimately, in approximately July 2006, the Ramoses put in an offer to purchase the home for the list price of $950,000.00 which was accepted. The home is located at 1435 Redmond Avenue, San Jose, California 95120.

129.   The Ramoses purchased the home with a $5,000 deposit .

130.   Claudia called the Ramoses to meet with Tran at her office on or about August 23, 2006 to sign documents for the purchase of their home. A woman by the name of "Heidi" who speaks Spanish and who worked in Tran's office was present to assist the Ramoses with signing their papers. She informed the Ramoses that a better loan had been secured for the Ramoses that was fixed (not variable) at a rate of 8%.

131.   The Ramoses signed a number of documents with Heidi at Tran's office prior to the arrival of a notary. When the notary arrived, the Ramoses signed the remaining documents.

132.   During the signing of the papers, the Ramoses noticed from the loan paper work that the total amount for the loan was for $970,00 and not $950,000  When they questioned Heidi about this she informed the Ramoses that they should not worry about the $20,000.00 difference.

133.   At the time of signing  the Ramoses believed that they were borrowing three interest only loans. The monthly payments for each loan were approximately $2500.00 for the first loan, $770.00 for the second loan and $989.00 for the third loan.

134.   Alliance Bancorp is the plaintiff's first lien holder.  The loan with Alliance Bancorp is for $750,000 with an adjustable interest rate of 8.23%.  It is a negative amortizing loan with a 110% cap on the principal amount and a three year pre-payment penalty.  The loan carries a balloon

1     payment of $484,028 due on maturity, September 1, 2036 .  Minimum monthly payments on this loan

2     are $1896.

3         135.    National City Bank holds Plaintiff's second mortgage.  The loan is for $104,950 at an

4     8.197% fixed rate with an $81,350 balloon payment after fifteen years.  The lender did not provide

5     TILA disclosures to Plaintiffs for their second loan.

6         136.    The third loan is held by Pablo Curiel. The Ramoses were informed that the third loan

7     through Pablo Curiel was a private loan.

8         137.    The Ramoses do not have any signed copies of any loan documents and were only

9     given unsigned copies at closing.

10        138.    One month after signing the loan paperwork when the Ramoses received their first

11     statement, they saw that the loan was in the name of Eugenio Ramos only.  Tran had told the

12     Ramoses that the loan would be taken out in the name of both Eugenio and Columba Ramos. The

13     Ramoses called Tran to complain about the loan being in Eugenio's name only, and were told by

14     Tran that it was a mistake that could be corrected.

15        139.    Two months after signing the loan paperwork when the Ramoses received their

16     second statement, they discovered that their loan payments would be increasing each month, which

17     was contrary to what had been represented Claudia, who had informed the Ramoses that their

18     monthly payments would not increase for three years.  Ms. Ramos telephoned Tran's office and was

19     informed by Heidi that Claudia should have explained the full terms of the loan.

20        140.    In or about October 2006, the Ramoses were very upset that the terms of the loan were

21     not what Tran, Claudia and Norma had represented and met with Tran and Claudia to complain that

22     all of the terms of the loans had not been fully explained. Tran suggested that the Ramoses refinance

23     their third loan with Pablo Curiel.  At this point the Ramoses did not trust Tran, and declined to

24     refinance.

25        141.    The loan application states that the Ramoses have a combined income of $28,650.00.

26     This is false.

27        142.    The Ramoses were never provided any documents in Spanish.

28

SV 346132979v4

1    According to the final HUD-1, the Ramoses were charged the following unreasonable,
2    duplicative, unearned, fees:

3              • A $11,250 loan origination fee paid to Palacio Mortgage;

4              • A yield spread premium in the amount of $9,375 paid to Palacio
5    Mortgage;

6              • An appraisal fee in the amount of $300, and an appraisal review
7    fee in the amount of $275 paid to Palacio Mortgage;

8              • A mortgage broker fee of $262 paid to Absolute Investment
9    Group;

10             • A second broker fee in the amount of $1,049 paid to Absolute
11   Investment Group;

12             • A transaction fee for $350 paid to Century 21 Golden Hills; and
13   $782 paid to Farmer's Insurance

14   **Plaintiffs Juan and Maria Ramirez**

15       143.    From 2004 to early 2006, Juan Ramirez ("Ramirez"), his wife Maria, and their two

16   small children had been renting an apartment at 1919 Fruitdale Avenue in San Jose, California for

17   approximately two years.  They paid $1,250 in rent per month.  Ramirez attempted to buy a home,

18   but it fell through at the last minute.  Because Ramirez had given notice on the Fruitdale apartment,

19   he and his family needed a place to live.  They moved in with Ramirez's cousin, Prospero Torralba,

20   in January or February of 2006.

21       144.    Because it was a crowded living situation, with Ramirez, Maria and their children

22   living in the same house with Torralba and his family, Ramirez was anxious to purchase a home.

23   Torralba told Ramirez about the company that helped Torralba purchase a home: Century 21 Golden

24   Hills.  Torralba had worked with Jesus Chavez at Century 21 Golden Hills and recommended that

25   Ramirez contact Chavez.

26       145.    In early April 2006, Ramirez contacted Chavez and made an appointment to speak

27   with Chavez that day.  Chavez met with Ramirez, discussed Ramirez's desire to purchase a home,

28   and ran a credit check on Ramirez.  Chavez informed Ramirez that Ramirez had a good credit score

COMPLAINT

SV 346132979v4

in the range of 680-700.  Since his wife Maria had no credit history, Chavez recommended that they proceed to purchase the home in Juan's name only.

146.   Chavez told Ramirez that he knew a woman named Linda Tran, who could arrange for loans for Ramirez.  During the meeting, Chavez called Tran and asked Tran how much of a loan Ramirez could obtain.  Tran informed Chavez that Ramirez could obtain a loan for $650,000.

147.   Ramirez explained to Chavez that Ramirez wanted a fixed rate loan, not a variable rate loan.  Chavez said that would "not be a problem."

148.   Chavez did not ask Ramirez about Ramirez's income.  Chavez then told Ramirez to make an appointment with Linda Tran to discuss the loan. Ramirez made an appointment and went to see Tran about one week later.

149.   During the meeting, Tran used a translator named "Angelica" to collect employment information from Ramirez.  Tran asked for Ramirez's full name and social security number to run a credit check.

150.   Tran proposed a loan under which the payments would be $3,600 per month, including taxes.  However, Ramirez told Tran that the highest monthly payment he could afford to pay was $3,200.

151.   Tran then proposed a plan that would involve three loans.  The first loan would cost $1,250 per month with a interest rate of 6.5%; the second would cost $700 per month with an interest rate of 9.75%, and the third would cost $675 per month, for a total of $2,625 per month.  Tran said this loan package would be "perfect" for Ramirez and promised that she could refinance the third loan in six months.  Tran also said that Ramirez's home would appreciate $40,000 per year, so Ramirez would actually make money.

152.   Ramirez explained to Tran that Ramirez wanted a fixed rate loan, not a variable rate loan.  Tran said that would be "no problem.".

153.   Tran informed Ramirez that the third loan was a private loan, but did not disclose any of the terms of the third loan..

154.   After meeting with Tran, Ramirez met with Chavez to look at homes three to four days after meeting with the lender.  Ramirez did not like any of the three homes that Chavez showed

1  him.  Several days later, Chavez contacted him and told Ramirez that he had the perfect house for

2  Ramirez and his wife Maria.

3      155.    In late April, Ramirez and his wife looked at the home.  The address was 2788 Cramer

4  Circle, San Jose, California, 95111.  Ramirez and Maria liked the house.  The listed price for the

5  house was $637,000.  Chavez suggested to Ramirez that Ramirez could make an offer for $647,000

6  but then ask for $10,000 back for closing costs.  Ramirez made an offer on the house for $647,000.

7      156.    One day later, Chavez asked Ramirez for $5,000 as a show of good faith interest in the

8  house.  Ramirez did not have $5,000, but gave Chavez a deposit of $3,500.  Several days later

9  Ramirez learned the offer was accepted.

10     157.    The loan application states that Ramirez works as a produce supervisor earning $4610

11 per month.  That is false.  Ramirez does work at Lunardi's Supermarket, but he is not a supervisor.

12 Ramirez earns approximately $3,200 per month.  Ramirez did not know at the time he signed the

13 application that one of the defendants had included such erroneous information on the application.

14     158.    The application also indicates that Ramirez is a self-employed handyman earning

15 $7990 per month.  That is false.  Ramirez does not work as a self-employed handyman.  Ramirez did

16 not know at the time he signed the application that one of the defendants had included such erroneous

17 information on the application.

18     159.    The loan application states that Ramirez owns a 2002 Chevrolet Tahoe.  Ramirez does

19 not, and has never, owned a 2002 Chevrolet Tahoe.  Ramirez owns a 1999 Pontiac GrandAm.

20 Ramirez did not know at the time he signed the application that one of the defendants had included

21 such erroneous information on the application.

22     160.    The loan application prepared by Chavez indicates that Ramirez would make a down

23 payment from savings, including a Bank of America account with $28,214 in it and a Wells Fargo

24 account containing $78,588.  Ramirez does have accounts with Bank of America and Wells Fargo,

25 but the balances were never in those amounts.  Ramirez never informed Chavez that he had $28,214

26 in a Bank of America account, or $28,214 in a Wells Fargo account.  Ramirez did not know at the

27 time he signed the application that one of the defendants had included such erroneous information on

28 the application.

COMPLAINT

SV 346132979v4

161.    Two to three weeks before signing in mid-April, 2006, Ramirez was contacted by someone at Washington Mutual, who asked Ramirez to verify that Ramirez is the owner of a business. Ramirez, confused, called Chavez.  Chavez told Ramirez that if Ramirez received any similar inquiries, Ramirez should direct the calls to Chavez.  Someone from Washington Mutual also called Ramirez's supervisor at Lunardi's Supermarket to verify that Ramirez was a "supervisor." Ramirez's co-workers and boss joked with Ramirez about that.  Ramirez's supervisor informed Ramirez that he told the Washington Mutual representative that Ramirez was not a supervisor.

162.    One week after making the offer, Ramirez went to Chavez's office to pick up the inspection report for the house.  When Ramirez received the inspection report, Ramirez learned that the seller of the house was the ex-brother-in-law of Chavez' wife, and his agent was defendant Norma Valdovinos.  Chavez had not previously informed Ramirez of that fact.

163.    Jesus' receptionist, Erica, called Ramirez in to sign the final papers on May 11, 2006. Ramirez signed the papers for the first two loans at Chavez's office, then went to Tran's office to sign the loan documents for the third loan.  Present at the first signing, in Chavez's office, were Juan Ramirez, the notary (Martha Hueso), Chavez and Tran.  Martha explained what the monthly loan payments would be, but did not disclose the interest rates.  Martha did not explain that the loans were variable rate loans.

164.    Ramirez was instructed to sign the English only loan documents, which he had never seen or reviewed beforehand.  The entire meeting took approximately 45 minutes, and Ramirez was given only un-signed copies of the loan documents.

165.    After signing the papers at Chavez's office for the first two loans, Ramirez immediately went to Tran's office to sign the papers for the third loan.  Tran was busy at first, so another person from Tran's office assisted Ramirez.  Tran joined the meeting at the very end. Someone took Ramirez's fingerprints and his identification.

166.    When Ramirez reviewed the papers, he was troubled by the numbers because they did not seem to add up.  The original loan that Tran had proposed involved a payment of $3,600 per month. The three loan payments did not total nearly that much.

167.   Additionally, the private loan was supposed to be for approximately $66,000 at a rate of 10%. However, the loan documents reflected that the private loan was actually for a principal amount of $80,625. When Ramirez asked about this discrepancy, Tran explained that the difference was "insurance."

168.   Ramirez was informed that the total payments on the three loans that he was getting should actually be $4,200. Since he would be making payments totaling $2,612, that left a difference of approximately $1,800 per month, which would add up to approximately $18,000 per year. Tran explained that Ramirez would still make money because his house would appreciate $40,000 per year.

169.   Ramirez is current on all loan payments. However, Ramirez's loan payments for the Curiel loan for February and March were not cashed.

170.   Ramirez's payments are as follows: $1,250.00 per month on the first loan, $733.00 per month for the second loan, and $671.88 per month on the third loan, for a total of $2,654.

171.   The broker listed on the loan application is Raya Ghajar from Palacio Mortgage. Ramirez has never met anyone named Raya Ghajar.

172.   Ramirez's first loan is a negative amortization loan with Washington Mutual for $485,250. The loan carries an interest rate of 1.1% for one month, then is variable starting July 2006 with a cap of 10.175%. Starting in July, 2007, the loan terms provide that monthly payments can increase by as much as 7.5% higher than the previous payment. The loan has a prepayment penalty of 3% of the original loan amount if paid off in the first year, 2% in the second year, and 1% in the third year.

173.   The Ramirez's second loan is a revolving line of credit with Washington Mutual for $96,985. The loan has an adjustable interest rate of 8.4% with a cap of 18%.

174.   Ramirez's third loan is with Curiel for $80,625. The loan has a 10% interest rate for the first two years followed by a balloon payment for $80,625 due . It is an interest-only loan. The monthly payment is $671.88.

**Plaintiff Prospero Torralba**

175.    Plaintiff Torralba and his wife, Cirila Torralba, purchased a home at 4754 Lyric Lane, San Jose, California, 95111 for $595,000.

176.    Prior to purchasing this home, Torralba had co-signed on for a home loan with his father in approximately 1997.  Additionally, Torralba had co-signed for a home loan with his brother in 2002, but his brother has since refinanced without Torralba.

177.    Torralba and his wife were living with Torralba's brother.  They decided to start looking to buy a house in approximately January 2006.

178.    Torralba saw an advertisement in a magazine that offered financing for a home at $0 down, 100% financing.  In late January, Torralba called to make an appointment with Norma Valdovinos.

179.    Jesus Chavez, not Norma Valdovinos, called in response to Torralba's message.  In late January, Torralba told Chavez that he could not put any money down on a house.  Torralba also told Chavez that Torralba could pay, at most, $2,500 per month.

180.    In or about early February 2006, Torralba met with Chavez at Chavez's office. Chavez asked Torralba about Torralba's income, then performed some calculations.  Chavez then informed Torralba that Torralba could qualify for a $700,000 loan.  Torralba once again emphasized to Chavez that Torralba could not afford to pay more than $2,500 per month.

181.    Torralba and Chavez looked at some homes.  Torralba made an offer, through Chavez, on a home listed at $525,000.  Torralba offered $535,000, but his offer was not accepted.  Chavez later told Torralba that the home was sold for about $565,000.

182.    Torralba and Chavez continued to look at homes.  In mid-February 2006, they found a home listed at $565,000.  Torralba authorized Chavez to offer $575,000 for the house.  At Chavez's request, Torralba provided $3,000 as a show of good faith on the offer.  After approximately one week, Torralba called Chavez to ask what happened.  Chavez told Torralba that Torralba's offer would be accepted.  Torrabla did not authorize Chavez to offer $595,000 on the house.

183.    Torralba and Chavez went to Chavez's office to complete the loan application. Chavez asked Torralba to sign a blank piece of paper.  Torralba was reluctant to do so, but Chavez insisted

COMPLAINT

SV 346132979v4

1  that it would make the process move along faster.  Torralba ultimately did not sign the blank piece of

2  paper.

3      184.    Chavez told Torralba to make an appointment to see Linda Tran, who would help

4  Torralba get the home loans.  Torralba made an appointment and went to Tran's office.  At Tran's

5  office, Tran performed calculations and confused Torralba.  Torralba emphasized to Tran that he

6  simply wanted to pay no more than $2,500 per month.

7      185.    Torralba talked with Tran in English.  No documents were provided to Chavez in

8  Spanish.

9      186.    On March 27, 2006, at the time Torralba signed the loan application, his income was

10  approximately $3,000 per month.  Torralba works in construction.  Cirila worked as a supervisor in a

11  hotel at that time; her income was approximately $1,600 per month.

12      187.    All conversations between Torralba and Chavez were in Spanish.  However, Chavez

13  did not provide any of the documents to Torralba in Spanish.

14      188.    Torralba signed the loan papers on March 17, 2006 in Chavez's office.  Torralba did

15  not understand some of the documents, so he asked the translator, whose name was Angelica, to

16  explain some of the terms.  Angelica responded that she "did not know" and advised Torralba to ask

17  Tran or Chavez.  No notary was present at the signing.

18      189.    Torralba then signed more loan papers at Tran's office the same day.  There was a

19  notary present at Tran's office.  At that time, Tran told Torralba that Torralba's monthly payments

20  would be between $2,300 and $2,500.  Tran did not tell Torralba the amounts of the loans, nor the

21  interest rates.  Tran did tell Torralba that Torralba could refinance in about 6 months and eliminate

22  one of the loans.

23      190.    The closing date on the house was March 24, 2006.

24      191.    Torralba was never informed, and did not know until approximately May 2006, that he

25  had three loans.  In May 2006, Torralba received a loan note from Pablo Curiel with payment

26  vouchers.  When Torralba contacted Curiel to ask about the loan, Curiel asked if Chavez had

27  explained the third loan.  Torralba answered that no one had ever told Torralba that he was taking

28  three loans.

COMPLAINT

192.    Torralba's first loan is with Washington Mutual for $446,250.  It is a forty-year, negative amortization loan with a 7.138% interest rate.  The interest rate can change monthly with a cap of 10.175%.  The loan carries a pre-payment penalty of 3% of the loan in the first year, 2% the second year, and 1% the first year.

193.    Torralba's second loan is an "Equity Plus Revolving Line of Credit" with Washington Mutual for $89,250.  The interest rate is 8.15% and is adjustable with a cap of 18%.

194.    Torralba's third loan is with Pablo Curiel for $74,375.  The loan has a 10% interest rate with a two-year balloon.  It is an interest-only loan.  The monthly payment is $619.79.

**Plaintiff Rafael Maldonado Bravo**

195.    Plaintiff Bravo works as a driver and has an income of approximately $3,000 a month.  His credit score at the time of purchase was approximately 770 - 790.

196.    At the time, Bravo owned a condominium.

197.    Bravo saw an advertisement for the real estate agent services of Normal Valdovinos posted in the magazine *El Aguila*.  The advertisement stated that Valdovinos could assist with the purchase of property with no money down and no work verification.

198.    Bravo reasonable relied upon this advertisement, which was intentionally misleading in that it did not state that Defendants misrepresented borrowers' income and assets to be able to purchase these homes.

199.    Plaintiff Bravo became interested in buying a second property, with the intention of renting one home out.

200.    Bravo took an equity line of credit from his condominium in the amount of $75,000 and deposited the funds into his bank account. He anticipated using the funds to assist with paying the monthly mortgage amount on his second piece of property.

201.    Upon seeing Valdovinos' advertisement, Bravo called Valdovinos who requested that he meet with her in person. Valdovinos spoke to Bravo exclusively in Spanish throughout these transactions.

202.    When Bravo met with Valdovinos at her office in approximately March 2006, he informed her that he was interested in purchasing a duplex located at 789-791 Blossom Hill Road, San Jose, CA 95123, which he had seen advertised.

203.    Valdovinos explained that he could not see the property unless he paid a deposit to her in the amount of $5,000 and also made an offer to purchase the property.

204.    Valdovinos knew this statement was false and purposefully made it to induce Bravo to make a deposit and a binding offer that he could not afford without any information.

205.    Bravo reasonable relied upon Valdovinos' statement and her expertise in the field in making a deposit and offer on a property he had not been shown.

206.    The duplex was listed at $789,000 but Valdovinos told Bravo to offer $799,000 to avoid closing costs. Valdovinos informed Bravo that the monthly payments for the property would be between $3,000 and $4,000 and that he could afford that level of payment because he would be able to get rental income.

207.    Valdovinos' statement was knowingly false, and Bravo reasonably relied upon it in making a deposit and offer on the home.

208.    With monthly rent payments from future tenants and funds from his $75,000 money line of credit to pay any difference, Bravo believed he could afford to purchase the duplex based on Valdovinos' representations.

209.    Bravo made an offer on the property in the amount of $799,000 that was accepted. Since Valdovinos informed Bravo that he could not look at the property prior to making a $5,000 deposit and making an offer to purchase the property, Bravo relied on the representations of Valdovinos and her colleague Jesus Chavez regarding the condition of the property. He was informed and believed that the property was in very good condition and was being offered at a competitive price.

210.    Two days after making his offer, it was accepted. The $5,000 check that Bravo wrote to Valdovinos was cashed.

211.    When Bravo visited the property for the first time, he discovered it was in very bad condition. Upon this discovery, Bravo informed Valdovinos of his concern that the property was

1    represented to be in better condition than it was. Valdovinos explained that the duplex was valued in

2    light of its condition so that he got a very good deal.  Bravo asked Valdovinos if he could see other

3    properties with similar list prices to determine whether her assertions were correct and she informed

4    him that she could not.  Valdovinos told Bravo that if he were to make repairs to the duplex, she

5    could help him sell the property the following year.

6         212.    Valdovinos informed Bravo that if he did not go through with the deal, he would lose

7    his $5,000 deposit.

8         213.    Upon information and belief, this statement was knowingly false, as Bravo could have

9    withdrawn without losing his deposit based on inspection contingencies.

10        214.    Bravo reasonably relied upon the statements of Valdovinos, so he decided to go

11   through with the purchase of the property.

12        215.    Shortly thereafter, Norma called Bravo and informed him that he would need to meet

13   with Chavez to sign some papers regarding the purchase of the property. With Chavez, Bravo signed

14   several disclosure documents relating to the property inspection and registered sex offenders in the

15   area. Bravo also paid for property insurance for one year through Farmer's Insurance and agent Paul

16   Curiel.

17        216.    When Bravo asked any questions, Chavez said, "Everything is OK.  You already said

18   yes."

19        217.    Bravo reasonably relied upon Chavez's statements in continuing with the transaction.

20        218.    Approximately three days later, Bravo was told to meet with Linda Tran in the office s

21   of Absolute Investments, who Norma had said would handle his loan. Bravo met with Linda to sign

22   the loan papers.

23        219.    Tran never explained the loan documents to Bravo.

24        220.    Upon information and belief, Defendants knowingly fabricated Bravo's income and

25   assets in his loan applications.  The falsified applications were signed and ratified by Ghajar.

26        221.

27        222.    Defendants purposefully withheld information from Bravo regarding the loan to

28   induce him to continue with a loan he could not afford.

-32 -                                              COMPLAINT

223.   During the meeting with Tran was present to quickly review the loan documents with Bravo. At times, a woman from Tran's office, Angelica, was present to assist with Bravo with signing the papers. Tran and the notary informed Bravo not to put dates on documents. Tran left the room while Bravo signed the loan documents in front of the notary.

224.   Valdovinos, Chavez, and Angelica spoke to Bravo exclusively in Spanish. The loan documents were never provided to Bravo in Spanish.

225.   At the time that Bravo signed the loan papers, he believed that he was obtaining two loans for the purchase of the property.

226.   Approximately five days later, Bravo was contacted by Angelica, from Absolute Investments.  She told Bravo that he had to come to the office to sign some more papers.  Bravo believed that the additional papers he needed to sign were for the property insurance.

227.   On the very same day, Bravo met with Tran at her office. Tran informed Bravo that the purchase of his property required a third loan for which Bravo would need to sign the papers for. Bravo was informed that the third loan was for the down payment.

228.   Tran explained that the third loan was a private loan and that Bravo would need to make monthly payments to Pablo Curiel.

229.   When Bravo asked why he was not told about the private loan previously, Tran responded that if Bravo did not sign the loan papers, he would lose the property and his $5,000.00 deposit.

230.   Tran further informed Bravo that he must pay $812.00 a month to Pablo Curiel and that he would never receive a monthly statement. Once two years had passed, Tran informed Bravo that she would refinance his property when it had gained equity to pay off the Pablo Curiel loan.

231.   No notary was present when Bravo signed the loan papers for this third, Pablo Curiel loan.

232.

233.   Bravo received some unsigned documents relating to his first two loans.  He never received any signed documents.  He did not receive any documents relating to the third Curiel loan except the Straight Note.

234.   Bravo's first loan was for $585,000 from Washington Mutual. The loan had a "teaser" rate of 1.35%, which was only in effect until June 1, 2006 (for approximately two months). The interest rate is variable, calculated by adding 3.025 points to an index, up to a maximum of 10.05%. It is a negative amortization loan, which means that if Bravo makes the minimum payments, the principal will continue to grow. When the principal reaches the 110% of the loan or five years has passed, Bravo will no longer be able to make the minimum payments. He will be required to pay the full portion of principal and interest. Although Bravo's monthly payments will change once a year, his interest rate changes monthly.

235.   The loan is for 40 years and contains a pre-payment penalty.

236.   Bravo did not understand that the principal on his first loan would continue to increase even if he made his minimum payments.

237.   Bravo's second loan was for $117,000 through Washington Mutual. The interest rate is variable, calculated by adding 0.6% to an index and starting at 8.1%.

238.   Bravo's third loan was for $97,500 from Pablo Curiel. Approximately $20,000 of that loan was paid to Defendants as "upfront interest." The loan is interest only for two years, which is due in monthly installments of $812.50, after which time a balloon payment of the entire loan amount will be due.

239.   Bravo did not learn of the third loan until the day after he signed the other loan documents.

240.   Upon receiving his loan statements for the first two loans, Bravo discovered that he paid $25,000.00 - $27,000.00 above the purchase price. Bravo immediately called Valdovinos and was informed that the extra money was to pay Pablo Curiel as upfront interest.

241.   Bravo asked Valdovinos if that was legal, and she assured him that it was legal.

242.   After the loan signing, Bravo received in the mail insurance documents from Farmer's Insurance. The agent's name on the documents was Paul Curiel.

243.   Bravo was never given a choice of insurance companies. Nor was he informed of any affiliated business agreement or association among Defendants.

244.   Approximately two months after purchasing the duplex located at 789-891 Blossom Hill Road, San Jose, California, 95123, Bravo received a telephone call from Valdovinos informing him that a duplex was for sale and was being offered at a good price.  Valdovinos told Bravo that he could purchase the property for a very cheap price.

245.   The property was located at 943/945 Desert Isla, San Jose, California.

246.   Valdovinos informed Bravo that he would have enough money to purchase the property because  he would be able to use the rent to make the monthly payments and would only have to pay about $200.00 - $400.00 more each month to cover the difference.

247.   Valdovinos had knowledge that Bravo had previously taken an equity line of credit and deposited the funds into his account. On that basis, she encouraged Bravo to purchase the property.

248.   When Bravo expressed his concerns about being able to purchase the property since he had just purchased another piece of property a couple of months before, Valdovinos explained to him that he would be approved to purchase the home because he was buying the property with his credit (and not the funds he had in his account). Valdovinos represented that other people with similar credit were buying about 2-3 properties and that Bravo should do the same.

249.   Valdovinos provided Bravo with the address to the property and suggested that he drive past it.

250.   Bravo said he would drive by the property and also explained to her that he wanted to compare other properties first to determine if it was listed at a good price.

251.   The next day, Bravo went to look at the property and check prices of comparable properties. Bravo noticed that the price that Valdovinos said the property was listed at was $25,000.00 - $30,000.00 less than other comparable properties.

252.   Valdovinos represented that the list price for the property was $799,000.

253.   The following day, Valdovinos called Bravo to ask if he had driven by the property. She informed him that if he wanted to see inside the property, he would have to pay her a $7,000.00 deposit. When Bravo informed Valdovinos that he did not have $7,000.00, Valdovinos asked Bravo how much he could pay. Bravo explained to Valdovinos that he could probably pay about $2,000.00.

1    Subsequently, Valdovinos told Bravo that she would accept his $2,000.00 deposit and would cover

2    him for $5,000.00 since he purchased the Blossom Hill property through her.

3        254.    Valdovinos told Bravo that the monthly payments would be approximately $3,180.

4        255.    Valdovinos knowingly made false statements to Bravo to induce him to purchase

5    another property that he would not be able to afford. Bravo reasonably relied upon these statements

6    in continuing with this transaction.

7        256.    After Bravo viewed the inside of the property, he spoke with Valdovinos who

8    informed him that if he bought the property, he would only have two loans and would not have a

9    third loan through Pablo Curiel. Valdovinos told Bravo to meet with Linda Tran to discuss the loans.

10   Upon reasonable reliance, Bravo agreed to make an offer on the property.

11       257.    When Bravo met with Tran, she informed him that his monthly payments would be

12   $3,300.00.

13       258.    Tran also informed Bravo that Valdovinos had made an offer on the property for

14   $810,000.00. Since Bravo was informed previously that the list price for the property was

15   $799,000.00 he asked Tran why she offered more and that he wanted to speak with Valdovinos.

16       259.    When Bravo called Valdovinos to find out whey she made an offer great than the list

17   price, she explained that it would cost $25,000 extra over the list price for the paper work but that if

18   Bravo paid $810,000.00 the seller would cover the difference.

19       260.    The next day, Bravo was informed by Valdovinos and Tran that his offer was

20   accepted.

21       261.    Approximately 3-4 days later, Tran called Bravo to inform him that he would need to

22   sign the loan papers. Tran informed Bravo that the monthly payment had changed a little and would

23   not be $3,300.00 a month as they previously told him. Tran explained that the monthly payment for

24   the first loan would be $3,500 and the payment for the second loan would be $1,568. Tran also

25   explained that the loans would be interest only and not option-arm as she had previously told Bravo.

26       262.    Bravo explained to Tran that these amounts were too high and requested that she

27   speak with Valdovinos who had explained he would be paying lower loan payments.

28

-36-                                                    COMPLAINT

SV 346132979v4

263.    Tran informed Bravo that the reason the loan payments were higher was because Pablo Curiel did not have the funds to finance a third loan. Bravo informed Tran that he had never wanted to borrow a loan from Pablo Curiel and that he wanted to borrow through a bank and not a private party.

264.    Tran explained to Bravo that he would only have to make the payments for two months and then later could refinance, which would lower his monthly payments.

265.    Subsequently, Bravo met with Valdovinos to ask her why he was told that his monthly payments were going to be $3,300.00 when they are in fact $5068.00. Valdovinos told Bravo to trust that Tran would lower his monthly payments after two months. She also told Bravo that if he did not complete the purchase, he would lose his $2,000.00 deposition plus would have to pay her for the $5,000.00 that she covered.

266.    To memorialize this deal, Tran drafted a written letter that she signed explaining that Bravo was only obligated to make payments in the total amount of $5,068 for two months. The letter indicated that following two months of payments, Bravo would return to Tran's office to sign different loan documents which would lower his monthly payments.

267.    These statements by Tran and Valdovinos were knowingly false and were intended to induce Bravo to purchase a property he could not afford and to refinance that property, all of which resulted in high fees for these Defendants.

268.    In reasonable reliance on the representations made by Tran and Valdovinos, Bravo went through with the purchase of the property.

269.    Defendants Tran and Valdovinos failed to abide by their agreement to lower the monthly payments for Bravo in two months. Bravo was required to make payments on his loans in the total amount of $5,068 for six months.

**Plaintiff Tomas Hernandez**

270.    In approximately October 2005, the Hernandez Plaintiffs were interested in finding out if they were qualified to buy a home.

271.    A friend of a friend referred the Hernandez Plaintiffs to Defendant Valdovinos.

272.    Valdovinos told the Hernandez Plaintiffs that she could help them.

SV 346132979v4

273.   When the Hernandez Plaintiffs did not call back Valdovinos for a month, she called them and asked them to come in for an appointment.

274.   The Hernandez Plaintiffs went to the offices of Golden Hills.  Valdovinos checked their credit score and stated that they both had good credit.

275.   She asked for their total income, which at that time was approximately $6,000 to $7,000 per month.

276.   The Hernandez Plaintiffs told Valdovinos that they could only afford a monthly payment of $2,300 to $2,400 per month.  Valdovinos responded that she would show them homes with that monthly payment.

277.   After showing the Hernandez Plaintiffs several homes in areas they did not like, Valdovinos called them in approximately November 2005.  She stated that she had found a house for $762,000 that they would like.

278.   Ms. Hernandez told her the price was too high.  Valdovinos stated on the telephone, "Don't worry.  The loan agent can give you a low payment."

279.   At that time, Valdovinos knew that the Hernandez Plaintiffs could not afford the house she was showing them on the loan terms that she and the other Defendants intended and that the loan payments would not be $2,500 or less.

280.   The Hernandez Plaintiffs reasonably relied upon the statements of Valdovinos, who they trusted, to continue with the purchase of this home.

281.   Valdovinos called back an hour later to tell the Hernandez Plaintiffs that she had gotten the seller to agree to lower the price to $750,000.

282.   Several hours later, Tran called the Hernandez Plaintiffs on the telephone and set up an appointment for that same day.

283.   The Hernandez Plaintiffs went to the offices of Absolute Investment on Capitol Expressway, in San Jose.  They brought their paycheck stubs to Tran.

284.   Tran told the Hernandez Plaintiffs that she could get them low interest loans.  Tran's statement was knowingly false and misleading.  The Hernandez Plaintiffs reasonably relied upon Tran's statement in continuing with the transaction.

SV 346132979v4

285.    Tran's employee "Angelica" acted as a translator so that the negotiation of the transaction with the Hernandez Plaintiffs occurred in Spanish.

286.    Tran told the Hernandez Plaintiffs to sign a large stack of documents, all of which were in English.  Neither Tran or Angelica explained what was contained in the documents.

287.    When Ms. Hernandez attempted to confirm that the payments would be approximately $2,500, Tran, through Angelica, told them for the first time that the monthly payments would actually total $4664.

288.    When the Hernandez Plaintiffs told Tran that they could not afford it, she promised them that she could refinance them into a different loan in April or May 2006.  At that point, she promised that there would be one fixed loan payment for between $2,400 and $2,600 on paper.  At that time, Tran knew that this information was false and that a refinance would cost the Hernandez Plaintiffs additional fees to Tran and loss of equity.

289.    The Hernandez Plaintiffs reasonably relied upon Tran and Valdovinos' statements in continuing with the purchase transaction.

290.    Tran then told the Hernandez Plaintiffs to go to the title company to sign more documents.

291.    The Hernandez Plaintiffs went to the title company, where they signed another stack of documents, all of which were in English.  A title company employee requested a check for $13,000.

292.    Ms. Hernandez told the employee that she only had $3,000, so she could not buy the house.  The employee told her that she would talk to Valdovinos.  The employee told Ms. Hernandez that she could not back out now.

293.    No defendant ever explained the terms of the loans the Hernandez Plaintiffs received.

294.    The Hernandez Plaintiffs were barely able to make the payments of $4664 for the first few months, but they did so with the understanding that their payments would be reduced in April or May 2006.

295.    In April 2006, Mr. Hernandez went to see Tran at the Absolute Investments office.

COMPLAINT

296.   Tran told Mr. Hernandez, using Angelica as a translator into Spanish, that she had already started the paperwork and it would be ready in one to two weeks.

297.   In the second half of April, Angelica called the Hernandez Plaintiffs and told them that Tran asked for their bank statements.   At this point, the Hernandez Plaintiffs had less than $500 in their bank account.

298.   Neither Angelica nor Tran ever asked the Hernandez Plaintiffs for their current income, which had decreased.   Nonetheless, Ms. Hernandez volunteered that information to Angelica.

299.   Approximately two days later, Angelica called Ms. Hernandez and told her to come and sign the documents.   Ms. Hernandez said to Angelica that Tran promised her $2500 payment. Angelica said, "Everything that she promises comes true.   She's helping a lot of people."

300.   The Hernandez Plaintiffs reasonably relied to their detriment on this statement, which was knowingly false.

301.   Approximately three days later, on May 2, 2006, the Hernandez Plaintiffs went to see Tran at the Absolute Investments office.  They met with an employee named Heidi who asked them to sign a stack of documents, all of which were in English.

302.   Upon information and belief, Defendants knowingly fabricated the Hernandez Plaintiffs' income and assets in their loan applications.   This falsified application was signed and ratified by Ghajar.

303.   At some point during the signing, the Hernandez Plaintiffs saw a document that looked like their total payment would be $3600 per month.

304.   Ms. Hernandez told Heidi, "This isn't right.   This isn't what we agreed to."

305.   Heidi could not explain it, so Ms. Hernandez asked to speak to Angelica or Tran. Heidi told her that neither person was present, even though Ms. Hernandez could hear Tran's voice in another office.

306.   The Hernandez Plaintiffs thought that because they had already signed a number of the documents, they were stuck, so they continued signing as urged by Heidi.

307.   After the Hernandez Plaintiffs had signed all the documents for the loans, a notary showed up and Tran came into the room.

308.   When asked, Tran explained that the notary was from the private lender, Pablo Curiel.

309.   Defendant purposefully never told the Hernandez Plaintiffs that they would have three loan, nor that one of the loans was from a private individual.

310.   The Hernandez's first refinance loan was for $596,000 through Countrywide Home Loans (America's Wholesale Lender).  It has a starting interest rate of 1.25%, but that rate was only effective one month..  After the first month, the interest rate is variable, calculated by adding 2.975 points to a LIBOR index.   The interest rate can increase to 9.95%.   The loan is a negative amortization, which means that the minimum monthly payments do not even cover interest.  If the borrower pays the minimum payments, the amount owed on the loan continues to increase.  When the principal reaches 115% of the borrowed amount or five years has passed, the minimum payments increases dramatically to full principal plus interest.   The loan has a pre-payment penalty, which means that the borrower must pay six months of interest if the loan is refinanced or paid off during the first three years.

311.   From that first loan, Absolute Investments was paid $17,880 as a yield spread premium from Countrywide.

312.   Defendants knowingly failed to disclose the material terms of this loan to the Hernandez Plaintiffs.  The Hernandez Plaintiffs did not understand that the principal they owed on the house would continue to increase as they made payments.

313.   The estimate of charges shown to the Hernandez Plaintiffs had the yield spread premium erased.

314.   The Hernandez's second refinance loan was for $74,450 from National City Bank. The loan was a 15 year loan with a fixed rate of 7.75%.  After 15 years, a balloon payment of approximately $57,000 would be due.

315.   None of the Defendants ever explained the terms of this loan to the Hernandez Plaintiffs.  The Hernandez Plaintiffs did not understand that they would have to pay a balloon payment after 15 years.

SV 346132979v4

316.   The Hernandez's third refinance loan was for $108,125 from Defendant Pablo Curiel. It was an interest-only loan at 10% for two years.  After two years, a balloon payment of the entire loan ($108,125) was due.

317.   In addition, only approximately $85,000 of the Curiel loan was credited to the refinance.  The other approximately $23,000 was taken as an upfront fee by Defendants.

318.   After signing, the Hernandez Plaintiffs received some unsigned documents associated with their first and second refinance loans.  The only document they received relating to the third Curiel loan were payments stubs in the mail.

319.   The Hernandez Plaintiffs never received any signed documents.  The Hernandez Plaintiffs never received a final HUD-1 closing statement.  The Hernandez Plaintiffs never received a right to cancel notice for the first or third loans with a date properly filled in.  The Hernandez Plaintiffs never received any disclosures in Spanish, even though the loan was negotiated in Spanish.

**All Plaintiffs**

320.   All of the Plaintiffs are members of a protected class, based on their race (Hispanic) and national origin (from Mexico).

321.   Defendants Valdovinos, Chavez, and Golden Hills knowingly targeted their advertisements and services to people who were Hispanic or had a national origin from Mexico.

322.   Upon information and belief, Defendants Absolute Investments, Tara Home Financial, Ghajar, and Tran targeted their services to people who were Hispanic or had a national origin from Mexico.

323.   In Santa Clara County, Defendant Pablo Curiel made his predatory and misleading loan to 100% people with Hispanic names.  Upon information and belief, 100% of those borrowers were Hispanic.

324.   Upon information and belief, Defendants Paul Curiel and Paul Curiel Insurance Agency targeted their inferior services and products to homeowners who were Hispanic and had a national origin from Mexico.

325.   Based on the factual allegations stated hereinabove, Plaintiffs are informed and believe and, on that basis, allege that Defendants (other than Paul Curiel and Curiel Insurance

SV 346132979v4

1    Agency) acted so that persons not of Plaintiffs' national origin, or race, who were no better qualified

2    financially for a mortgage loan than were Plaintiffs, either:  (a) were offered loans on more favorable

3    terms than those offered by Defendants to Plaintiffs; or (b) were not issued predatory loans with

4    exorbitant closing costs and fees, falsified applications, misrepresented terms, and missing

5    disclosures.

6        326.    All Defendants are engaged in residential real estate-related transactions, including but

7    not limited to making or brokering of loans, brokering of residential real property, and providing

8    insurance for residential real property.

9        327.    Defendant Pablo Curiel, using the brokering services of Defendants Tran, Absolute

10    Investments, Tara Home Financial and Ghajar, engaged in a pattern and practice of extending credit

11    to consumers without regard to the consumers' repayment ability.

12        328.    Upon information and belief, Defendants had a business arrangement with each other

13    Defendant.

14                                    **INJURIES**

15        329.    Plaintiffs were financially damaged by Defendants' actions, including but not limited

16    to receiving loans inferior to those that they were promised, with higher interest rates and variable,

17    increasing rates, paying exorbitant and unreasonable fees, paying higher monthly payments than

18    promised, and enduring substantial damage or risk of damage to their credit.

19        330.    As a result of Defendants' actions in connection with their home loans, Plaintiffs have

20    suffered persistent emotional distress with physical manifestations.

21        331.    Defendants arranged for Plaintiffs to receive loans with worse loans with higher

22    interest rates and fees and more onerous terms than they could have received based on their credit

23    scores and applications.

24        332.    Defendants have illegally gained fees and profit from plaintiffs as described herein.

25    Therefore, plaintiffs are entitled to restitution.

26        333.    Defendants were unjustly enriched at the expense of Plaintiffs, who are therefore

27    entitled to equitable restitution and disgorgement of profits obtained by Defendants.

28

COMPLAINT

334.   As a direct and proximate result of Defendants' actions, Plaintiffs were and continue to be damaged in an amount according to proof but not yet ascertained including, without limitation, statutory damages and all amounts paid or to be paid in connection with the transaction.

335.   There now exists an actual controversy between the parties regarding Defendants' duties under applicable law.  Therefore, Plaintiffs are entitled to declaratory relief.

336.   The monthly mortgage payments on the loans will periodically increase and either will require Plaintiffs to refinance or sell their property or will threaten Plaintiffs with foreclosure.

337.   Unless enjoined, Defendants will continue to engage in the unlawful acts described above.  Plaintiffs continue to suffer irreparable harm from Defendants unlawful acts unless relief is provided by this court.  Accordingly, Plaintiffs are entitled to injunctive relief.

338.   Plaintiffs believe that the acts of Defendants as described herein were willful, wanton, and in conscious disregard of the rights of Plaintiffs, and on that basis allege that Plaintiffs are entitled to recover punitive damages in an amount to be established at trial.

339.   Plaintiffs are entitled to all statutory damages under the claims in this Complaint, including but not limited to treble damages under California Code of Civil Procedure § 1021.5.

340.   Plaintiffs were financially damaged by Defendants' actions, including but not limited to receiving loans inferior to those that they were promised, with higher interest rates and variable, increasing rates after the fixed introductory rate, paying exorbitant and unreasonable fees, and substantial damage or risk of damage to their credit.

341.   As a result of Defendants' actions in connection with their home loans, Plaintiffs have suffered persistent emotional distress with physical manifestations.

342.   Plaintiffs have tendered payments to Defendants and their assignees.

343.   The monthly mortgage payments on the loans will periodically increase and either have required Plaintiffs to refinance or sell their property or will threaten Plaintiffs with foreclosure.

344.   Defendants were unjustly enriched at the expense of Plaintiffs, who are therefore entitled to equitable restitution and disgorgement of profits obtained by Defendants.

345.   As a direct and proximate result of these violations, Plaintiffs were and continue to be damaged in an amount according to proof but not yet ascertained including, without limitation,

1   statutory damages and all amounts paid or to be paid in connection with the transaction, excluding

2   principal payments, if any.

3       346.   Plaintiffs believe that the acts of Defendants as described herein were willful, wanton,

4   and in conscious disregard of the rights of Plaintiffs, and on that basis allege that Plaintiffs are

5   entitled to recover punitive damages in an amount to be established at trial.

6       **347.**   Plaintiffs are entitled to all statutory damages under the claims in this Complaint,

7   including but not limited to treble damages under California Code of Civil Procedure § 1021.5.

8   **CLAIMS**

9   **FIRST CLAIM**

10  **Violation of the Fair Housing Amendments Act,**
**42 U.S.C. § 3601, et seq.**
**(All Plaintiffs v. all Defendants)**

11

12      348.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 347

13  inclusive, as though fully set forth herein verbatim.

14      349.   Defendants, through their authorized representatives and agents, have violated the Fair

15  Housing Amendments Act by inducing Plaintiffs to enter predatory purchase agreements,

16  homeowners insurance with inferior terms, and mortgage loans designed to fail with adjustable

17  interest rates, negative amortization, balloon payments, and very high fees because of their race and

18  national origin.

19      350.   Defendants specifically targeted their products and services, which were inferior and

20  predatory, to Hispanic residents whose national origin is Mexico.

21      351.   Defendants have discriminated in the provision of services in connection with

22  residential real estate transactions, or in the terms or conditions of such transactions, because of race,

23  color, and national origin of the borrower in violation of 42 U.S.C. § 3605.

24      352.   Defendants discriminated against Plaintiffs because of their race and national origin in

25  the provision of services in connection with a dwelling, in violation of 42 U.S.C. § 3604.

26      353.   Defendants' actions made or will make the homes of Plaintiffs (other than Plaintiffs

27  Arreola and Bravo) otherwise unavailable because of Plaintiffs' race and national origin, in violation

28  of 42 U.S.C. § 3604.

COMPLAINT

SV 346132979v4

354.   By the actions described herein and as a proximate cause of Defendants' conduct, Plaintiffs have been damaged, as set forth above.

## SECOND CLAIM
### Violation of the Truth in Lending Act
### 15 U.S.C. § 1601, et seq., and Regulation Z, 12 C.F.R. § 226, et seq.
### (All Plaintiffs except Maria Ramirez and Cirila Torralba against Defendant Pablo Curiel)

355.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 354 inclusive, as if fully set forth herein verbatim.

356.   Defendant Pablo Curiel is a creditor within the meaning of the Truth in Lending Act ("TILA") as implemented by Regulation Z.

357.   Charges, including but not limited to the fees paid to Defendant Pablo Curiel and other Defendants, were not bona fide and reasonable and were "finance charges" under TILA that required proper disclosure to Plaintiffs.

358.   Defendant Pablo Curiel violated TILA by failing to provide Plaintiffs with appropriate material disclosures required under TILA.

359.   Defendant Pablo Curiel failed to give Plaintiffs Antoinia or Jesus Arreola or Tomas or Martha Hernandez copies of a notice of the right to cancel the loan at the time at which they signed their refinance loan documents or at anytime since then.  Accordingly, these Plaintiffs are entitled to rescind the loans that they obtained from Defendants.

360.   As a result of these actions, Plaintiffs were damaged, as set forth above.

## THIRD CLAIM
### Violation of Home Ownership and Equity Protection Act (HOEPA)
### 15 U.S.C. § 1639
### (Plaintiffs Arreola and Hernandez v. Defendant Pablo Curiel)

361.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 360 inclusive, as though fully set forth herein verbatim.

362.   Defendant Pablo Curiel, using the broker services of Defendants Ghajar, Absolute Investments and Tran, made high cost loans, as defined by 15 U.S.C. § 1602(aa), to Plaintiffs Arreola and Hernandez.

363.   Defendants failed to disclose that these loans were high cost loans, and did not give them three business days before signing, to these Plaintiffs, in violation of 15 U.S.C. § 1639.

364.   The loans from Defendant Pablo Curiel to Arreola and Hernandez contained balloon payments and had a term of less than five years, in violation of 15 U.S.C. § 1639(e).

365.   These loans from Defendant Pablo Curiel to Arreola and Hernandez were issued without regard to Plaintiffs' repayment ability, in violation of 15 U.S.C. § 1639(h).

366.   As a result of these actions, Plaintiffs were damaged and, as these violations were material, are entitled to enhanced damages under HOEPA.

**FOURTH CLAIM**
**Real Estate Settlement Procedures Act**
**12 U.S.C. § 2601, et seq., and Regulation X, 24 C.F.R. § 3500, et seq.**
**(All Plaintiffs except Jesus Arreola, Maria Ramirez, and Cirila Torralba v. all Defendants)**

367.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 366 inclusive, as though fully set forth herein verbatim.

368.   Fees paid to Defendants were unlawful kickbacks and unearned fees under Real Estate Settlement Procedures Act (RESPA) because they were not reasonably related to the performance of lawful services.

369.   Defendants violated RESPA by either paying or receiving an excessive or unearned fee.

370.   Defendants had associations and/or controlled business arrangements amongst each other, yet failed to disclose these arrangements or associations to Plaintiffs, in violation of RESPA.

371.   By the actions described herein and as a proximate cause of Defendants' conduct, Plaintiffs were damaged, in an amount to be proven at trial.

**FIFTH CLAIM**
**Violation of Fair Employment and Housing Act**
**Cal. Gov't Code § 12955 et seq.**
**(All Plaintiffs v. All Defendants)**

372.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 371, inclusive, as if fully set forth herein verbatim.

373.   Defendants discriminated against Plaintiffs because of their race and national origin in the provision and arrangement of financial assistance for the purchase and refinancing of housing accommodations, in violation of Cal. Gov't Code § 12955(e), (g).

COMPLAINT

SV 346132979v4

374.    Defendants discriminated against Plaintiffs because of their race and national origin in the terms and conditions of a real estate-related transaction, in violation of Cal. Gov't Code § 12955(i).

375.    Defendants' discrimination based on race and national origin made Plaintiffs' homes, except for the homes of Plaintiff Arreola and Bravo, otherwise unavailable, in violation of Cal. Gov't Code § 12955(k).

376.    By the actions described herein and as a proximate cause of Defendants' conduct, Plaintiffs were damaged, in an amount to be proven at trial.

## SIXTH CLAIM
### Breach of Fiduciary Duty
### (All Plaintiffs v. Defendants Absolute Investment, Ghajar, Tran, Golden Hills, Valdovinos, and Chavez)

377.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 376, inclusive, as if fully set forth herein verbatim.

378.    California law imposes on the real estate agents and mortgage brokers, as fiduciaries, the same obligation of undivided service and loyalty that it imposes on a trustee in favor of a beneficiary. Real estate agents have a fiduciary duty to parties for whom they arrange exchanges of realty to disclose all material facts which might effect their decision regarding the transaction. *Pepitone v. Russo*, 64 Cal. App. 3d 685 (1977). Brokers owe a fiduciary duty to borrowers at least until the loan is funded. *Umet v. Santa Monica Med. Invt.*, 140 Cal. App. 3d 864 (1983).

379.    As mortgage brokers, Defendants Absolute Investment, Ghajar, and Tran owed Plaintiffs each a fiduciary duty of loyalty and a duty of care.

380.    As real estate agents, Defendants Golden Hills, Valdovinos, and Chavez owed Plaintiffs each a fiduciary duty of loyalty and a duty of care.

381.    All of these Defendants violated their duty of care and duty of loyalty, as described above, including but not limited to:

    a.    Misleading Plaintiffs to believe that their monthly mortgage payments would be lower than they ultimately were;

    b.    Failing to explain the terms of the loan transactions to Plaintiffs;

-48-

SV 346132979v4

c.   Inducing plaintiffs to sign loan documents by either misrepresenting the terms or failing to disclose the terms;

d.   Failing to disclose all charges, costs, and fees incurred in connection with the loans and purchase of homes;

e.   Putting their own financial interest above the financial interest of Plaintiffs;

f.   Procuring loans that on worse terms than Plaintiffs' credit made them eligible for;

g.   Purposefully inducing plaintiffs to sign purchase agreements and loans that they were ultimately unable to afford; and

h.   Falsifying plaintiffs' income and assets on their loan application.

382.   Defendants engaged in the conduct alleged herein for the purpose of advancing their own financial interest and in callous disregard of the foreseeable financial consequences to plaintiffs.

383.   As a result of defendants' breach of their fiduciary duties to plaintiffs, plaintiffs have sustained damages to be proven at trial.  Defendants' conduct as alleged herein was a substantial factor in causing the damages sustained by plaintiffs.

## SEVENTH CLAIM
### Fraud
### (All Plaintiffs against All Defendants)

384.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 383 , inclusive, and the allegations in all of the other claims alleged in this complaint, as if fully set forth herein verbatim.

385.   Defendant Tran and agents of Defendants Absolute Investments and Ghajar knowingly and willfully induced Plaintiffs to enter into loan agreements by making false oral statements and omitting material information regarding the terms of the loan and plaintiffs' application.

386.   Defendants Valdovinos, Chavez, and agents of Golden Hills made knowingly false statements regarding the condition and/or cost of homes in order to induce Plaintiffs to purchase these homes.

SV 346132979v4

387.    Defendants made these false statements with the intent to induce plaintiffs to rely on them so that defendant would receive its brokerage fees upon the closing of the refinance loan.

388.    Defendants specifically withheld loan documents translated into Spanish to prevent plaintiffs from discovering the exact terms of the loans defendants had procured.

389.    Plaintiffs reasonably relied on all such misrepresentations and omissions.   Absent those misrepresentations and omissions, plaintiffs would not have entered into the loan transactions.

390.    Plaintiffs have been harmed by Defendants' fraudulent conduct in an amount to be proven at trial.

391.    In their conduct alleged herein, defendants acted with oppression, malice and fraud so as to entitled plaintiffs to punitive damages in an amount sufficient to punish defendants for their wrongful conduct.

### EIGHTH CLAIM
### Violation of California Financial Code § 4970
### (All Plaintiffs except Bravo v. Defendants Pablo Curiel, Absolute Investments, Ghajar, and Tran)

392.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 390 , inclusive, and the allegations in all of the other claims alleged in this complaint, as if fully set forth herein verbatim.

393.    Defendant Curiel was a creditor who issued a high cost loan.   The finance charges associated with each Plaintiff's loan with Curiel were 6% or more of the loan amount.

394.    Defendants Absolute Investments, Ghajar, and Tran were mortgage brokers who arranged these high-cost loans.

395.    Defendants violated Cal. Financial Code § 4970 by brokering and issuing loans to Plaintiffs:

    a.    That included a balloon payment, although the loans had a term of less than five years;

    b.    Without reasonable belief that Plaintiffs would be able to make the scheduled payments to repay the loan based on income, assets, and employment status;

    c.    That were higher cost than other available loan products for Plaintiffs;

SV 346132979v4

d.      While acting with fraud; and

e.      Without mandatory notices, disclosures, and warnings, as required by law.

**396.**   As a result of these violations, Plaintiffs were damaged.

## NINTH CLAIM
### Violation of California Civil Code § 1632
**(All Plaintiffs v. Defendants Pablo Curiel, Absolute Investments, Tran, and Ghajar)**

397.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 396, inclusive, as if fully set forth herein verbatim.

398.   Defendants Pablo Curiel, Absolute Investments, Tran, and Ghajar failed to provide any disclosures in the Spanish language despite the fact that the loans were negotiated in Spanish, in violation of Cal. Civil Code § 1632(c).

399.   Pursuant to subdivision (k) of California Civil Code § 1632, defendants must allow plaintiffs to rescind such loans.

400.   Pursuant to California Civil Code § 1691(b), this complaint serves as notice of rescission.

401.   Plaintiffs are entitled to rescind the loans and are entitled to equitable restitution.

## TENTH CLAIM
### Rescission/Cancellation
### California Civil Code § 1689 and Court's Inherent Equitable Authority
**(All Plaintiffs against Defendants Pablo Curiel, Absolute Investments, Ghajar, & Tran)**

402.   Plaintiffs hereby incorporates by reference the allegations of paragraphs 1 through 401, inclusive, as if fully set forth herein verbatim.

403.   Plaintiffs' signatures on the loan notes were obtained by fraud, duress, and undue influence.

404.   The public interest will be prejudiced by allowing these contracts to stand.

405.   Plaintiffs are entitled to rescission and/or cancellation of their loan notes, inter alia, pursuant to California Civil Code § 1689.

COMPLAINT

SV 346132979v4

## ELEVENTH CLAIM
### Violation of Consumers Legal Remedies Act
### California Civil Code § 1760 et seq
### (All Plaintiffs v. All Defendants)

406.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 405, inclusive, and the allegations in all of the other claims alleged in this complaint, as if fully set forth herein verbatim.

407.    Defendants violated Civil Code § 1770 through the following acts:.

        a.    Misrepresenting their licensing and affiliation status;

        b.    Representing that their products and services had characteristics and benefits which they do not have;

        c.    Advertising services with intent not to sell them as advertised; and

        d.    Representing that a transaction confers or involves rights, remedies, or obligations which it does not have.

408.    Plaintiffs currently only seek injunctive relief from Defendants under this section.

## TWELFTH CLAIM
### Civil Conspiracy to Defraud
### (All Plaintiffs v. All Defendants)

409.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 408, inclusive, and the allegations in all of the other claims alleged in this complaint, as if fully set forth herein verbatim.

410.    Defendants, by their actions, engaged in a civil conspiracy to fraudulently induce Plaintiffs to enter into real property purchase and loan transactions.

411.    Defendants entered into an agreement (either explicitly or tacitly) to fraudulently induce Plaintiffs to enter into and be bound by purchase and loan transaction by intentionally making misrepresentations and concealing material facts as described above.  All of the Defendants' acts were directed toward the goal of the conspiracy.

412.    Each defendant stood to gain from this conspiracy, through fees, referral of business, and interest on Plaintiffs' loans.

COMPLAINT

SV 346132979v4

1       413.   On information and belief, no Defendant took any steps to withdraw from the

2   conspiracy and therefore all Defendants are liable for the actions of the others in effecting the

3   conspiracy.

4       414.   Plaintiffs were injured by the actions taken in furtherance of the conspiracy and are

5   therefore entitled to damages.

### THIRTEENTH CLAIM
**Violation of the Unfair Competition Act**
**California Business and Professions Code § 17200 et seq.**
**(All Plaintiffs v. all Defendants)**

    415.   Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 414,

inclusive, and the allegations in all of the other claims alleged in this complaint, as if fully set forth

herein verbatim.

    416.   Defendants have been engaged in, and continue to engage in, numerous acts and a

pattern and practice of unfair competition within the State of California in violation of Business and

Professions Code § 17200 et seq., proscribing deceptive business practices. These unfair business

practices include, without limitation, the following:

    a.   Engaging in predatory lending practices in dealings with plaintiffs including, but

not limited to, the use of high pressure sales tactics and the falsification of loan application

information;

    b.   Self-dealing at the expense of home buyers and borrowers;

    c.   Failing to provide notices and disclosures required by RESPA;

    d.   Discriminating on the basis of race, national origin, or unlawful criteria;

    e.   Violating RESPA; violating the False Advertising Act, California Business and

Professions Code § 17500 et seq., or any other applicable statute;

    f.   Failing to provide Spanish translations as required by California Civil Code §

1632; and

    g.   Charging and collecting fees in excess than those permitted under statute.

    417.   The above-described unlawful, unfair and fraudulent business practices are an ongoing

threat of injury to plaintiffs and the general public. Plaintiffs and the general public continue to be

COMPLAINT

SV 346132979v4

1   financially harmed by such conduct and, unless restrained, defendants will continue to engage in such

2   conduct.

3        418.   Pursuant to California Business and Professions Code § 17203, Plaintiffs are entitled

4   to an order of this Court enjoining defendants from continuing to engage in unfair competition, as

5   defined in Business and Professions Code § 17200, in the State of California. Plaintiffs and the

6   general public will be irreparably harmed if such an order is not granted.

7        419.   Defendants have been unjustly enriched at the expense of the plaintiffs who therefore

8   are entitled to equitable restitution and disgorgement of profits realized by defendants.

9                                    **RELIEF**

10      Wherefore, plaintiffs pray for the following relief:

11      1.      That the Court assume supplemental jurisdiction over all state law claims, pursuant to

12   28 U.S.C. § 1367;

13      2.      That the Court declare that Defendants violated applicable provisions of federal and

14   state law;

15      3.      That the Court enjoin all unlawful practices complained of in this action and impose

16   affirmative injunctive relief requiring defendants, their partners, agents, employees, assignees, and all

17   persons acting in concert or participating with them, to take affirmative action to immediately

18   implement policies designed to ensure: (1) that all prospective borrowers' loan applications do not

19   contain false information, (2) a thorough evaluation of all prospective borrowers' ability to repay any

20   loans made available to them, (3) training regarding applicable lending laws for all of defendants'

21   employees and agents, (4) translate disclosure documents into Spanish if negotiated in Spanish and

22   (5) eliminating discriminatory policies and practices;

23      4.      That the Court order defendants to immediately rescind the loans and return all costs

24   to Plaintiffs associated with the loans;

25      5.      That the Court award compensatory and punitive damages, where appropriate, to

26   plaintiffs according to proof;

27      6.      That the Court award plaintiffs costs of suit, including reasonable attorney's fees; and

28      7.      That the Court award plaintiffs all other relief as the Court deems just.

- 54 -

COMPLAINT

Dated: 3/19 , 2007

GREENBERG TRAURIG, LLP


By:_____
    William J. Goines
    Karen Rosenthal
    Cindy Hamilton
    Alisha Louie


FAIR HOUSING LAW PROJECT


By:_____
Stephanie A. Stevens
Kerstin Arusha


Attorneys for Plaintiffs

- 55 -

COMPLAINT

1

2   Dated: 3 · 19 2007

3                                          GREENBERG TRAURIG, LLP

4

5                                          By: _____
                                               William J. Goines
6                                              Karen Rosenthal
                                               Cindy Hamilton
7                                              Alisha Louie

8                                          FAIR HOUSING LAW PROJECT

9

10                                         By:
                                           Stephanie A. Stevens
11                                         Kerstin Arusha

12                                         Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

SV 348132979v4