# EXHIBIT A

UNITED STATES DISTRICT
NORTHERN DISTRICT OF CALIFORNIA

MARIA A. GARVIN, JESUS ARREOLA,
ANTONIA ARREOLA, RAFAEL M. BRAVO,
TOMAS HERNANDEZ, MARTHA HERNANDEZ,
JUAN RAMIREZ, MARIA C. RAMIREZ,
EUGENIO RAMOS, COLUMBA RAMOS,
PROSPERO TORRALBA, CIRILA TORRALBA,
RAUL TORRES and RAUL GONZALEZ,

                    Plaintiffs,

         vs.                          No. C07-01571 RS

LINDA TRAN; ABSOLUTE INVESTMENT
GROUP, INC., a California corporation
doing business as PALACIO MORTGAGE;
NORMA VALDOVINOS; RAYA GHAJAR;
PABLO CURIEL; PABLO CURIEL doing
Business as DOWNPAYMENT ASSISTANCE;
PAUL CURIEL; PAUL CURIEL INSURANCE
AGENCY; PALACIO REAL FUNDINGS, INC.,
a California corporation, doing
business as PALACIO FUNDINGS; GOLDEN
HILLS ASSOCIATES, INC., a California
corporation doing business as CENTURY
21 GOLDEN HILLS; and TARA HOME FINANCIAL
SERVICES, INC., a California corporation,
JESUS CHAVEZ,

                    Defendants.
_____/

**CERTIFIED COPY**

Deposition of
**NORMA VALDOVINOS**
Tuesday, August 12, 2008


Reported by SANDRA BUNCH VANDER POL, RMR, CRR, CSR
License No. 3032
Job No. 19831LR



**PHILLIPS LEGAL SERVICES**
SAN FRANCISCO DEPOSITION REPORTERS
795 FOLSOM STREET, FIRST FLOOR
SAN FRANCISCO, CA 94107
1-888-333-8270
WWW.PHILLIPSDEPO.COM

Norma Valdovinos                                              8/12/08

1           And I also started to inquire about real estate.

2     But I didn't start until late '99 taking the classes.

3     Q.      And what classes are those?  Are those the

4     real estate classes with Century 21?

5     A.      Yeah.  And I got my license in 2000.  And I

6     started working in real estate in 2000.

7     Q.      I'm going to make sure I understand your

8     testimony.

9           When you -- did you perform any -- were you

10    employed by Century 21 Su Casa while you were taking

11    classes or were you --

12    A.      No.

13    Q.      -- strictly taking classes from them?

14    A.      Just -- just going to the -- like once a week.

15    Once a week for about an hour.

16          MS. REUTER:  I don't know if you're aware

17    Su Casa operated a large school that was associated with

18    the brokerage.

19          THE WITNESS:  But I wasn't working.  I was

20    working at the other company when I was just taking the

21    classes to get the license.  Just to get the license.

22    Q.      BY MS. HAMILTON:  So you continued to work for

23    Zycon while you took classes at Century 21?

24    A.      Yes.

25    Q.      And there was some overlap between them?

22

```
 1    A.       I'm sorry?

 2    Q.       They overlapped, your job at Zycon and your

 3    classes at Century 21?

 4    A.       Yes.

 5    Q.       And after your training with Century 21, did you

 6    start working for Century 21 as an employee?

 7    A.       Yes.

 8             MS. REUTER:  Objection, that calls for a legal

 9    opinion and/or expert -- expert opinion as to the

10    definition of employer/employee relationship.

11    Q.       BY MS. HAMILTON:  And what was your position at

12    Century 21?

13    A.       What was my position?

14    Q.       What was your title?

15    A.       Realtor.

16    Q.       And what were some of your responsibilities as a

17    realtor at Century 21?

18    A.       My responsibilities?

19    Q.       The responsibilities of your position as a

20    realtor?  What sorts of things did you do for that

21    position?

22    A.       I was -- what should I -- I don't know exactly

23    how to --

24             MS. REUTER:  She wants to know the things that

25    you did as a part of your job as a real estate agent.
```

23

```
 1              THE WITNESS:  As a real estate agent.  Showing
 2    homes.  Making offers.  Negotiating the offers.
 3    Q.        BY MS. HAMILTON:  Were you responsible for
 4    bringing in new clients?
 5    A.        Bringing in my clients?
 6    Q.        New clients to Century 21.
 7    A.        People would call me.
 8    Q.        Did you do any advertising?
 9    A.        At that time when I started, no.  Just people
10    who knew me.  That's how I started.
11    Q.        And how long did you work for Century 21
12    Su Casa?
13    A.        For about four years.  Three years, maybe.
14    Q.        Do you recall what year you left your employment
15    at Century 21 Su Casa?
16              MS. REUTER:  Objection, calls for a legal
17    conclusion and/or expert opinion as to the definition of
18    "employment relationship."
19              If you want to rephrase your question, I'm sure
20    it would be more appropriate.
21    Q.        BY MS. HAMILTON:  Do you understand the
22    question?
23    A.        I understand the question.
24    Q.        Do you recall what year you left Century 21
25    Su Casa?
```

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                          www.phillipsdepo.com

Norma Valdovinos                                    8/12/08

1    A.        Should I answer?

2              MS. REUTER:  You can answer to the extent of

3    your understanding of her use of the term "employment

4    relationship."

5              THE WITNESS:  2003, I think.

6    Q.    BY MS. HAMILTON:  And did you seek new

7    employment?

8    A.        Yes.

9    Q.        And where did you seek new employment?

10   A.        Century 21 --

11             MS. REUTER:  Again, I'm going to object to the

12   use of the term "employment" on the same grounds.

13   Q.    BY MS. HAMILTON:  Do you understand the

14   question?

15             MS. REUTER:  You can answer.

16             THE WITNESS:  Yes.  I started working at Century

17   21 Golden Hills.

18   Q.    BY MS. HAMILTON:  And what -- and what year was

19   that?

20   A.        2003.

21             MS. HAMILTON:  I'm going to mark as Exhibit 18 a

22   multipage document Bates stamped C21-GAR-164 through

23   C21-GAR 169.

24                  (Exhibit No. 18 was marked.)

25             MS. HAMILTON:  Do you want to take a few moments

1    A.        Yes.

2    Q.        If I could direct your attention to page 3 of

3    this booklet -- at the bottom it says C21-GAR-166 -- to

4    paragraph 18 of this section.

5    A.        Arbitration?

6    Q.        Of disputes, yes.

7              Have you ever participated in an arbitration of

8    a dispute with Century 21 Golden Hills?

9    A.        No.

10   Q.        And if I could now direct your attention to the

11   very next page.  The bottom of this page is C21-GAR-167.

12   A.        This one?  This one.

13   Q.        I'm sorry.  Could I actually change the page I'm

14   looking at to C21-GAR-169.

15             Have you ever seen this document before?

16   A.        Yes.

17   Q.        Can you describe this document for me.

18   A.        This is -- this is like the splits.

19   Q.        And by "splits," are you referring to commission

20   splits?

21   A.        Yes.

22   Q.        And if I said that this document was --

23   described categories of commission splits, would you

24   agree with that?

25   A.        Yes.

1    Q.       So you haven't gone up or down from this chart

2    during your entire time at Century 21?

3    A.       Yes.

4    Q.       Okay.  If I could direct your attention to the

5    next page, the bottom of this page C21-GAR-170.

6             Towards the middle of the page it lists your

7    starting commission at 90 percent.

8    A.       Yes.  But I didn't see any 90 percent here in

9    the charts.  That's why I say the last one.

10   Q.       I'm sorry.  I want to understand your testimony.

11            Are you telling me that your percentage of

12   commission split was actually 85 and not 90?

13   A.       No.  It was the opposite.  It was 90 instead of

14   85.  But I didn't see on this.

15   Q.       I see.  But since there's no higher category,

16   you considered yourself to be the sixth category?

17   A.       Yes.

18   Q.       I think I understand.

19            And underneath the starting commission

20   percentage, whose signature is that below the line with

21   90 percent?

22   A.       It looks like Robert Fernandez.

23   Q.       Turning back to the first page of this document.

24   Has your real estate salesperson license ever been

25   suspended?

40

1    Q.      Do you recognize what the front page of this

2    document is?

3    A.      Yes.

4    Q.      And what is it?

5    A.      This is the cover of the Hispanic magazine.

6    Q.      What is it called?  I know there's a woman's

7    head blocking it, but are you familiar with it?

8    A.      El Aguila.

9    Q.      And can you spell that for the court reporter.

10   A.      E-L, A-G-I -- A-G-U-I-L-A.

11   Q.      And is this your picture on the front page of

12   this magazine?

13   A.      Yes.

14   Q.      Did you place this advertisement in this

15   magazine?

16   A.      Yes.

17   Q.      So you were aware this advertisement was placed

18   on your behalf?

19   A.      Yes.

20   Q.      How long have you been advertising in El Aguila?

21   A.      About -- probably about five years.

22   Q.      And do you personally do any other forms of

23   advertising, aside from placing ads in El Aguila?

24   A.      Yes.

25   Q.      And what other forms of advertising do you do?

1    A.        Right now -- actually, right now it's only in

2    El Aguila.

3    Q.        And in 2004, can you describe for me what other

4    forms of advertising you did?

5              MS. REUTER:  I'm going to direct my client not

6    to answer that question and invoke her fifth Amendment

7    privilege against self-incrimination.

8    Q.        BY MS. HAMILTON:  Are you going to follow your

9    counsel's advice?

10   A.        Yes.

11   Q.        Can you translate for me what it says under your

12   picture on the front page of this.

13   A.        "Realtor Norma Valdovinos," and my phone number.

14   Q.        And underneath your phone number, can you

15   translate what that says in English for me.

16   A.        Yes.  It says, "With me it's easy to buy a

17   house -- to buy your house."

18   Q.        And there appears to be a little figure to the

19   right of your photo.  Can you tell me what that is?

20   A.        The logo?

21   Q.        Not the logo.  Just under the logo.

22   A.        That's a centurion logo.

23   Q.        Let me make sure that we're talking about the

24   same item.  I'm talking about right here, directly to the

25   right of your photograph, this little figurine that looks

1    black background, could you translate for me what that

2    says.

3    A.        Yes.  "As your real estate agent, my purpose is

4    to guide you so the banks will qualify you, and you will

5    receive the best loan rate and payment possible.  That

6    way I will find you the property that you would like."

7              I'm worried about the translating.  You probably

8    didn't understand what I say.

9    Q.        No, I think that's fine.

10             So do you feel that this statement accurately

11   describes what you do for your clients?

12   A.        Yes.

13   Q.        I'd like you to walk me through the process of

14   what happens when -- we will just start.  You said about

15   50 percent of your clients come through advertising and

16   about 50 percent are personal referrals; is that correct?

17   A.        Yes.

18   Q.        Can you just walk me through the process of what

19   happens, say, when someone calls having seen this

20   advertisement or another advertisement?

21             MS. REUTER:  Vague as to time.

22             MS. HAMILTON:  Currently.

23   Q.        If someone were to call you today, can you just

24   walk me through the process of what you say to them and

25   how the conversation goes?

62

```
 1    A.        I ask them if they -- if they already have their

 2    finance ready or --

 3    Q.        I'm sorry.  Finance rating?  Do you mean a

 4    credit rating?

 5    A.        Yeah, like the credit.  If they know how their

 6    credit -- usually I ask them if they know how the credit

 7    is, if they have good or bad credit.

 8    Q.        Anything else?

 9    A.        And, well, I -- I try to make an appointment

10    with them so I can talk to them.

11    Q.        Is it your general practice to meet with all of

12    your clients face to face?

13    A.        Yes.

14    Q.        Either if they call you or if they are a

15    personal referral?

16    A.        Yes.

17    Q.        Is there anything else that you discuss on the

18    phone with them when they first call?

19    A.        Sometimes I ask them if they -- if they own a

20    property already, or if this is going to be their first

21    time buying a house.

22    Q.        Is there anything else?

23    A.        Over the phone usually we just make the

24    appointment.

25    Q.        How long would you say the conversations
```

63

```
 1    typically lasts over the phone?

 2    A.        I would say around two, three minutes.

 3    Q.        And I described this as a situation where

 4    someone calls having seen your ad in El Aguila, would

 5    this conversation be any different if someone had called

 6    you based on a personal referral?

 7    A.        It's about the same.

 8    Q.        And has your -- has this been your general

 9    practice as to what you do when customers call inquiring

10    about a home?

11    A.        Yes.

12    Q.        Has it been any different in years past?

13    A.        Actually, most of them -- they ask how much are

14    they, this house.  The houses that I advertise.  They ask

15    more about the house, how much is this house.  I would

16    like to buy a house.

17              I ask them, where would you like to buy your

18    house?  Here in San Jose or out of the area?  And what

19    type of house would you like?  Two bedrooms, one bath; or

20    three bedrooms or more?

21    Q.        And has that always been your practice to ask

22    that type of information in the past, as well as right

23    now?

24    A.        Yes.

25    Q.        And the conversation always lasts about two to
```

1    three minutes?

2    A.       More.  More sometimes.

3    Q.       How soon after you have a phone conversation do

4    clients typically come into your office?

5    A.       I'm sorry?

6    Q.       How long after this two- to three-minute phone

7    conversation do your clients typically come into your

8    office to meet with you personally?

9    A.       Within the next day or two.

10   Q.       And what happens at that face-to-face meeting?

11   A.       Well, if they want to buy a house, I would ask

12   them to go and talk to a loan agent so they can get a

13   loan.

14   Q.       So --

15   A.       Or sometimes they already have somebody who

16   would do the loan, and they just give you the

17   information, who is doing the loan, and I contact to that

18   person.

19   Q.       So some clients come in already having a loan

20   agent in mind?

21   A.       Yes.

22   Q.       And some clients come in without a loan agent in

23   mind?

24   A.       Yes.

25   Q.       And what about -- what do you tell the clients

65

1    who come in with no loan agent in mind?

2    A.       I would refer to -- because I used to -- well,

3    right now I'm not.   Three different loan agents, I would

4    send them.

5         MS. REUTER:   What period of time are we talking

6    about here?

7         MS. HAMILTON:   I guess I'm just asking about her

8    general practice, as you've been employed at Century 21

9    Golden Hills.   So from 2004 to the present.

10        MS. REUTER:   From 2004 through the end of 2006,

11   I'm going to instruct my client to invoke her Fifth

12   Amendment privilege against self-incrimination.

13        The last four or five questions I understood you

14   were talking about current, 2008.   That's what I had

15   understood that you had qualified those questions as.

16        Is that a correct understanding?

17        MS. HAMILTON:   Except to the extent where I

18   asked her if her practice differed in past years, and she

19   indicated that it did not.

20        MS. REUTER:   Okay.   But certainly from the end

21   of 2006 forward, you're welcome to answer.

22   Q.       BY MS. HAMILTON:   So who were those three

23   different loan agents that you would refer clients to?

24   A.       I was working with Linda Tran, with Pedro

25   Benitez.

```
1    Q.        I am sorry.  Can you spell his last name for me.

2    A.        B, as in boy, E-N-I-T-E-Z.

3              Wells Fargo, Jose Rodriguez.

4    Q.        You said Wells Fargo.  Does Wells Fargo employ

5    either Pedro Benitez or Jose Rodriguez?

6    A.        Jose Rodriguez.

7    Q.        I'm sorry?

8    A.        Jose Rodriguez.

9    Q.        Jose Rodriguez is employed by Wells Fargo?

10   A.        Yes.

11   Q.        How about Pedro Benitez, who is he employed by?

12   A.        He was the mortgage broker.

13   Q.        Did he have a company name?

14   A.        Yeah.  I don't recall the company name.  I

15   always go by his name.

16   Q.        And what percentage of clients would you say you

17   refer to Linda Tran, Pedro Rodriguez -- I am sorry, Pedro

18   Benitez and Jose Rodriguez, what percentage from each

19   client?

20             MS. REUTER:  From 2004 to 2006, I will instruct

21   my client to invoke her Fifth Amendment privilege against

22   self-incrimination.  From 2007 forward she can answer.

23   Q.        BY MS. HAMILTON:  So from 2004 to 2006, what

24   percentage would you say that you allocated to each of

25   these three loan agents?
```

67

```
 1            MS. REUTER:  I will instruct my client to invoke
 2    her Fifth Amendment privilege.
 3    Q.        BY MS. HAMILTON:  Are you going to follow your
 4    counsel's instructions?
 5    A.        Yes.
 6    Q.        How about 2006 to 2008, what percentage of
 7    clients who came in with no financing options would you
 8    say you referred to Linda Tran, Pedro Benitez and Jose
 9    Rodriguez, respectively?
10    A.        How many percent to each one?
11    Q.        Yes.
12    A.        I would say -- from 2006, did you say?
13            MS. HAMILTON:  Did you tell --
14            MS. REUTER:  No.  Through 2006.  I have stated
15    my objection, and she has followed my instruction.
16            So after 2006.  In 2007 through current.
17            THE WITNESS:  2007.  Actually 2007 I was working
18    with another loan agent.
19    Q.        BY MS. HAMILTON:  And what was that loan agent's
20    name?
21    A.        Valerie Nguyen.
22    Q.        Do you have a spelling for that?
23    A.        No.
24    Q.        Is it Nguyen?
25    A.        Yes.
```

```
1              THE WITNESS:  Yes.  Well, she opened her company
2   at Palacio.
3   Q.        BY MS. HAMILTON:  Okay.  Is it your
4   understanding that Linda is the owner of Palacio?
5   A.        In my understanding, yes.
6   Q.        And do you know when Linda opened up Palacio?
7   A.        I don't recall the year.
8   Q.        Do you recall if it was the same year that you
9   first met her, which you testified was 2003?
10  A.        No.  She was in another company when I met her.
11  Q.        Can you estimate how long after you met her that
12  she opened up her own company?
13  A.        One or two years, I would say.
14  Q.        And in 2003, did you ultimately end up referring
15  your clients to Linda Tran at Landmark for financing?
16  A.        Some of them.
17  Q.        What percentage would you say in 2003 of your
18  clients you referred to Linda at Landmark?
19  A.        About probably 80 percent.
20  Q.        In 2003?
21  A.        Yeah.  I'm not sure about the year.
22  Q.        Okay.
23  A.        I'm just guessing.
24  Q.        The first year you met her.
25  A.        Yeah, the first year.
```

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                        www.phillipsdepo.com

Norma Valdovinos                                      8/12/08

```
 1   A.        No.

 2   Q.        Did you conduct any sort of investigation into

 3   her real estate practice before you started referring

 4   clients to Linda?

 5   A.        No.

 6   Q.        At some point after you met Linda and she

 7   successfully refinanced your own home loan, did you start

 8   referring clients to her?

 9   A.        Yes.

10   Q.        So you didn't have an understanding one way or

11   the other whether Linda held a license?

12   A.        No.

13   Q.        Did you have an understanding before referring

14   clients to Linda as to whether she advertised?

15   A.        No.

16   Q.        Had you ever seen any ads that she had placed in

17   any magazines?

18   A.        No.

19   Q.        Do you know if Linda Tran speaks Spanish?

20   A.        No, I don't.

21   Q.        You don't know one way or the other?

22   A.        I don't think she speaks Spanish.

23   Q.        You have never spoken to her in Spanish?

24   A.        No.

25   Q.        In the year 2004, can you estimate for me how
```

1    many financing transactions you referred to Linda?

2              MS. REUTER:  I'm going to instruct my client not

3    to answer that question and invoke her Fifth Amendment

4    privilege against self-incrimination.

5    Q.        BY MS. HAMILTON:  Are you going to follow your

6    counsel's instructions?

7    A.        Yes.

8    Q.        In the year 2005, can you explain for me how

9    many financing transactions you referred to Linda?

10             MS. REUTER:  Same instruction.

11   Q.        BY MS. HAMILTON:  Are you going to follow your

12   counsel's advice and not respond to your counsel's advice

13   on the Fifth Amendment privilege against

14   self-incrimination?

15   A.        Yes.

16   Q.        In 2006, can you estimate for me how many

17   financial transactions you referred to Linda?

18             MS. REUTER:  Same instructions.

19   Q.        BY MS. HAMILTON:  Are you going to invoke your

20   Fifth Amendment privilege against self-incrimination and

21   follow your counsel's instruction?

22   A.        Yes.

23   Q.        In the year 2004, can you estimate for me how

24   many real estate transactions you were involved with as

25   an agent that you did not refer to Linda for financing?

77

```
 1    A.        In the year 2004.  Probably 20.  10 to

 2    20 percent.

 3    Q.        20 percent of real estate transactions were

 4    not -- were referred to someone other than Linda Tran for

 5    financing?

 6    A.        Yes.  Approximately.

 7    Q.        And what other -- and who else did you refer

 8    your clients to for financing in 2004, aside from Linda

 9    Tran?

10    A.        2004, I would say the same.  Pedro Benitez and

11    who else?  I think that's it that -- at that time.

12    Q.        And in the year 2003, did you also refer your

13    clients to Pedro Benitez and Pablo for financing

14    transactions?

15              MS. REUTER:  I am sorry, Pablo?

16              MS. HAMILTON:  I am sorry.  I am getting the

17    names wrong.  Let me look.

18    Q.        So we have Pedro Benitez and Jose Rodriguez?

19    A.        Yes.

20    Q.        I will repeat my question so we have a clear

21    record.

22              In 2003, did you refer your clients to Pedro

23    Benitez for financing?

24    A.        In 2003, yes, I think he -- I refer him some

25    clients.
```

Norma Valdovinos                                    8/12/08

1    Q.       My previous --

2    A.       Is that the same question?

3    Q.       I'm sorry.  My previous question referred to the

4    year 2004.  So I know it was a long time ago.  But now

5    I'm asking you about the year 2005, if you have an

6    estimate of how many loans -- I'm sorry, how many

7    transactions you were involved with as an agent that you

8    did not refer to Linda for financing?

9    A.       She was getting most of them.  Well,

10   five percent.

11   Q.       So five percent were not referred to Linda Tran?

12   A.       Yes.

13   Q.       Or were referred to someone other than Linda

14   Tran?

15   A.       Yes.

16   Q.       Was that five percent referred to Pedro?

17   A.       Yes.

18   Q.       Anyone else?

19   A.       Not that I remember.

20   Q.       And the same question but for the year 2006.  In

21   the year 2006, can you estimate for me how many

22   real estate transactions you were involved with as an

23   agent that you did not refer to Linda for financing?

24   A.       Approximately the same as 2005.

25   Q.       That would be five percent?

1     A.        Yes.

2     Q.        And was that same five percent referred to

3     Pedro?

4     A.        Yes or -- yeah, Pedro.  Liz Cortez got some,

5     maybe like one percent.

6               MS. REUTER:  Say that name again.

7               THE WITNESS:  Liz Cortez.

8     Q.        BY MS. HAMILTON:  And the last name?

9     A.        Cortez.

10    Q.        And is she an individual that you would refer

11    your clients to for assistance?

12    A.        But only, I think, like one percent.  She got,

13    like, one or two percent.

14    Q.        Is there a reason she didn't get more than

15    one percent?

16    A.        Yes.  Because she -- she took, like, a long time

17    to close, so I didn't refer anything.

18    Q.        In the year 2003, was there any money exchanged

19    between you and Linda as a result of the financing

20    transactions that you referred to her?

21              MS. REUTER:  I'm going to instruct my client not

22    to answer that question and invoke her Fifth Amendment

23    privilege against self-incrimination.

24    Q.        BY MS. HAMILTON:  Are you going to follow your

25    counsel's instructions?

Norma Valdovinos                                              8/12/08

```
 1    A.        Yes.

 2    Q.        In the year 2004, was there any money exchanged

 3    between you and Linda as a result of the financing

 4    transactions that you referred to her?

 5              MS. REUTER:  Same instruction.

 6    Q.        BY MS. HAMILTON:  Are you going to follow your

 7    instructions and not respond?

 8    A.        Yes.

 9    Q.        Based on your Fifth Amendment privilege against

10    self-incrimination?

11    A.        Yes.

12    Q.        In the year 2005, was there any money exchanged

13    between you and Linda as a result of any of the financing

14    transactions that you referred to her?

15              MS. REUTER:  Same instruction.

16    Q.        BY MS. HAMILTON:  Are you going to follow your

17    counsel's advice?

18    A.        Yes.

19    Q.        And not respond to the question based on your

20    Fifth Amendment right against self-incrimination?

21    A.        Yes.

22    Q.        How about in 2006, was there any money exchanged

23    between you and Linda as a result of any of the financing

24    transactions that you referred to her?

25              MS. REUTER:  Same instruction.
```

82

1    Q.        BY MS. HAMILTON:  Are you going to follow your

2    counsel's advice and not answer based on your Fifth

3    Amendment right against self-incrimination?

4    A.        Yes.

5    Q.        In the year 2007, was there any money exchanged

6    between you and Linda as a result of any of the financing

7    transactions that you referred to her?

8              MS. REUTER:  Say that again.  I'm sorry.  I

9    didn't hear the first three words of that.

10             MS. HAMILTON:  In the year 2007.

11             MS. REUTER:  Ah, okay.  Same instruction.

12   Q.        BY MS. HAMILTON:  Are you going to follow your

13   counsel's advice and not respond based on your Fifth

14   Amendment right against self-incrimination?

15   A.        Yes.

16   Q.        In 2008, was there any money exchanged between

17   you and Linda as a result of any of the financing

18   transactions that you referred to her?

19             MS. REUTER:  Well, first, same instruction.

20   And, second, I'm going to object that it assumes facts

21   not in evidence, and to the extent it states -- repeats

22   testimony, it misstates her testimony because she says

23   she hasn't done -- she hasn't done any in 2008.

24   Q.        BY MS. HAMILTON:  So is it correct that in 2008

25   you did not refer any of your clients to Linda Tran for

1    the clients that you referred to Linda Tran were then

2    referred to Pablo Curiel for down payment assistance?

3            MS. REUTER:  I'm going to instruct my client not

4    to answer the question and invoke her Fifth Amendment

5    privilege against self-incrimination.

6    Q.      BY MS. HAMILTON:  Are you going to follow your

7    counsel's instructions?

8    A.      Yes.

9    Q.      Do you have an understanding of whether Pablo

10   took a security interest in the home of Linda Tran's

11   clients?

12   A.      What was the question again?

13   Q.      Did you have an understanding of whether Pablo

14   took a security interest in the homes of Linda Tran's

15   clients?

16   A.      I really don't know how they struck the loans.

17   Q.      Did any of your clients ever ask you about Pablo

18   Curiel?

19   A.      If they ask me?  Like?

20   Q.      Any questions about him at all.

21   A.      No.

22   Q.      You've never been asked any questions by your

23   clients --

24   A.      No.

25   Q.      -- about Pablo Curiel?

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                    www.phillipsdepo.com

Norma Valdovinos                                    8/12/08

1    Q.      How about the follow-up meeting, when the

2    clients would come to your office and meet you

3    personally, was that meeting conducted in Spanish?

4    A.      Yes.

5    Q.      Did you have an understanding generally of what

6    percentage of your clients spoke exclusively Spanish,

7    meaning they have very little understanding of English?

8    A.      I'm sorry.  What was the question again?

9            MS. HAMILTON:  Could you repeat the question.

10           (Record read as follows:  QUESTION:  Did you

11   have an understanding generally of what percentage of

12   your clients spoke exclusively Spanish, meaning they have

13   very little understanding of English?)

14           THE WITNESS:  How many --

15   Q.      BY MS. HAMILTON:  What percentage.

16   A.      They understand Spanish only?

17   Q.      Yes.

18   A.      About 80 percent.

19   Q.      And when you, generally speaking, would discuss

20   purchasing a home with your clients when they would come

21   into your office, did you ever present them with any

22   documents?

23           MS. REUTER:  Repeat the question for me again,

24   please.

25           MS. HAMILTON:  Could you repeat the question.

Norma Valdovinos                                           8/12/08

```
 1              (Record read as follows:  QUESTION:  And when
 2    you, generally speaking, would discuss purchasing a home
 3    with your clients when they would come into your office,
 4    did you ever present them with any documents?)
 5              MS. REUTER:  Is this relating to the first time
 6    they come into her office?
 7              MS. HAMILTON:  Yes.
 8              MS. REUTER:  The first meeting.
 9              THE WITNESS:  Any documents, like what kind of
10    documents?
11    Q.        BY MS. HAMILTON:  Like would you show them any
12    pictures of houses?
13    A.        Yes, sometimes we -- I sit on the computer, and
14    I show them what is available in the area that they want.
15    Q.        So you would show them on the computer as
16    opposed to something in hard copy?
17    A.        Yes.  On the computer.
18    Q.        Did you present them with any other documents of
19    any kind, when they would come in for the first meeting
20    with you, after having spoken with you on the phone?
21    A.        No.
22    Q.        And at any time, even after the first meeting
23    when you would meet with clients, would you present them
24    with any documents?
25              MS. REUTER:  It's vague and overbroad.
```

91

Norma Valdovinos                                          8/12/08

1    Q.       BY MS. HAMILTON:   Do you understand the

2    question?

3    A.       Not really.

4    Q.       So you indicated at the first meeting that you

5    would have with clients, generally speaking, you would

6    show them pictures of houses on your computer but

7    otherwise not present them with any documents.

8            And what I'm asking is were there -- generally

9    speaking, did you ever have a second meeting with clients

10   after the first meeting, or did you simply refer them to

11   Linda Tran and that was the end of your part of the

12   process?

13   A.       No.   The next time would be like to go and

14   physically look at the houses, if they are qualified.   I

15   mean, if they are going to -- if they are ready to start

16   looking.

17   Q.       So you would physically go to houses with your

18   clients?

19   A.       Yes.

20   Q.       And assuming that you found them a home that

21   they were interested in purchasing, would there be any

22   meetings after the actual visit to the home that clients

23   would have with you?

24   A.       They would -- no.   Well, they would come back,

25   of course, to the office to sign disclosures, and all

1    that.

2    Q.        And who in your office was responsible for

3    preparing disclosures?

4    A.        Preparing disclosures, they --

5              MS. REUTER:  On the seller side transaction?

6              MS. HAMILTON:  Yes.

7              THE WITNESS:  On the seller's side, they -- I

8    would say the escrow coordinators or their assistants.

9    Q.        BY MS. HAMILTON:  How about on the buyer's side?

10             MS. REUTER:  Lacks foundation.  Assumes facts

11   not in evidence.  Buyers don't prepare disclosures.

12   Q.        BY MS. HAMILTON:  So is that correct, that you

13   would not prepare any disclosures for a buyer's side

14   transaction?

15   A.        For a buyer.  Actually, I would prepare most of

16   them.  But some -- some stuff would be prepared for the

17   assistants -- assistant.

18   Q.        Okay.  What is the specific name of the

19   individuals in your office?  How many escrow coordinators

20   have you employed over the years?

21             MS. REUTER:  Lacks foundation.  Assumes facts

22   not in evidence.

23             She didn't say she employed escrow coordinators.

24   Q.        BY MS. HAMILTON:  How many escrow coordinators

25   did you work with at Century 21 Golden Hills?

93

Norma Valdovinos                                    8/12/08

1    A.        Like three.   Three or four.

2    Q.        And do you recall their names?

3    A.        Ornelas.  Actually, I prepare -- I prepared the

4    packages.  And whatever is missing, then the escrow

5    coordinators would take over.

6    Q.        So when you said you would prepare a package,

7    what would be contained in that package?

8    A.        It would be the -- I don't remember exactly how

9    the forms are called, but I can't recognize them.

10   Q.        Can you describe what the forms were for, what

11   was contained in them?

12   A.        The disclosures.  It would be like the JCP

13   report, the -- what else?  Usually I don't look at the

14   names -- the titles of the documents.  I just grab them

15   and put them together.

16   Q.        Okay.

17   A.        And --

18   Q.        Do you know how many different types of

19   documents you would put together?

20   A.        Yes.  The TBS-14.

21   Q.        I am sorry, could you repeat that.

22   A.        TBS-14 or TBS-11, I don't remember exactly how

23   it's called, where you explain to the buyer if there is

24   any violation in the house.  The seller has to fill out

25   that form.  What is it called for the earthquake -- I

94

Norma Valdovinos                                    8/12/08

```
 1   don't remember exactly how those things are called.
 2   Q.        There was a document that related to whether
 3   there was an earthquake?
 4   A.        Yes.
 5   Q.        Any other types of documents that you can
 6   remember, even if you don't know the exact name, that you
 7   can just describe generally?
 8   A.        We also include -- I get confused because the
 9   buyer's side, all those inspections and all that that we
10   get.
11             I don't remember right now the names.
12   Q.        So what you told me is what you can remember of
13   what you provide to them?
14   A.        Yes.
15   Q.        And then if there's anything missing, you
16   indicated that you have your escrow coordinators retrieve
17   those documents for you?
18   A.        Yes.  But once the package is complete, then we
19   call the seller and to sign disclosures.
20   Q.        And is that packet in English or in Spanish?
21   A.        That's in English.
22   Q.        And do you have any Spanish translations of
23   those documents at your office?
24             MS. REUTER:  I'm going to instruct my client not
25   to answer that question, invoke the Fifth Amendment
```

95

1   Hernandez?

2   A.      Yes.

3   Q.      Are you familiar with a woman by the name of

4   Martha Hernandez?

5   A.      Yes.

6   Q.      And do you understand that Tomas and Martha

7   Hernandez are married?

8   A.      I'm not sure if they are married.

9   Q.      How are you familiar with Tomas and Martha?

10  A.      They -- they buy a house.  They purchase a

11  house.

12  Q.      How did you first come into contact with them?

13  A.      I think Martha called me because she wanted to

14  buy a house.

15  Q.      Do you recall what she said on the phone?

16  A.      To be honest with you, I don't remember.

17  Q.      Okay.  So you recall that she said she wanted to

18  buy a house, and that's kind of the end of what you

19  recall of your phone conversation?

20  A.      Yes.

21  Q.      Did you invite her to come into your office to

22  meet with you?

23  A.      That's what I usually do, yes.

24  Q.      Do you remember specifically, with regard to

25  Martha Hernandez, if you invited her into your office?

1    pay for a house?

2              MS. REUTER:   Same Fifth Amendment instruction.

3    Q.       BY MS. HAMILTON:   Are you going to follow your

4    counsel's instruction?

5    A.       Yes.

6    Q.       Do you recall if Tomas and Martha Hernandez were

7    looking to purchase a home for the first time or if they

8    were looking to refinance a home they currently owned?

9              MS. REUTER:   Same Fifth Amendment instruction.

10   Q.       BY MS. HAMILTON:   Are you going to follow your

11   counsel's instruction?

12   A.       Yes.

13   Q.       Did you refer Tomas Hernandez and Martha

14   Hernandez to Linda Tran for financing options?

15             MS. REUTER:   Same Fifth Amendment instruction.

16   Q.       BY MS. HAMILTON:   Are you going to follow your

17   counsel's instruction?

18   A.       Yes.

19   Q.       After the meeting where they came into your

20   office, did you after that time talk with either Tomas or

21   Martha Hernandez?

22             MS. REUTER:   I'm sorry.  Say that again.

23   Q.       BY MS. HAMILTON:   After the meeting where Tomas

24   and Martha Hernandez came into your office, did you speak

25   to them after that time, either over the phone or in

Norma Valdovinos                                      8/12/08

1    person?

2              MS. REUTER:   Same Fifth Amendment instruction.

3    Q.      BY MS. HAMILTON:   Are you going to follow your

4    counsel's instruction?

5    A.      Yes.

6    Q.      Did Tomas Hernandez or Martha Hernandez ever

7    complain to you about the financing that they had

8    received from Linda Tran?

9              MS. REUTER:   Same Fifth Amendment instruction.

10   Q.      BY MS. HAMILTON:   Are you going to follow your

11   counsel's instruction?

12   A.      Yes.

13   Q.      Are you familiar with Jesus Arreola?

14   A.      Yes.

15   Q.      Are you familiar with Antonia Arreola?

16   A.      Yes.

17   Q.      And how are you familiar with them?

18   A.      They bought a house in Morgan Hill.

19   Q.      And did you act as their real estate agent in

20   that transaction?

21   A.      Yes.

22   Q.      When did you -- how did you first come into

23   contact with Jesus Arreola?  Did he call you?  Did he

24   come into your office?

25   A.      Yes, I think he called me.

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                         www.phillipsdepo.com

1   Q.      BY MS. HAMILTON:  Are you going to follow your

2   counsel's instruction?

3   A.      Yes.

4   Q.      Did Jesus and Antonia indicate whether they were

5   there to purchase a new home or whether to refinance

6   their current home?

7           MS. REUTER:  Fifth Amendment instruction.

8   Q.      BY MS. HAMILTON:  Are you going to follow your

9   counsel's instruction?

10  A.      Yes.

11  Q.      Did you refer Jesus and Antonia Arreola to Linda

12  Tran for financing options?

13          MS. REUTER:  Fifth Amendment instruction.

14  Q.      BY MS. HAMILTON:  Are you going to follow your

15  counsel's instruction?

16  A.      Yes.

17  Q.      Did you hear from Jesus and Antonia Arreola

18  after you referred them to Linda Tran for financing

19  options?

20          MS. REUTER:  Fifth Amendment instruction.

21  Q.      BY MS. HAMILTON:  Are you going to follow your

22  counsel's instruction?

23  A.      Yes.

24  Q.      After the transaction involving Jesus and

25  Antonia Arreola, did you hear from them at any later

Norma Valdovinos                                        8/12/08

```
 1    time?
 2              MS. REUTER:  I am sorry.  Say that between.
 3    Q.       BY MS. HAMILTON:  After the transaction with
 4    Jesus and Antonia Arreola to either refinance or purchase
 5    a home, whichever the case may be, did you hear from them
 6    again after that time?
 7              MS. REUTER:  Fifth Amendment instruction.
 8    Q.       BY MS. HAMILTON:  Are you going to follow your
 9    counsel's instruction?
10    A.       Yes.
11    Q.       Are you familiar with an individual by the name
12    of Raul Torres?
13    A.       Yes.
14    Q.       And how do you know Raul Torres?
15    A.       He also purchased a house.
16    Q.       Do you recall what year?
17    A.       It was, like, around 2006.
18    Q.       And do you recall when you first came into
19    contact with Raul Torres?  Was it over the phone?  Was it
20    in person?
21    A.       Over the phone.
22    Q.       Did Raul Torres call you?
23    A.       Yes.
24    Q.       Do you recall what Raul Torres said when he
25    called you?
```

113

```
 1    A.       He wanted to buy a house.

 2    Q.       When Raul Torres called you, did he speak

 3    Spanish or did he speak English?

 4    A.       Spanish.

 5    Q.       Do you have --

 6             MS. REUTER:  I'm sorry.  I want to instruct

 7    my -- I'm going to ask you to withdraw your answer and

 8    instruct you not to answer that question.

 9    Q.       BY MS. HAMILTON:  Are you going to follow your

10    counsel's instruction?

11    A.       Yes.

12    Q.       Do you have an understanding as to whether Raul

13    Torres spoke English?

14    A.       I'm sorry?

15    Q.       Do you have an understanding as to whether Raul

16    Torres spoke English?

17    A.       No.

18    Q.       You don't have an understanding one way or the

19    other?

20    A.       I don't have an understanding.

21    Q.       Do you know whether -- did Raul Torres say

22    whether he had called you whether he had seen your

23    advertisement or whether it was a personal referral?

24    A.       I think it was from the advertisement.

25    Q.       Do you recall him telling you it was because of
```

```
1    Q.       Did you take any notes of this meeting?

2             MS. REUTER:  Fifth Amendment instruction.

3    Q.       BY MS. HAMILTON:  Are you going to follow your

4    counsel's instruction?

5    A.       Yes.

6    Q.       Was this meeting conducted in Spanish or

7    English?

8             MS. REUTER:  Fifth Amendment instruction.

9    Q.       BY MS. HAMILTON:  Are you going to follow your

10   counsel's instruction?

11   A.       Yes.

12   Q.       At some point after he met with you, did Raul

13   Torres purchase a home?

14   A.       What was the question again?

15   Q.       Do you have an understanding of whether or not

16   after Raul Torres met with you, he purchased a home?

17   A.       Yes.

18   Q.       And what is your understanding?

19   A.       My understanding that he did purchase a house.

20   Q.       Okay.  Thank you.

21            Do you have an understanding as to whether Raul

22   Torres refinanced after the meeting with you?

23   A.       I have an understanding that, yes, he did.

24   Q.       So he both purchased a home and refinanced?

25   A.       I think so.
```

116

1    Q.      When Raul Torres came to meet with you in your

2    office, did he tell you how much he could afford to pay

3    for a home?

4            MS. REUTER:  Fifth Amendment instruction.

5    Q.      BY MS. HAMILTON:  Are you going to follow your

6    counsel's instruction?

7    A.      Yes.

8    Q.      Did you refer Raul Torres to Linda Tran for

9    financing options?

10           MS. REUTER:  Fifth Amendment instruction.

11   Q.      BY MS. HAMILTON:  Do you have an understanding

12   of whether Raul Torres used Linda Tran to finance his

13   home purchase?

14           MS. REUTER:  Fifth Amendment instruction.

15   Q.      BY MS. HAMILTON:  Are you going to follow your

16   counsel's instruction?

17           MS. REUTER:  Actually, you know what, you can

18   answer that, whether you have an understanding of whether

19   Raul Torres used Linda Tran or not.

20           THE WITNESS:  Yes.

21   Q.      BY MS. HAMILTON:  You have an understanding that

22   he --

23   A.      That he did.

24   Q.      Did -- after Raul Torres purchased and

25   refinanced their home, did he ever call you again?

117

1           MS. REUTER:  Fifth Amendment instruction.

2   Q.      BY MS. HAMILTON:  Are you going to follow your

3   counsel's instruction?

4   A.      Yes.

5           MS. REUTER:  There's three questions that I'm

6   going to let you answer on the Arreola, the Arreola

7   questions, back one page: The did he come to see you;

8   was anybody else present, and there was a third one in

9   between those two.

10          After the first telephone conversation, there

11  were three questions that were asked regarding their

12  first meeting.

13          MS. KIRKHAM:  And notes?  Was that --

14          MS. REUTER:  No, not the notes.  There were, I

15  believe, three questions -- maybe there were just two.

16          MS. HAMILTON:  Maybe was his wife present.  I

17  asked, was anyone else present.

18          MS. REUTER:  So did he come to have a meeting,

19  that was one of the questions, right?

20          MS. KIRKHAM:  Right.

21          MS. REUTER:  And was anybody else present at

22  that meeting.  Those were the two.  And was there a third

23  one?

24          MS. KIRKHAM:  Yes.  When did they first meet,

25  right?

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                         www.phillipsdepo.com

Norma Valdovinos                                  8/12/08

1   Q.      Yes.

2   A.      I think it was in 2004 or 2005.

3   Q.      And do you recall why they came to see you?

4   A.      To buy the house.  Because they wanted to buy a

5   house.

6   Q.      Was anyone else present at that meeting?

7   A.      No.

8   Q.      Do you have an understanding as to whether or

9   not Jesus and Antonia Arreola used Linda Tran for the

10  financing of their house?

11  A.      Yes.

12  Q.      And what is that understanding?

13  A.      I have an understanding.

14  Q.      And what is your understanding?

15  A.      That they did use Linda.

16  Q.      Do you have an understanding as to whether Jesus

17  and Antonia Arreola used Linda Tran to refinance their

18  home?

19  A.      Yes, I have an understanding.

20  Q.      And what is your understanding?

21  A.      That they did use her.

22  Q.      Do you have an understanding as to whether Jesus

23  and Antonia Arreola received down payment assistance from

24  Pablo Curiel?

25  A.      I don't have any idea.

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                          www.phillipsdepo.com

```
 1    A.       You mean the year?

 2    Q.       If you recall the year, yes.

 3    A.       Around 2006.

 4    Q.       And was that meeting in your office?

 5    A.       Yes.

 6    Q.       Was anyone else present during that meeting?

 7    A.       No.

 8    Q.       Were both Tomas and Martha present at that

 9    meeting?

10    A.       Yes.

11    Q.       Did Tomas and Martha Hernandez speak Spanish to

12    you at this meeting?

13             MS. REUTER:  Fifth Amendment instruction.

14    Q.       BY MS. HAMILTON:  Are you going to follow your

15    counsel's instruction?

16    A.       Yes.

17    Q.       Do you have an understanding as to whether Tomas

18    and Martha Hernandez used Linda Tran for financing to

19    purchase a home?

20    A.       Yes, I have an understanding.

21    Q.       And what is that understanding?

22    A.       That they used Linda.

23    Q.       Do you have an understanding as to whether Tomas

24    and Martha Hernandez used Linda Tran to refinance their

25    home?
```

```
1   A.        I don't have an understanding.

2   Q.        Do you have an understanding as to whether Tomas

3   and Martha Hernandez used Pablo Curiel for down payment

4   assistance?

5   A.        I don't have an understanding.

6   Q.        And I've been using that term a lot, so I just

7   want to see what your understanding of it is.

8             When I say "down payment assistance," what does

9   that mean to you?

10  A.        Down payment assistance is when somebody assists

11  you with the down appointment.

12  Q.        Financially?

13  A.        Yes.

14  Q.        In the form of a loan?

15  A.        Yes.

16  Q.        Now I'm going to move on to Maria Garvin.   Are

17  you familiar with Maria Garvin?

18  A.        Yes.

19  Q.        And how are you familiar with Maria Garvin?

20  A.        She purchased a house.

21  Q.        With your assistance?

22  A.        Yes.

23  Q.        Do you recall what year that was?

24  A.        I would say 2005.

25  Q.        And has she just purchased one home with your
```

123

Norma Valdovinos                                          8/12/08

1    assistance?

2    A.        Yes.

3    Q.        Did you ever represent her on any other

4    transactions prior to that?

5    A.        No.

6    Q.        And what was your first contact with Maria

7    Garvin?

8    A.        She called me.

9    Q.        Do you have an understanding as to whether she

10   called you because she had seen your advertisement or if

11   it was a personal referral?

12   A.        I would say the advertisement.

13   Q.        And what do you base that on?

14   A.        The same reason because I don't know anybody

15   that knows her.

16   Q.        And what did she say when she called you?

17   A.        She wanted to buy a house.

18   Q.        Did she indicate whether she wanted to buy a

19   house on her own or with anyone else, such as family

20   members?

21           MS. REUTER:   Fifth Amendment instruction.

22   Q.        BY MS. HAMILTON:  Are you going to follow your

23   counsel's instruction?

24   A.        Yes.

25   Q.        Did you invite Maria Garvin to come to your

124

1    counsel's instruction?

2    A.       Yes.

3    Q.       When Maria Garvin came to see you, what did you

4    tell her regarding your ability to help her find a house?

5             MS. REUTER:   Fifth Amendment instruction.

6    Q.       BY MS. HAMILTON:  Are you going to follow your

7    counsel's instruction?

8    A.       Yes.

9    Q.       What price range of houses did you look for,

10   based on what Maria Garvin told you about her finances?

11            MS. REUTER:   Fifth Amendment instruction.

12   Q.       BY MS. HAMILTON:  Are you going to follow your

13   counsel's instruction?

14   A.       Yes.

15   Q.       Did you refer Maria Garvin to Linda Tran for

16   financing options?

17            MS. REUTER:   Fifth Amendment instruction.

18   Q.       BY MS. HAMILTON:  Are you going to follow your

19   counsel's instruction?

20   A.       Yes.

21   Q.       Did Linda Tran tell you what price range Maria

22   Garvin could afford?

23            MS. REUTER:   Fifth Amendment instruction.

24   Q.       BY MS. HAMILTON:  Are you going to follow your

25   counsel's instruction?

Norma Valdovinos                                              8/12/08

```
 1    Q.        Do you typically visit the house that the -- the
 2    houses that you find for your clients?
 3    A.        Yes.
 4    Q.        In person?
 5    A.        Yes.
 6    Q.        Did you refer Maria Garvin to Linda Tran for
 7    financing options?
 8             MS. REUTER:  Fifth Amendment instruction.
 9    Q.        BY MS. HAMILTON:  Are you going to follow your
10    counsel's instruction?
11    A.        Yes.
12    Q.        Do you have an understanding as to whether Maria
13    Garvin used Linda Tran for financing for her home?
14    A.        Yes.
15    Q.        And what is that understanding?
16    A.        That she used Linda Tran.
17    Q.        Do you have an understanding as to whether Maria
18    Garvin used Pablo Curiel for down payment assistance?
19    A.        I have no idea.
20    Q.        When Maria Garvin first contacted you, did she
21    say anything with regard to her ability to provide a down
22    payment?
23             MS. REUTER:  Fifth Amendment instruction.
24    Q.        BY MS. HAMILTON:  Are you going to follow your
25    counsel's instruction?
```

Norma Valdovinos                                                  8/12/08

```
 1    A.        I don't remember.

 2    Q.        Do you remember if Mrs. Garvin made an offer for

 3    this house that was lower than $638,000?

 4    A.        I don't remember.

 5    Q.        Do you remember advising her one way or the

 6    other as to how to make an offer on this house?

 7              MS. REUTER:  Fifth Amendment privilege.

 8    Q.        BY MS. HAMILTON:  Are you going to follow your

 9    counsel's instructions?

10    A.        Yes.

11    Q.        I'm going to refer you to page 2 of this

12    document.  At the top of the page it says, "Selling

13    Agent:  Norma Valdovinos."  Do you see where it says

14    that?

15    A.        Yes.

16    Q.        Did you represent the seller of this property?

17    A.        No.

18    Q.        Do you know -- do you recall who did?

19    A.        It says here, listed by Monica Haney.

20    Q.        So your understanding is Monica Haney, based on

21    what it says here?

22    A.        Yes.  From South Bay.

23    Q.        Do you know her, by any chance?

24    A.        No.

25    Q.        And you've been to visit this house?
```

1   information that you provide them and gives that

2   information for the HUD-1?

3   A.      Yes.  They should.

4   Q.      So it's your understanding that they do that?

5   A.      Yes.

6   Q.      That the title company takes information that

7   you have given them for the HUD-1?

8   A.      Yes.

9   Q.      Okay.  And, generally, as a real estate agent,

10  do you ever get an opportunity to see the HUD-1 for your

11  client at any stage in the process?

12  A.      Yes.

13  Q.      And at what point do you typically see a HUD-1

14  for your clients?

15  A.      When the documents are in title.

16  Q.      Is that the only time you see it?

17  A.      And at the sign-off.

18  Q.      Is that the last time you see them, is at the

19  sign-off?  And by "the sign-off, do you mean executing

20  the loan documents?

21  A.      Yes.

22  Q.      Is that the last time you typically see a HUD-1?

23  A.      Yes.

24  Q.      And I would direct your attention to Section 101

25  on the first page of this HUD-1, where it lists the

1    contract sales price as $648,000.  Do you see that?

2    A.       Huh-huh.

3    Q.       If I could refer you also back to Exhibit 20,

4    which was the photograph of the house --

5    A.       Yes.

6    Q.       -- containing a list price of $638,000.

7            Do you have an understanding as to why the

8    contract sales price is $648,000 and the listing price of

9    the house is $638,000?

10           MS. REUTER:  Fifth Amendment privilege.

11   Q.       BY MS. HAMILTON:  Are you going to follow your

12   counsel's advice?

13   A.       Yes.

14   Q.       If I could direct your attention to the second

15   page of this document.  The bottom of it is Bates stamped

16   C21-GAR --

17           MS. REUTER:  Which document, 20 or 22.

18           MS. HAMILTON:  22.  You can put 20 away.

19   Q.       BY MS. HAMILTON:  I'd like to direct your

20   attention to the second page of Exhibit 22.  It is Bates

21   stamped C21-GAR-5, and specifically to line 703 where it

22   indicates, "Commission paid at settlement, $32,400."

23           Do you see that?

24   A.       Yes, I see it.

25   Q.       Is this a commission that was received by you?

Norma Valdovinos                                          8/12/08

```
 1    A.        I don't think so.

 2    Q.        Do you have an understanding of who received

 3    that commission?

 4    A.        No.  It had been split between the agent who was

 5    representing the seller and the agent who was

 6    representing the buyer.  Actually --

 7    Q.        I'm sorry.  Were you not the agent who was

 8    representing the buyer in this transaction?

 9    A.        Yes.  But not the seller.

10    Q.        So when you say that this $32,400 was split

11    between the agent representing the seller and the agent

12    representing the buyer, what two people did you mean this

13    was split between?

14    A.        The listing agent.

15    Q.        Okay.  In this case that was --

16    A.        Monica.

17    Q.        Monica?

18    A.        Huh-huh.

19    Q.        And who else received the commission on this?

20    A.        My company, Century 21 Golden Hills, the other

21    half.

22    Q.        And of what Century 21 receives, did you receive

23    a portion of this?

24    A.        Yes.

25    Q.        Do you recall how much?
```

```
 1    A.       No, I don't recall.

 2    Q.       Do you recall what percentage of this you would

 3    have received?

 4    A.       I would say --

 5             MS. REUTER:  Actually, right to financial

 6    privacy.  Don't answer that.

 7    Q.       BY MS. HAMILTON:  Are you going to follow your

 8    counsel's instruction?

 9    A.       Yes.

10    Q.       Do you know who would have received the

11    percentage of this that did not go to you, aside from

12    Monica Haney?  Did that go to Century 21?

13    A.       Yes.

14    Q.       Did it go to a specific individual at Century 21

15    or the corporate entity, Century 21?

16    A.       I would say the company, and then the company

17    paid the corporation.

18    Q.       Okay.  Do you know if any individuals at

19    Century 21, aside from yourself personally, received a

20    portion of this $32,400?

21    A.       Like I say, my company did not receive this

22    $32,400.

23    Q.       They received a portion of it?

24    A.       Yes.

25    Q.       And you received a portion of it?
```

```
1    A.        Yes.  Of half of the 32.

2    Q.        Do you have an understanding of whether or not

3    Linda Tran received a portion of this?

4    A.        I don't have an understanding.

5    Q.        And what did you do to earn this fee?

6              MS. REUTER:  Fifth Amendment privilege.  Don't

7    answer that.

8    Q.        BY MS. HAMILTON:  Are you going to follow your

9    counsel's instructions?

10   A.        Yes.

11   Q.        And if I could direct your attention to line 903

12   on this paper where it says, "Hazard insurance premium

13   for one year to Farmers Insurance."  Do you see that?

14   A.        Yes.

15   Q.        Does this represent the fact that Maria Garvin

16   received hazard insurance for one year to Farmers

17   Insurance, as far as you know?

18   A.        Yes.

19   Q.        Do you know how Maria Garvin came to receive

20   hazard insurance from Farmers Insurance?

21             MS. REUTER:  Fifth Amendment privilege.  Don't

22   answer that.

23   Q.        BY MS. HAMILTON:  Are you going to follow your

24   counsel's advice?

25   A.        Yes.
```

Norma Valdovinos                                              8/12/08

```
1    A.        I don't remember.  I don't recall.

2    Q.        So it sounds familiar, but you don't know any

3    specific information about Tara Home Financial?

4    A.        I don't recall.

5    Q.        Do you know anyone who works for Tara Home

6    Financial?

7    A.        I don't remember.

8    Q.        And did Maria Garvin ever contact you after your

9    final meeting with her in your office where you gave her

10   the disclosures?

11            MS. REUTER:  Fifth Amendment privilege.

12   Q.        BY MS. HAMILTON:  Are you going to follow your

13   counsel's instructions?

14   A.        Yes.

15   Q.        Are you familiar with an individual by the name

16   of Rafael Bravo?

17   A.        Yes.

18   Q.        And how are you familiar with Mr. Bravo?

19   A.        He called me because he wanted to buy a house.

20   Q.        Was that the first time you had ever been in

21   contact with Mr. Bravo?

22   A.        Yes.

23   Q.        Do you know whether Mr. Bravo contacted you

24   because of an advertisement that he saw or based on a

25   personal referral?
```

Phillips Legal Services (888) 333-8270

Sacramento/San Francisco                                www.phillipsdepo.com

1    A.      Yes.

2    Q.      At some point did you tell Mr. Bravo anything

3    regarding your ability to help him find a home?

4            MS. REUTER:   Fifth Amendment privilege.

5    Q.      BY MS. HAMILTON:   Are you going to follow your

6    counsel's and refuse to answer?

7    A.      Yes.

8    Q.      Did you recommend to Mr. Bravo a price range of

9    houses that he could look for, based on his finances?

10           MS. REUTER:   Fifth Amendment privilege.

11   Q.      BY MS. HAMILTON:   Are you going to follow your

12   counsel's advice and refuse to answer?

13   A.      Yes.

14   Q.      Did you refer Mr. Bravo to Linda Tran for

15   financing options?

16           MS. REUTER:   Fifth Amendment privilege.

17   Q.      BY MS. HAMILTON:   Are you going to follow your

18   counsel's advice?

19   A.      Yes.

20   Q.      Did you refer Mr. Bravo to Linda Tran before or

21   after you started looking for a home for him?

22           MS. REUTER:   Fifth Amendment privilege.

23   Q.      BY MS. HAMILTON:   Are you going to follow your

24   counsel's instructions?

25   A.      Yes.

```
 1              MS. REUTER:   Fifth Amendment privilege.
 2    Q.        BY MS. HAMILTON:   Are you going to follow your
 3    counsel's advice?
 4    A.        Yes.
 5    Q.        At this second meeting with Rafael Bravo at your
 6    office, did you present him with disclosures to sign?
 7    A.
 8              MS. REUTER:   Fifth Amendment privilege.
 9    Q.        BY MS. HAMILTON:   Are you going to follow your
10    counsel's advice?
11    A.        Yes.
12    Q.        Did you provide Mr. Bravo with disclosures
13    written in English?
14              MS. REUTER:   Fifth Amendment privilege.
15    Q.        BY MS. HAMILTON:   Are you going to follow your
16    counsel's advice?
17    A.        Yes.
18    Q.        Did you provide Mr. Bravo with disclosures
19    written in Spanish?
20              MS. REUTER:   Fifth Amendment privilege.
21    Q.        BY MS. HAMILTON:   Are you going to follow your
22    counsel's advice?
23    A.        Yes.
24    Q.        Do you recall whether or not Rafael Bravo
25    purchased a home?
```

```
1    A.        Yes, he did.

2    Q.        He did purchase a home.  Did you ever visit this

3    home?

4    A.        Yes.

5    Q.        And do you recall whether Mr. Bravo purchased

6    one home or two homes?

7    A.        Two homes.

8    Q.        And I'm sorry.  Did you -- which home did you

9    visit?

10   A.        Both.

11   Q.        You visited both homes.  Was Mr. Bravo present

12   with you when you visited these homes?

13   A.        One of them.

14   Q.        Okay.  Which one?

15   A.        The one he purchased by Blossom Hill.

16   Q.        Okay.  So if we can describe Mr. Bravo's first

17   home as the Blossom Hill home, would that make sense to

18   you?

19   A.        Yes.

20   Q.        So you visited the Blossom Hill home accompanied

21   by Mr. Bravo?

22   A.        Yes.

23   Q.        How many times?

24   A.        I think one or two times.

25   Q.        And do you recall whether you visited these
```

160

```
 1    home, did he ask you any questions at that time?

 2            MS. REUTER:  Fifth Amendment privilege.

 3    Q.      BY MS. HAMILTON:  Are you going to follow your

 4    counsel's advice?

 5    A.      Yes.

 6            MS. REUTER:  What time is it?

 7            MS. HAMILTON:  2:30.

 8            MS. REUTER:  Can we take a break in about 15

 9    minutes.

10            MS. HAMILTON:  Sure.

11    Q.      Do you have an understanding as to whether or

12    not Rafael Bravo used Linda Tran for financing for the

13    Blossom Hill home?

14    A.      Yes.

15    Q.      And what is your understanding?

16    A.      That she used Linda.

17    Q.      I'm sorry.  Could you repeat that.

18    A.      That she did -- he did use Linda.

19    Q.      And do you have an understanding as to whether

20    or not Pablo Curiel provided down payment assistance for

21    Rafael Bravo?

22    A.      I don't have an understanding.

23            MS. HAMILTON:  I'm going to mark as document --

24    as Exhibit 23 a document Bates stamped C21-BRV-BH-237.

25                    (Exhibit No. 23 was marked.)
```

1           MS. HAMILTON:   Exhibit 27 is a document

2     entitled, "Supplement Page HUD-1 Settlement Statement."

3                     (Exhibit No. 27 was marked.)

4     Q.      BY MS. HAMILTON:   Have you ever seen this

5     document before?

6     A.      I think so.

7     Q.      Do you recall the first time you saw this

8     document?

9     A.      When the documents were in title.

10    Q.      Do you recall whether or not you contributed any

11    information to this HUD-1?

12              MS. REUTER:   Fifth Amendment privilege.

13    Q.      BY MS. HAMILTON:   Are you going to follow your

14    counsel's instructions?

15    A.      Yes.

16    Q.      If I could direct your attention to the section

17    at the bottom of page 2 of this document, the heading is,

18    "Disbursements Paid."

19              Do you see where it says, "Escrow administrative

20    fee to Century 21 Golden Hills, $350"?   Do you see where

21    it says that?

22    A.      Oh, yes.

23    Q.      Do you have an understanding of what an escrow

24    administration fee is?

25    A.      That's a --

1           MS. REUTER:  It's a "yes" or "no" question.

2           THE WITNESS:  Yes.

3    Q.      BY MS. HAMILTON:  And what is an escrow

4    administration fee?

5           MS. REUTER:  Fifth Amendment privilege.

6    Q.      BY MS. HAMILTON:  Are you going to follow your

7    counsel's advice?

8    A.      Yes.

9    Q.      Do you have an understanding of what Century 21

10   Golden Hills did to earn this escrow administration fee

11   of $350?

12          MS. REUTER:  Again, it's a "yes" or "no"

13   question.

14          THE WITNESS:  Yes.

15   Q.      BY MS. HAMILTON:  And can you tell me what

16   Century 21 Golden Hills did?

17          MS. REUTER:  Fifth Amendment privilege.

18   Q.      BY MS. HAMILTON:  Are you going to follow your

19   counsel's advice?

20   A.      Yes.

21   Q.      Can you tell me whether you personally did

22   anything to -- on behalf of Century 21 Golden Hills to

23   earn this escrow administration fee of $350?

24          MS. REUTER:  Fifth Amendment privilege.

25   Q.      BY MS. HAMILTON:  Are you going to follow your

Norma Valdovinos                                    8/12/08

1   counsel's instruction?

2   A.      Yes.

3   Q.      Can you tell me if this $350 fee was split with

4   anyone at Century 21 Golden Hills?

5           MS. REUTER:  Fifth Amendment privilege.

6   Q.      BY MS. HAMILTON:  Are you going to follow your

7   counsel's advice?

8   A.      Yes.

9   Q.      Do you see just above that line where it says,

10  "Fire insurance premium to Paul Curiel Insurance Agency,

11  $732"?

12  A.      Yes.

13  Q.      Do you have an understanding of how Mr. Bravo

14  came to secure a fire insurance premium from Paul Curiel?

15          MS. REUTER:  It's a "yes" or "no" question.

16          THE WITNESS:  Yes.

17  Q.      BY MS. HAMILTON:  And how did he come to have

18  fire insurance through Paul Curiel?

19          MS. REUTER:  Fifth Amendment privilege.

20  Q.      BY MS. HAMILTON:  Are you going to follow your

21  counsel's advice?

22  A.      Yes.

23  Q.      And do you see below the escrow administration

24  fee where it says, "Notary fee to Meeta Nanavati"?

25  A.      Yes.

1   Q.        Did you refer Mr. Bravo to Linda Tran for

2   financing to purchase this second home?

3            MS. REUTER:   Fifth Amendment privilege.

4   Q.        BY MS. HAMILTON:   Are you going to follow your

5   counsel's instruction?

6   A.        Yes.

7   Q.        Do you have an understanding as to whether

8   Mr. Bravo used Linda Tran to purchase this second home?

9   A.        Yes.

10  Q.        And what is that understanding?

11  A.        That he did.

12  Q.        Do you have an understanding as to whether

13  Mr. Bravo used Pablo Curiel for down payment assistance

14  for the second home?

15  A.        I don't know.

16  Q.        When you met with Mr. Bravo regarding the

17  purchase of the Desert Isle home -- I'm sorry, the Desert

18  Isle Drive home, was that meeting in your office?

19  A.        Yes.

20  Q.        And did you just have one meeting with Mr. Bravo

21  regarding the purchase of the Desert Isle Drive home?

22  A.        One or two.

23  Q.        At one of those meetings did you provide

24  Mr. Bravo with disclosures?

25            MS. REUTER:   Fifth Amendment privilege.

Norma Valdovinos                                    8/12/08

```
 1    Q.        BY MS. HAMILTON:  Could you take a few minutes
 2    to review this document.
 3              (Witness reviewing document.)
 4    Q.        If I could -- I'm sorry.  Do you recognize this
 5    document as the HUD-1 for Mr. Bravo regarding the Desert
 6    Isle Drive house?
 7    A.        Yes.
 8    Q.        And directing your attention to line 1.  I know
 9    the numbers are kind of cut off here, but we will do the
10    best we can.  Where it says, "Contract sales price 810."
11    A.        Yes.
12    Q.        Do you have an understanding what the list price
13    was originally for the Desert Isle Drive home?
14              MS. REUTER:  It's a "yes" or "no" question.
15              THE WITNESS:  Yes.
16    Q.        BY MS. HAMILTON:  And what was that list price?
17    A.        I believe it was, like, 800.
18    Q.        800?
19    A.        I'm not sure.  Around there.
20    Q.        And do you know why the contract sales price is
21    810?
22              MS. REUTER:  Fifth Amendment privilege.
23    Q.        BY MS. HAMILTON:  Are you going to follow your
24    counsel's advice?
25    A.        Yes.
```

182

```
 1     Q.        If I could direct your attention to the very
 2     last -- I'm sorry, the second to the last -- I'm sorry,
 3     the third to the last page of this document, Bates
 4     stamped C21-BRV-DI-5.
 5     A.        What page?
 6               MS. REUTER:  No.  Page 5.  Down here you will
 7     see page numbers.
 8     Q.        BY MS. HAMILTON:  Under the section entitled,
 9     "Commissions," do you see that, where it says, "$28,000
10     to Century 21 Real Estate"?
11     A.        Yes.
12     Q.        Is this the commission you received from
13     Mr. Bravo's purchase of this home?
14               MS. REUTER:  I'm sorry.  Say that again.
15     Q.        BY MS. HAMILTON:  Is this the commission that
16     you received for Mr. Bravo's purchase of this home?
17     A.        No.  I personally didn't receive it.
18     Q.        Who received this?
19     A.        The company.
20     Q.        And do you know if this fee was split with
21     anyone?
22     A.        With me.
23     Q.        Was it split with anyone else?
24               MS. REUTER:  Fifth Amendment privilege.
25     Q.        BY MS. HAMILTON:  Are you going to follow your
```

1    counsel's advice?

2    A.      Yes.

3    Q.      And do you see a little farther down under

4    "Escrow and Title Charges" where it states, "Notary fee

5    to Alka Talati"?

6    A.      Huh-huh.

7    Q.      Do you know Alka Talati?

8    A.      Let me see.  I'm trying to remember.  I think I

9    have, yes.

10   Q.      I'm sorry.  You know her?

11   A.      Yes.

12           MS. REUTER:  Well, I think your entire answer

13   was, "I think I have met her, yes."

14   Q..     BY MS. HAMILTON:  Okay.  So you don't know one

15   way or the other whether you have met her or not?

16   A.      Yes.

17   Q.      Have you met Alka Talati?

18   A.      I think so.  I'm not sure.

19   Q.      Do you know whether Alka Talati provides Notary

20   services for Century 21?

21   A.      No.

22   Q.      You don't know if she does or not?

23   A.      For Century 21.  I don't know.

24   Q.      Do you know if Alka Talati provides Notary

25   services for Linda Tran?

Norma Valdovinos                                    8/12/08

```
 1    A.       Yes.

 2    Q.       And --

 3    A.       I think so.

 4    Q.       You think she provides Notary services for Linda

 5    Tran?

 6    A.       Yes, I think so.

 7    Q.       And if I could direct your attention to page 2

 8    of this document, at the bottom where it says,

 9    "Additional Settlement Charges," specifically line 307,

10    where it says --

11             MS. REUTER:  What Bates number are you on?

12             MS. HAMILTON:  I'm on C21-BRV-DI-2.

13             MS. REUTER:  Oh.

14             THE WITNESS:  Okay.

15             MS. REUTER:  And where are you looking?

16             MS. HAMILTON:  I'm looking at line 307, where it

17    says, "Escrow administration fee to Century 21 Golden

18    Hills."

19             THE WITNESS:  Huh-huh.

20    Q.       BY MS. HAMILTON:  Do you know who received this

21    fee at Century 21 Golden Hills?

22             MS. REUTER:  It's a "yes" or "no" question.

23             THE WITNESS:  No, I don't know exactly who

24    received it.

25    Q.       BY MS. HAMILTON:  Did you perform services
```

185

1   relating to this escrow administration fee?

2           MS. REUTER:  Fifth Amendment privilege.

3   Q.      BY MS. HAMILTON:  Are you going to follow your

4   counsel's instructions?

5   A.      Yes.

6   Q.      And can you describe for me what Century 21 did

7   to earn this escrow administration fee?

8           MS. REUTER:  Fifth Amendment privilege.

9   Q.      BY MS. HAMILTON:  Are you going to follow your

10  counsel's instructions?

11  A.      Yes.

12  Q.      Do you have an understanding of what Century 21

13  did to earn this escrow administration fee?

14          MS. REUTER:  Fifth Amendment privilege.

15  Q.      BY MS. HAMILTON:  Are you going to follow your

16  counsel's instructions?

17  A.      Yes.

18  Q.      Do you know whether the escrow administration

19  fee was shared with anyone else?

20          MS. REUTER:  Fifth Amendment privilege.

21  Q.      BY MS. HAMILTON:  Are you going to follow your

22  counsel's instructions?

23  A.      Yes.

24  Q.      Are you familiar with Juan Ramirez?

25          MS. REUTER:  Fifth Amendment privilege.

```
 1                MS. HAMILTON:  As to whether she's familiar with
 2     him?
 3                MS. REUTER:  That's correct.
 4     Q.         BY MS. HAMILTON:  Are you going to follow your
 5     counsel's instructions?
 6     A.         Yes.
 7     Q.         Are you familiar with Maria Ramirez?
 8                MS. REUTER:  Fifth Amendment privilege.
 9     Q.         BY MS. HAMILTON:  Are you going to follow your
10     counsel's instructions?
11     A.         Yes.
12     Q.         When did you first meet Juan Ramirez?
13                MS. REUTER:  Fifth Amendment privilege.
14     Q.         BY MS. HAMILTON:  Did you ever receive a
15     telephone call from Juan Ramirez?
16     A.         Fifth Amendment privilege.
17     Q.         Are you going to follow your counsel's
18     instructions?
19     A.         Yes.
20     Q.         Did you ever meet with Juan Ramirez?
21                MS. REUTER:  Fifth Amendment privilege.
22     Q.         BY MS. HAMILTON:  Did you ever meet with Maria
23     Ramirez?
24                MS. REUTER:  Fifth Amendment privilege.
25     Q.         BY MS. HAMILTON:  Did you ever meet with Juan
```

```
 1    Q.       BY MS. HAMILTON:  Are you going to follow your
 2    counsel's advice?
 3    A.       Yes.
 4    Q.       Did you ask Juan or Maria Ramirez for any
 5    documents detailing their monthly financial obligations?
 6             MS. REUTER:  Fifth Amendment privilege.
 7    Q.       BY MS. HAMILTON:  Are you going to follow your
 8    counsel's advice?
 9    A.       Yes.
10    Q.       Did you ask Juan and Maria Ramirez for a credit
11    report?
12             MS. REUTER:  Fifth Amendment privilege.
13    Q.       BY MS. HAMILTON:  Are you going to follow your
14    counsel's advice?
15    A.       Yes.
16    Q.       Did you refer Juan and Maria Ramirez to Linda
17    Tran for financing options?
18             MS. REUTER:  Fifth Amendment privilege.
19    Q.       BY MS. HAMILTON:  Are you going to follow your
20    counsel's advice?
21    A.       Yes.
22    Q.       Do you have an understanding as to whether Juan
23    and Maria Ramirez used the services of Linda Tran for the
24    financing of their home?
25             MS. REUTER:  Fifth Amendment privilege.
```

1    Q.        BY MS. HAMILTON:   Are you going to follow your

2    counsel's instructions?

3    A.        Yes.

4    Q.        Do you have an understanding as to whether Juan

5    and Maria Ramirez used Pablo Curiel for down payment

6    assistance?

7              MS. REUTER:   Fifth Amendment privilege.

8    Q.        BY MS. HAMILTON:   Are you going to follow your

9    counsel's advice?

10   A.        Yes.

11   Q.        Did Linda Tran tell you anything regarding the

12   ability of Juan and Maria Ramirez to purchase a home and

13   in what price range?

14             MS. REUTER:   Fifth Amendment privilege.

15   Q.        BY MS. HAMILTON:   Are you going to follow your

16   counsel's instructions?

17   A.        Yes.

18   Q.        How long did your first meeting with Juan and

19   Maria Ramirez last?

20             MS. REUTER:   Fifth Amendment privilege.

21   Q.        BY MS. HAMILTON:   Did you meet with Juan and

22   Maria Ramirez after this initial meeting?

23             MS. REUTER:   Fifth Amendment privilege.

24   Q.        BY MS. HAMILTON:   Do you know whether Juan and

25   Maria Ramirez purchased a home?

Norma Valdovinos                                    8/12/08

```
 1                MS. REUTER:  Is that the end of your question?

 2                MS. HAMILTON:  Yes.

 3                MS. REUTER:  Fifth Amendment privilege.

 4    Q.       BY MS. HAMILTON:  Are you going to follow your

 5    counsel's instructions?

 6    A.       Yes.

 7                MS. REUTER:  It sounded like you had more to

 8    say.

 9                MS. HAMILTON:  I did, and I decided to end the

10    sentence there.

11    Q.       Did you ever visit the home ultimately purchased

12    by Juan and Maria Ramirez?

13                MS. REUTER:  Fifth Amendment privilege.

14    Q.       BY MS. HAMILTON:  Are you going to follow your

15    counsel's instructions?

16    A.       Yes.

17    Q.       Did you recommend that Juan and Maria Ramirez

18    recommend a higher price for their home than the list

19    price?

20                MS. REUTER:  I'm sorry.  Say that again.

21                MS. HAMILTON:  Could you read the question back.

22                (Record read as follows:  QUESTION:  Did you

23    recommend that Juan and Maria Ramirez recommend a higher

24    price for their home than the list price?)

25                MS. HAMILTON:  Let me change that.
```

                                                        194

Norma Valdovinos                                    8/12/08

```
 1   Q.      Did you recommend to Juan and Maria Ramirez that
 2   they make an offer for a home higher than the list price?
 3           MS. REUTER:  Fifth Amendment privilege.
 4   Q.      BY MS. HAMILTON:  Are you going to follow your
 5   counsel's advice?
 6   A.      Yes.
 7           MS. HAMILTON:  I'm going to mark as Exhibit 30 a
 8   document containing the Bates stamp at the bottom
 9   RAM0001.
10                    (Exhibit No. 30 was marked.)
11           MS. HAMILTON:  If you would take a few minutes
12   to review this document.
13           (Witness reviewing document.)
14   Q.      BY MS. HAMILTON:  Do you recognize this
15   document?
16           MS. REUTER:  I'm sorry.  Just give me one
17   second, okay?
18           MS. HAMILTON:  Sure.
19           MS. REUTER:  Can you ask your question again,
20   please.
21           MS. HAMILTON:  Sure.
22   Q.      Do you recognize this document?
23           MS. REUTER:  Fifth Amendment privilege.
24   Q.      BY MS. HAMILTON:  Are you going to follow your
25   counsel's advice?
```

195

Norma Valdovinos                                            8/12/08

```
 1   Q.       Are you familiar with Eugenio Ramos?

 2   A.       Yes.

 3   Q.       Are you familiar with Columba Ramos?

 4   A.       Yes.

 5   Q.       How did you first meet Eugenio and Colombo

 6   Ramos?

 7   A.       Columba called me.

 8   Q.       Were you familiar with Columba Ramos at the time

 9   that she called you?

10   A.       No.

11   Q.       That was the first time you had ever heard from

12   her, when she called you on the phone?

13   A.       Yes.

14   Q.       And what did she say?

15   A.       She wanted to buy a house.

16   Q.       And did she speak to you in Spanish when she

17   called you?

18            MS. REUTER:  Fifth Amendment privilege.

19   Q.       BY MS. HAMILTON:  Are you going to follow your

20   counsel's advice?

21   A.       Yes.

22   Q.       And did you invite Columba to come to your

23   office?

24   A.       Yes.

25   Q.       And did she, in fact, come to your office?
```

200

```
 1    counsel's advice?

 2    A.         Yes.

 3    Q.         What did you tell Columba Ramos at this point

 4    regarding your ability to help her find a home?

 5               MS. REUTER:  Fifth Amendment privilege.

 6    Q.         BY MS. HAMILTON:  Are you going to follow your

 7    counsel's advice?

 8    A.         Yes.

 9    Q.         What price range of homes did you look for,

10    based on what Columba Ramos told you about her finances?

11               MS. REUTER:  Fifth Amendment privilege.

12    Q.         BY MS. HAMILTON:  Are you going to follow your

13    counsel's advice?

14    A.         Yes.

15    Q.         At some point did you refer Columba Ramos to

16    Linda Tran for financing options?

17               MS. REUTER:  Fifth Amendment privilege.

18    Q.         BY MS. HAMILTON:  Are you going to follow your

19    counsel's advice?

20    A.         Yes.

21    Q.         Do you have an understanding as to whether

22    Eugenio and Columba Ramos used Linda Tran for financing?

23    A.         Yes.

24    Q.         And what is your understanding?

25    A.         That they did.
```

Norma Valdovinos                                                    8/12/08

```
 1    Q.       Did Linda Tran tell you what price range of home
 2    Eugenio and Columba Ramos could afford?
 3             MS. REUTER:  Fifth Amendment privilege.
 4    Q.       BY MS. HAMILTON:  Are you going to follow your
 5    counsel's advice?
 6    A.       Yes.
 7    Q.       Did you visit the house that Eugenio and Columba
 8    Ramos ultimately purchased?
 9    A.       Yes.
10    Q.       Did you make an offer on their behalf for this
11    house?
12             MS. REUTER:  Fifth Amendment privilege.
13    Q.       BY MS. HAMILTON:  Are you going to follow your
14    counsel's advice?
15    A.       Yes.
16    Q.       Did you recommend that Eugenio and Columba Ramos
17    make a higher offer for this home than the list price?
18             MS. REUTER:  Fifth Amendment privilege.
19    Q.       BY MS. HAMILTON:  Are you going to follow your
20    counsel's advice?
21    A.       Yes.
22    Q.       After the meeting with Columba Ramos in your
23    office, what was the next meeting you had with Columba
24    Ramos at your office?
25             MS. REUTER:  When was the next meeting or what
```

```
 1    Q.        Did any of this money go to you personally?

 2    A.        Yes.

 3    Q.        How much?

 4              MS. REUTER:  Right to financial privacy.  Don't

 5    answer that.

 6    Q.        BY MS. HAMILTON:  Are you going to follow your

 7    counsel's instructions?

 8    A.        Yes.

 9    Q.        Do you have an understanding of whether this fee

10    was split with anyone else?

11    A.        The confirmation --

12              MS. REUTER:  I'm sorry.  I'm sorry.  Not

13    including Golden Hills or her, or --

14              MS. HAMILTON:  I will clarify.

15    Q.        Do you have an understanding of whether the

16    $28,500 to Century 21 that's found in entry 207 -- I'm

17    sorry, 702 on this page, was that $28,500 split with

18    anyone else besides Century 21 Golden Hills?

19    A.        The Century 21 corporation.

20    Q.        Okay.  Do you know whether this $28,500 was

21    split among employees of Century 21 Golden Hills?

22              MS. REUTER:  Fifth Amendment privilege.

23    Q.        BY MS. HAMILTON:  Are you going to follow your

24    counsel's instructions?

25    A.        Yes.
```

220

1   Q.       And if I could direct your attention to the next

2   page of this document.  The bottom is Bates stamped

3   C21-RAM-52, line 1303 where it says, "Transaction fee to

4   Century 21 Golden Hills."

5            Can you explain to me what this fee is for?

6            MS. REUTER:  That's a "yes" or "no" question.

7            THE WITNESS:  Yes.

8   Q.       BY MS. HAMILTON:  And what is this fee for?

9            MS. REUTER:  Fifth Amendment privilege.

10  Q.       BY MS. HAMILTON:  Are you going to follow your

11  counsel's instructions?

12  A.       Yes.

13  Q.       Can you describe for me what you did to eastern

14  this fee?

15           MS. REUTER:  Fifth Amendment privilege.

16  Q.       BY MS. HAMILTON:  Are you going to follow your

17  counsel's instructions?

18  A.       Yes.

19  Q.       Can you describe for me what anyone at Century

20  21 Golden Hills did to earn this fee?

21           MS. REUTER:  Fifth Amendment privilege.

22  Q.       BY MS. HAMILTON:  Are you going to follow your

23  counsel's instructions?

24  A.       Yes.

25  Q.       Do you know if this fee was split with anyone?

Norma Valdovinos                                                    8/12/08

```
1    A.       Fifth Amendment privilege.

2    Q.       Are you going to follow your counsel's

3    instructions?

4    A.       Yes.

5    Q.       Did Prospero or Cirila Torralba tell you that

6    they were looking for a home?

7             MS. REUTER:  Fifth Amendment privilege.

8    Q.       BY MS. HAMILTON:  Are you going to follow your

9    counsel's instructions?

10   A.       Yes.

11   Q.       Did Propero or Cirila Torralba tell you how much

12   they could afford to pay for a home?

13            MS. REUTER:  Fifth Amendment privilege.

14   Q.       BY MS. HAMILTON:  Are you going to follow your

15   counsel's instructions?

16   A.       Yes.

17   Q.       Did Propero or Cirila Torralba tell you the

18   price range of home they were looking for?

19            MS. REUTER:  Fifth Amendment privilege.

20   Q.       BY MS. HAMILTON:  Are you going to follow your

21   counsel's instructions?

22   A.       Yes.

23   Q.       Did Propero and/or Cirila Torralba tell you

24   anything about their financial situation?

25            MS. REUTER:  Fifth Amendment privilege.
```

226

1    Q.        BY MS. HAMILTON:   Are you going to follow your

2    counsel's advice?

3    A.        Yes.

4    Q.        Did you tell Propero or Cirila Torralba at any

5    point whether you could find them a home?

6              MS. REUTER:   Fifth Amendment privilege.

7    Q.        BY MS. HAMILTON:   Are you going to follow your

8    counsel's advice?

9    A.        Yes.

10   Q.        What price range of houses did you look for,

11   based on what the Torralbas told you about their

12   finances?

13             MS. REUTER:   Fifth Amendment privilege.

14   Q.        BY MS. HAMILTON:   Are you going to follow your

15   counsel's advice?

16   A.        Yes.

17   Q.        Did you refer the Torralbas to Linda Tran for

18   financing advice?

19             MS. REUTER:   Fifth Amendment privilege.

20   Q.        BY MS. HAMILTON:   Are you going to follow your

21   counsel's advice?

22   A.        Yes.

23   Q.        Did Linda Tran tell you what the Torralbas could

24   afford in a home?

25             MS. REUTER:   Fifth Amendment privilege.

Norma Valdovinos                                    8/12/08

1    Q.       BY MS. HAMILTON:   Are you going to follow your

2    counsel's advice?

3    A.       Yes.

4    Q.       Did you have subsequent meetings with the

5    Torralbas after they came to your office?

6             MS. REUTER:   Fifth Amendment privilege.

7    Q.       BY MS. HAMILTON:   Are you going to follow your

8    counsel's advice?

9    A.       Yes.

10   Q.       Did you make a higher offer on the Torralbas'

11   house than the list price without their authorization?

12            MS. REUTER:   Fifth Amendment privilege.

13   Q.       BY MS. HAMILTON:   Are you going to follow your

14   counsel's advice?

15   A.       Yes.

16   Q.       Were you present at the meeting where the

17   Torralbas executed their loan documents?

18            MS. REUTER:   Fifth Amendment privilege.

19   Q.       BY MS. HAMILTON:   Are you going to follow your

20   counsel's advice?

21   A.       Yes.

22   Q.       Who was present at this meeting?   I'm sorry.

23   Where the Torralbas executed their loan documents?

24            MS. REUTER:   Fifth Amendment privilege.

25   Q.       BY MS. HAMILTON:   Are you going to follow your

1      counsel's advice?

2      A.      Yes.

3      Q.      Was a Spanish translation of any document

4      provided to the Torralbas?

5              MS. REUTER:  Fifth Amendment privilege.

6      Q.      BY MS. HAMILTON:  Are you going to follow your

7      counsel's advice?

8      A.      Yes.

9              MS. HAMILTON:  I am going to mark as Exhibit 35

10     a document with a Bates stamp C21-TRLB-197.

11                      (Exhibit No. 35 was marked.)

12     Q.      BY MS. HAMILTON:  Have you ever seen this

13     document before?

14             MS. REUTER:  Fifth Amendment privilege.

15     Q.      BY MS. HAMILTON:  Are you going to follow your

16     counsel's advice?

17     A.      Yes.

18     Q.      Is there a reason that only Propero Torralba is

19     listed on this document and not Cirila?

20             MS. REUTER:  Fifth Amendment privilege.

21     Q.      BY MS. HAMILTON:  Are you going to follow your

22     counsel's advice?

23     A.      Yes.

24     Q.      Do you understand from this document that

25     Propero Torralba was approved to purchase the home in the

1   amount of $300,000?

2           MS. REUTER:  As she sits here today or at some

3   time prior to that?

4   Q.      BY MS. HAMILTON:  At the time you received this

5   letter on or about February 10th, 2006.

6           MS. REUTER:  Fifth Amendment privilege.

7   Q.      BY MS. HAMILTON:  Are you going to follow your

8   counsel's advice?

9   A.      Yes.

10  Q.      As you sit here today, do you have an

11  understanding of whether this document approved the

12  Torralbas -- I'm sorry, approved Propero Torralba to

13  purchase a home in the amount of $300,000?

14          MS. REUTER:  You can answer.

15          THE WITNESS:  What was that?  I'm sorry.

16          MS. HAMILTON:  Could you repeat the question.

17          (Record read as follows:  QUESTION:  As you sit

18  here today, do you have an understanding of whether this

19  document approved Propero Torralba to purchase a home in

20  the amount of $300,000?)

21          MS. REUTER:  As you sit here today, looking at

22  this piece of paper, do you understand that?

23          THE WITNESS:  Yes.

24  Q.      BY MS. HAMILTON:  After you received this

25  document on or about February 10th, 2006, did you look

233

```
1    for a home for Propero Torralba that costs in the
2    neighborhood of $300,000?
3            MS. REUTER:  Fifth Amendment privilege.
4    Q.      BY MS. HAMILTON:  Are you going to follow your
5    counsel's advice?
6    A.      Yes.
7            MS. HAMILTON:  I'm going to mark as Exhibit 36 a
8    document Bates stamped C21-TRLB-194.
9                    (Exhibit No. 36 was marked.)
10   Q.      BY MS. HAMILTON:  I will note that this document
11   is dated February 16th, 2006.  Have you ever seen this
12   document before?
13           MS. REUTER:  Fifth Amendment privilege.
14   Q.      BY MS. HAMILTON:  Are you going to follow your
15   counsel's advice?
16   A.      Yes.
17   Q.      When you received this document on or about
18   February 16, 2006, did you have an understanding of
19   whether it approved Propero Torralba to purchase a home
20   that cost $545,000?
21           MS. REUTER:  Fifth Amendment privilege.
22   Q.      BY MS. HAMILTON:  Are you going to follow your
23   counsel's advice?
24   A.      Yes.
25   Q.      As you sit here today, do you have an
```

234

1    understanding of whether this letter approved Propero

2    Torralba to purchase a home in the amount of $545,000?

3    A.       What was the question again?

4            MS. HAMILTON:  Could you repeat the question

5    back, please.

6            (Record read as follows:  QUESTION:  As you sit

7    here today, do you have an understanding of whether this

8    letter approved Propero Torralba to purchase a home in

9    the amount of $545,000?)

10           THE WITNESS:  Yes.

11   Q.       BY MS. HAMILTON:  That is your understanding of

12   what this document is?

13   A.       Yes.

14   Q.       Do you have an understanding of why five days

15   prior Propero Torralba was preapproved for $300,000 to

16   purchase a home?

17           MS. REUTER:  Fifth Amendment privilege.

18   Q.       BY MS. HAMILTON:  Are you going to follow your

19   counsel's advice?

20   A.       Yes.

21   Q.       Do you have an understanding of what changed

22   between February 10th and February 16th that increased

23   the amount of home that Propero Torralba could afford

24   from 300,000 to 545,000?

25           MS. REUTER:  Fifth Amendment privilege.

Norma Valdovinos                                          8/12/08

1   Q.      BY MS. HAMILTON:  Are you going to follow your

2   counsel's advice?

3   A.      Yes.

4           MS. HAMILTON:  I'm going to mark as Exhibit 37 a

5   document dated February 10th, 2006, Bates stamped

6   C21-TRLB-204.

7                   (Exhibit No. 37 was marked.)

8           MS. HAMILTON:  Take just a moment to review

9   that.

10          (Witness reviewing document.)

11  Q.      BY MS. HAMILTON:  Do you recall receiving this

12  document on or about February 10, 2006?

13          MS. REUTER:  Fifth Amendment privilege.

14  Q.      BY MS. HAMILTON:  Are you going to follow your

15  counsel's advice?

16  A.      Yes.

17  Q.      When you received this document on

18  February 10th, 2006, did you have an understanding that

19  it preapproved Propero Torralba to purchase a home in the

20  amount of $600,000?

21          MS. REUTER:  Fifth Amendment privilege.

22  Q.      BY MS. HAMILTON:  Are you going to follow your

23  counsel's advice?

24  A.      Yes.

25  Q.      As you sit here today, do you have an

1    understanding of whether this document preapproved

2    Propero Torralba to purchase a home in the amount of

3    $600,000?

4    A.      Yes.

5    Q.      Do you have an understanding as to why comparing

6    this document to Exhibit 35, these letters sent on the

7    same day, preapproved Propero Torralba for two different

8    purchase price of homes?

9            MS. REUTER:  Fifth Amendment privilege.

10   Q.      BY MS. HAMILTON:  Are you going to follow your

11   counsel's advice?

12   A.      Yes.

13   Q.      Do you see at the top of Exhibit 37 where it

14   indicates -- it appears to indicate that this fax was

15   sent on February 13th, 2006?  On the top, left-hand

16   corner.

17   A.      Yes.

18   Q.      Do you have any idea why this fax would have

19   been sent three days after it was drafted?

20           MS. REUTER:  Fifth Amendment privilege.

21   Q.      BY MS. HAMILTON:  Are you going to follow your

22   counsel's advice?

23   A.      Yes.

24           MS. HAMILTON:  I'm going to mark as Exhibit 38 a

25   document titled, "U.S. Housing -- I'm sorry, U.S.

Norma Valdovinos                                      8/12/08

1    Department of Housing and Urban Development, Bates stamp

2    at the bottom C21-TRLB-84.

3                    (Exhibit No. 38 was marked.)

4            MS. HAMILTON:  Could you please take a few

5    moments to review this document.

6            (Witness reviewing document.)

7    Q.      BY MS. HAMILTON:  Have you ever seen this

8    document before?

9            MS. REUTER:  Fifth Amendment privilege.

10   Q.      BY MS. HAMILTON:  Are you going to follow your

11   counsel's advice?

12   A.      Yes.

13   Q.      If I could direct your attention to line 702 of

14   this document where it states 72,851 -- I'm sorry,

15   $17,850 to Century 21 Golden Hills.  Do you see where I'm

16   looking?

17   A.      Yes.

18   Q.      Is it your understanding that Century 21 Golden

19   Hills received $17,850 in commission, based on this

20   transaction?

21           MS. REUTER:  Fifth Amendment privilege.

22   Q.      BY MS. HAMILTON:  Are you going to follow your

23   counsel's advice?

24   A.      Yes.

25   Q.      Did you receive any portion of this amount

```
1    listed on 9702?

2            MS. REUTER:   Fifth Amendment privilege.

3    Q.      BY MS. HAMILTON:   Are you going to follow your

4    counsel's advice?

5    A.      Yes.

6    Q.      Is the $17,850 listed on line 702, was this sum

7    split between anyone?

8            MS. REUTER:   Fifth Amendment privilege.

9    Q.      BY MS. HAMILTON:   Are you going to follow your

10   counsel's advice?

11   A.      Yes.

12   Q.      If I could direct your attention down to line

13   704, "Escrow administration fee to Century 21 Golden

14   Hills."  Do you see that?

15   A.      Yes.

16   Q.      Do you know what Century 21 Golden Hills did to

17   earn this escrow fee?

18           MS. REUTER:   Fifth Amendment privilege.

19   Q.      BY MS. HAMILTON:   Are you going to follow your

20   counsel's advice?

21   A.      Yes.

22   Q.      Do you know whether this $350 escrow

23   administration fee was split among anyone at Century 21

24   Golden Hills?

25           MS. REUTER:   Fifth Amendment privilege.
```

1    Q.       BY MS. HAMILTON:  Are you going to follow your

2    counsel's advice?

3    A.       Yes.

4    Q.       Do you know whether the escrow administration

5    fee found on line 704 was split between Century 21 Golden

6    Hills and any third party?

7            MS. REUTER:  I'm sorry.  Say that again.

8            MS. HAMILTON:  Could you repeat the question.

9            (Record read as follows:  QUESTION:  Do you know

10   whether the escrow administration fee found on line 704

11   was split between Century 21 Golden Hills and any third

12   party?)

13           MS. REUTER:  Fifth Amendment privilege.

14   Q.       BY MS. HAMILTON:  Are you going to follow your

15   counsel's advice?

16   A.       Yes.

17   Q.       If I could direct your attention to line 903,

18   where it states, "Hazard insurance premium for 12 months

19   to Paul Curiel Insurance Agency."

20           Do you have an understanding as to how

21   Mr. Torralba came to have hazard insurance from Paul

22   Curiel?

23           MS. REUTER:  Fifth Amendment privilege.

24   Q.       BY MS. HAMILTON:  Are you going to follow your

25   counsel's advice?

1    A.       Yes.

2    Q.       Did you recommend to Mr. Torralba that he take

3    out hazard insurance with Paul Curiel Insurance?

4             MS. REUTER:  Fifth Amendment privilege.

5    Q.       BY MS. HAMILTON:  Are you going to follow your

6    counsel's advice?

7    A.       Yes.

8    Q.       Did you fail to inform Mr. Torralba that he had

9    been signed up for hazard insurance with Paul Curiel

10   Insurance?

11            MS. REUTER:  Fifth Amendment privilege.

12   Q.       BY MS. HAMILTON:  Are you going to follow your

13   counsel's advice?

14   A.       Yes.

15   Q.       If I could direct your attention down to line

16   1106, "Notary fees to Mary Linder."  Do you see that?

17   The same page, line 1106.  It's towards the middle of the

18   page.

19   A.       Okay.

20   Q.       Do you know Mary Linder?

21   A.       Mary Linder?  I don't remember.  I don't recall.

22   Q.       You don't know if you've ever met her before?

23   A.       Probably, but -- I probably don't remember her

24   name.

25   Q.       Okay.  Do you have an understanding as to

1    counsel's advice?

2    A.        Yes.

3    Q.        When Margerita Narvaez, Mr. Gonzalez and a third

4    individual, possibly a cousin, came to meet with you in

5    your office, why were they there?

6    A.        They wanted to buy a house.

7    Q.        And why did they come to see you?

8    A.        They wanted to see some houses, like printout.

9    Q.        Did you show them printouts at that first

10   meeting with them?

11   A.        I think I showed them something on the computer.

12   Q.        Did you show them any other documents?

13             MS. REUTER:   Fifth Amendment privilege.

14   Q.        BY MS. HAMILTON:   Are you going to follow your

15   counsel's advice?

16   A.        Yes.

17   Q.        Did you have an understanding as to whether

18   Mr. Gonzalez was looking to purchase a home by himself or

19   with anyone else?

20             MS. REUTER:   Fifth Amendment privilege.

21   Q.        BY MS. HAMILTON:   Are you going to follow your

22   counsel's advice?

23   A.        Yes.

24   Q.        Did Mr. Gonzalez tell you how much she could

25   afford to pay for a home?

1    Q.      Did you refer Mr. Gonzalez to Linda Tran for

2    financing?

3            MS. REUTER:  Fifth Amendment privilege.

4    Q.      BY MS. HAMILTON:  Are you going to follow your

5    counsel's advice?

6    A.      Yes.

7    Q.      Did Linda Tran ever tell you what price range of

8    home Raul Gonzalez could afford?

9            MS. REUTER:  Fifth Amendment privilege.

10   Q.      BY MS. HAMILTON:  Are you going to follow your

11   counsel's advice?

12   A.      Yes.

13   Q.      How long did this first meeting at your office

14   last with Margerita Narvaez and Mr. Gonzalez and a

15   cousin?

16           MS. REUTER:  You can answer.

17           THE WITNESS:  About an hour.

18   Q.      BY MS. HAMILTON:  Did you have a subsequent

19   meeting with Mr. Gonzalez and Ms. Narvaez and the cousin?

20   A.      Yes.

21   Q.      And when was that?

22   A.      About a few weeks later.

23   Q.      And what was the purpose of that meeting?

24   A.      Let me think.  I don't remember.

25   Q.      Do you remember whether they had selected a home

1    at that time?

2    A.       I'm sorry?

3    Q.       Do you remember when they came back for the

4    subsequent meeting if they had already found a home or if

5    they --

6    A.       Yes.

7    Q.       -- were still looking for a home?

8             I'm sorry.  Which one?

9    A.       They already -- they had already found a home.

10   Q.       They had already found a home?

11   A.       Yes.

12   Q.       And they came back to meet with you a second

13   time?

14   A.       Yes.

15   Q.       But you don't recall what took place during that

16   meeting?

17   A.       No.

18   Q.       Do you recall how long this meeting lasted?

19   A.       About 20 minutes.

20   Q.       Did you have any other meetings with them?

21   A.       I don't recall.

22   Q.       Did you visit the house that Mr. Gonzalez

23   ultimately purchased?

24   A.       Yes.

25   Q.       Did you visit it with him?

Norma Valdovinos                                          8/12/08

1    "$15,250 to Century 21 Golden Hills."  Do you see that?

2    A.      Yes.

3    Q.      Did you receive this sum of money?

4    A.      No.

5    Q.      Who received it?

6    A.      The company, Century 21.

7    Q.      Did you receive a portion of this money?

8    A.      Yes.

9    Q.      Do you recall how much?

10          MS. REUTER:  Objection, right to privacy on this

11   one.

12   Q.      BY MS. HAMILTON:  Are you going to follow your

13   counsel's advice?

14   A.      Yes.

15   Q.      Do you know whether this fee was split with

16   anyone else, aside from you?

17          MS. REUTER:  Fifth Amendment privilege.

18   Q.      BY MS. HAMILTON:  Are you going to follow your

19   counsel's advice?

20   A.      Yes.

21   Q.      I'm going to direct your attention, if I could,

22   to the next page of this document, line No. 1306, where

23   it says, "Transaction fee to C21 Golden Hills for $350."

24   Do you see that?

25   A.      Yes.

Norma Valdovinos                                    8/12/08

```
 1    Q.        Did you receive this money?

 2    A.        No.

 3    Q.        Do you know who did?

 4    A.        The company.

 5    Q.        Do you know if this money was split amongst

 6    anyone at Century 21 Golden Hills?

 7    A.        No.

 8    Q.        You don't have an understanding one way or the

 9    other?

10    A.        No.

11    Q.        Do you know what was -- what work was performed

12    by Century 21 Golden Hills to earn this fee?

13              MS. REUTER:   Fifth Amendment privilege.

14    Q.        BY MS. HAMILTON:   Are you going to follow your

15    counsel's advice?

16    A.        Yes.

17    Q.        Do you have an understanding of the phrase

18    "transaction fee"?

19    A.        I'm sorry.   What was your question?

20    Q.        Do you have an understanding of the phrase

21    "transaction fee"?

22    A.        Transaction fee?   I don't understand the

23    question.

24    Q.        On line 1306, which is on the third page of this

25    packet, it says, "Transaction fee to C21 Golden Hills."
```

1    A.        Huh-huh.

2    Q.        I'm just wondering, does the phrase "transaction

3    fee" mean anything to you?

4              MS. REUTER:   It's a "yes" or "no" question.

5              THE WITNESS:   Yes.

6    Q.        BY MS. HAMILTON:   And what does the phrase

7    "transaction fee" mean to you?

8              MS. REUTER:   Fifth Amendment privilege.

9    Q.        BY MS. HAMILTON:   Are you going to follow your

10   counsel's advice?

11   A.        Yes.

12             MS. HAMILTON:   I believe that concludes my

13   questions regarding the Gonzalez family.

14             If I could briefly revisit Mr. Ramirez.   I

15   neglected to show you his HUD-1, which I would like to

16   mark as Exhibit 41.

17                    (Exhibit No. 41 was marked.)

18   Q.        BY MS. HAMILTON:  Have you ever seen this

19   document before?

20             MS. REUTER:   Fifth Amendment privilege.

21   Q.        BY MS. HAMILTON:   Are you going to follow your

22   counsel's advice?

23   A.        Yes.

24   Q.        Did you contribute any information to this

25   document?

```
 1              MS. REUTER:   Fifth Amendment privilege.
 2    Q.        BY MS. HAMILTON:   Are you going to follow your
 3    counsel's advice?
 4    A.        Yes.
 5    Q.        Can I direct your attention to the top of the
 6    page, line E, where it says the, "Name of Seller:
 7    Gustavo Valdovinos."
 8              Is Gustavo Valdovinos related to you?
 9              MS. REUTER:   Fifth Amendment privilege.
10              MS. HAMILTON:   I don't believe your counsel has
11    instructed you not to --
12              MS. REUTER:   No.  But she's perfectly in her
13    capacity to invoke it for herself.  If she does, she
14    does.
15    Q.        BY MS. HAMILTON:   So you're invoking your Fifth
16    Amendment privilege as to the question of whether you're
17    related to Gustavo Valdovinos?
18    A.        Yes.
19    Q.        Do you fear criminal prosecution for telling me
20    whether or not you are related to Gustavo Valdovinos?
21    A.        Yes.
22    Q.        So you think that your relationship to him can
23    lead to you being criminally prosecuted?
24    A.        Yes.
25              MS. REUTER:   Okay.  And I would just tell your
```

```
 1    counsel that it has to be a reasonable fear of criminal
 2    prosecution.
 3              MS. HAMILTON:  I don't know if you want to
 4    confer on this.
 5              MS. REUTER:  Is that okay?  Can I go ahead and
 6    talk to my client for a second?
 7              MS. HAMILTON:  Sure.  We can take a break.
 8              (Off the record at 4:43 p.m.  Back on the record
 9    at 4:48 p.m.)
10              MS. REUTER:  Do you want to go back to your
11    Gustavo Valdovinos questions.
12              MS. HAMILTON:  Are we back on?
13              THE REPORTER:  Yes.
14    Q.        BY MS. HAMILTON:  Do you know an individual by
15    the name of Gustavo Valdovinos?
16    A.        Yes.
17    Q.        And who is Gustavo Valdovinos?
18    A.        He's the brother of someone of who I was married
19    to.
20    Q.        So he's the brother of your ex-husband?
21    A.        Yes.
22    Q.        And so this is the same Gustavo Valdovinos who
23    is listed at line E of Exhibit 41?
24    A.        Yes.
25    Q.        If I could direct your attention to line 701 on
```

Norma Valdovinos                                          8/12/08

1    the next page, where it says -- I'm sorry, where it says,
2    "$19,410 to Century 21 Golden Hills."
3    A.       Yes.  I see it.
4    Q.       Do you -- did you receive a portion of this fee?
5    A.       Yes.
6    Q.       And what percentage of this sum did you receive?
7             MS. REUTER:  Invasion of privacy.  Don't answer
8    that.
9    Q.       BY MS. HAMILTON:  Are you going to follow your
10   counsel's advice?
11   A.       Yes.
12   Q.       Do you know if this fee was split between
13   yourself and anyone else at Century 21 Golden Hills?
14            MS. REUTER:  Fifth Amendment privilege.
15   Q.       BY MS. HAMILTON:  Are you going to follow your
16   counsel's advice?
17   A.       Yes.
18   Q.       And one additional question regarding Gustavo
19   Valdovinos.
20            At the time of this transaction, were you still
21   married to Mr. Gustavo Valdovinos's husband -- I'm sorry,
22   brother.  Let me rephrase that question.
23            At the time of this transaction, were you still
24   married to the brother of Gustavo Valdovinos?
25   A.       At the time of the --

261

Norma Valdovinos                                                          8/12/08

```
 1    there been any complaints filed against any of your
 2    coworkers?
 3                MS. REUTER:  Calls for speculation.
 4    Q.      BY MS. HAMILTON:  Do you have an understanding
 5    of whether your coworkers have been named in any
 6    lawsuits?
 7    A.      I have no idea.  I do not know.
 8                MS. REUTER:  Other than this one, of course.
 9                MS. HAMILTON:  Yes.
10    Q.      You don't know?
11    A.      I don't know.
12    Q.      Have there been any complaints filed against you
13    by any federal agency?
14    A.      Not that I know.
15    Q.      Have there been any complaints filed against you
16    by any state agency?
17    A.      Not that I know.
18    Q.      Have there been any complaints filed against you
19    by any local agencies?
20    A.      No.
21    Q.      Are you aware of any consumer complaints against
22    you?
23                MS. REUTER:  Vague as to "consumer complaints."
24    What does that mean?
25    Q.      BY MS. HAMILTON:  Are you aware of any
```

263

REPORTER'S CERTIFICATE

1

2

3     I certify that the witness in the foregoing

4  deposition.

5              NORMA VALDOVINOS,

6  was by me duly sworn to testify in the within-entitled

7  cause; that said deposition was taken at the time and

8  place therein named; that the testimony of said witness

9  was reported by me, a duly Certified Shorthand Reporter

10  of the State of California authorized to administer oaths

11  and affirmations, and said testimony, pages 1 through 266

12  was thereafter transcribed into typewriting.

13     I further certify that I am not of counsel or

14  attorney for either or any of the parties to said

15  deposition, nor in any way interested in the outcome of

16  the cause named in said deposition.

17     IN WITNESS WHEREOF, I have hereunto set my hand this

18  17th day of August, 2008.

19

20     _Sandra Bunch Vander Pol_

21     SANDRA BUNCH VANDER POL

22     Certified Shorthand Reporter

23     Certificate No. 3032

24

25

267